## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0403 (TFH) |
| | ) | |
| **DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFF'S CROSS-MOTION FOR *IN CAMERA* REVIEW

Plaintiff Electronic Frontier Foundation ("EFF") respectfully moves for *in camera* review of the agency records responsive to EFF's Freedom of Information Act request to defendant Department of Justice ("DOJ") dated January 23, 2007, which records have been withheld in their entirety by DOJ. A memorandum of points and authorities in support of this motion is filed herewith.

Respectfully submitted,

*/s/David L. Sobel*
DAVID L. SOBEL
D.C. Bar No. 360418

MARCIA HOFMANN
D.C. Bar. No. 484136

Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0403 (TFH) |
| | ) | |
| **DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF PLAINTIFF'S MOTION FOR _IN CAMERA_ REVIEW**

Plaintiff Electronic Frontier Foundation ("EFF") initiated this action under the Freedom

of Information Act ("FOIA"), 5 U.S.C. § 552, to obtain disclosure of records concerning actions

taken by the Foreign Intelligence Surveillance Court ("FISC") that purportedly authorize

surveillance activities within the United States that the Executive Branch had previously asserted

could be conducted without such judicial authorization.  Defendant Department of Justice

("DOJ") has moved for summary judgment, asserting that all of the material EFF requests is

exempt from disclosure in its entirety.  Plaintiff opposes the government's motion and cross-

moves for _in camera_ review of the withheld material.

**Background**

On December 16, 2005, the _New York Times_ reported on its front page that "after the

Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop

on Americans and others inside the United States to search for evidence of terrorist activity

without the court-approved warrants ordinarily required for domestic spying."  James Risen and

Eric Lichtblau, _Bush Lets U.S. Spy on Callers Without Courts_, NY Times, Dec. 15, 2005.  One

day after the publication of the *Times* article, on December 17, 2005, President Bush confirmed

the existence of the warrantless surveillance program.  President's Radio Address, December 17,

2005.  The President and other Executive Branch officials subsequently referred to the program

as the "Terrorist Surveillance Program" (hereinafter "the surveillance program").  Complaint, ¶

6; Answer, ¶ 6.

Since its disclosure, the Administration's purported legal rationale for the warrantless

surveillance program was the focus of great controversy and public debate.  Within hours of the

publication of the *New York Times* report, Senator Arlen Specter, then-Chairman of the Senate

Judiciary Committee, said that the surveillance program was "wrong, clearly and categorically

wrong  . . . . This will be a matter for oversight by the Judiciary Committee as soon as we can get

to it in the new year — a very, very high priority item."  *Specter Says Senate to Probe Report*

*U.S. Broke Law on Spying,* Bloomberg.com, Dec. 16, 2005.  Other members of the Judiciary

Committee, on both sides of the aisle, also questioned the legality of the surveillance program;

for instance, "[a] prominent conservative on the committee [Sen. Sam Brownback] said he is

troubled by the legal arguments the Bush administration has presented for establishing the

National Security Agency program."  Douglass K. Daniel, *Specter Seeks AG's Testimony on*

*Spying*, Associated Press, Jan. 8, 2006.  "He said he was 'troubled by . . . the grounds that the

administration says that they did these on, the legal basis, and I think we need to look at that far

more broadly and understand it a great deal.'"  *Id.*[1]

---

[1]  The Congressional Research Service ("CRS") issued a memorandum last year assessing the
legality of the warrantless surveillance program.  Congressional Research Service, *Presidential*
*Authority to Conduct Warrantless Electronic Surveillance to Gather Foreign Intelligence*
*Information*, Jan. 5, 2006 (*available at* http://www.fas.org/sgp/crs/intel/m010506.pdf).  CRS
noted that "[t]he Administration's views have been the subject of debate," *id.* at 3, and concluded
that "the Administration's legal justification . . . does not seem to be as well-grounded [as the
Justice Department has suggested]," *id.* at 44.

In a letter to Senate Judiciary Committee Chairman Patrick Leahy and ranking minority member Arlen Specter dated January 17, 2007, the Attorney General revealed that the FISC had recently issued orders relating to the surveillance program. He wrote, *inter alia*,

> I am writing to inform you that on January 10, 2007, a Judge of the Foreign Intelligence Surveillance Court issued orders authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization. As a result of these orders, any electronic surveillance that was occurring as part of the Terrorist Surveillance Program will now be conducted subject to approval of the Foreign Intelligence Surveillance Court.

Defendant's Exhibit A  (attached to the Declaration of Matthew G. Olsen ("Olsen Decl.")).

At a press briefing on January 17, 2007, White House Press Secretary Tony Snow discussed the FISC action described in the Attorney General's letter. Mr. Snow said, *inter alia*, that "[t]he FISA Court has published the rules under which such [surveillance] activities may be conducted," that "the Foreign Intelligence Surveillance Court has put together its guidelines and its rules [governing the conduct of such surveillance]," and that the Administration's electronic surveillance activities will "continue[] under the rules that have been laid out by the court." Press Briefing by Tony Snow, Jan. 17, 2007; Complaint, ¶ 8; Answer, ¶ 8.

The revelation of FISC orders and rules relating to the surveillance program generated an immediate request from Congress for public disclosure. In a letter to FISC Presiding Judge Colleen Kollar-Kotelly dated January 17, 2007, Sens. Leahy and Specter referenced the letter they received from the Attorney General and wrote:

> On behalf of the Senate Judiciary Committee, we ask that you provide the Committee with copies of the [FISC] orders and opinions.  We also request that you make the Court's decision public to the extent possible.
>
> These are matters of significant interest to the Judiciary Committee and the Congress and to the American people, as well. We all have an interest in ensuring

that the government is performing surveillance necessary to prevent acts of terrorism and that it is doing so in ways that protect the basic rights of all Americans, including the right to privacy.

Plaintiff's Exhibit A (attached hereto).  Judge Kollar-Kotelly responded that same day and indicated that she had "no objection" to the Judiciary Committee's request:

> I am writing in response to your request that I provide the Committee on the Judiciary with "copies of the orders and opinions" issued in the matter referenced in Attorney General Alberto R. Gonzales' letter to you, dated January 17, 2007. As the presiding judge of the Foreign Intelligence Surveillance Court (FISC), I have no objection to this material being made available to the Committee. However, the Court's practice is to refer any requests for classified information to the Department of Justice.  In this instance, the documents that are responsive to your request contain classified information and, therefore, I would ask you to discuss the matter with the Attorney General or his representatives.  If the Executive and Legislative Branches reach agreement for access to this material, the Court will, of course, cooperate with the agreement.

Plaintiff's Exhibit B (attached hereto).

By letter sent by facsimile to defendant DOJ's Office of Intelligence Policy and Review ("OIPR") on January 23, 2007, plaintiff requested under the FOIA the following records:

> copies of all Foreign Intelligence Surveillance Court ("FISC") orders referenced by the Attorney General in his letter to Sens. Leahy and Specter, and all FISC rules and guidelines associated with such orders and/or referenced by Mr. Snow in the January 17 press briefing.

Defendant's Exhibit B (attached to Olsen Decl.), at 2.  Plaintiff also requested that processing of its request be expedited pursuant to the applicable DOJ regulation, 28 CFR § 16.5(d).  By letter to plaintiff dated January 26, 2007, defendant DOJ acknowledged that it received plaintiff's FOIA request on January 23, 2007.  Defendant's Exhibit C (attached to Olsen Decl.).  Upon defendant DOJ's failure to respond to the request within the statutorily mandated time period, 5 U.S.C. § 552 (a)(6)(A), plaintiff initiated this action on February 27, 2007.  The agency denied plaintiff's request by letter dated March 9, 2007, asserting that "two documents that are responsive to [the] request" had been located and that "these documents have been withheld in

their entirety pursuant to Exemptions 1, 5, 6, and 7(C) of the FOIA." Defendant's Exhibit D (attached to Olsen Decl.), at 1.

Plaintiff is not alone in its unsuccessful efforts to obtain disclosure of information concerning the FISC actions relating to the surveillance program. The Senate Judiciary Committee's attempts to obtain the FISC material from the Department of Justice have also been unavailing. On May 21, 2007, Sens. Leahy and Specter wrote to the Attorney General to reiterate the Committee's longstanding requests for various documents, including "the January 2007 FISC orders to which you refer in your January 17, 2007 letter to us and all other opinions or orders of the FISA court with respect to this surveillance." Plaintiff's Exhibit C (attached hereto) at 3. The Senators noted the Administration's unwillingness to respond to the Committee's requests:

> This Committee has made no fewer than eight formal requests over the past 18 months — to the White House, the Attorney General, or other Department of Justice officials seeking documents and information related to this surveillance program. These requests have sought the Executive Branch legal analysis of this program and documents reflecting its authorization by the President. You have rebuffed all requests for documents and your answers to our questions have been wholly inadequate and, at times, misleading.

*Id*. at 1. They further noted that the Committee currently is considering legislation relating to surveillance activities, and that the requested information is "critical" to the legislative process:

> [T]he Administration has offered a legislative proposal that it contends seeks to "modernize" the Foreign Intelligence Surveillance Act (FISA). As you know, the Judiciary Committee has historically overseen changes to FISA and it is this Committee's responsibility to review the Administration's proposal with great care. The draft legislation would make dramatic and far-reaching changes to a critical national security authority. Before we can even begin to consider any such legislative proposal, we must be given appropriate access to the information necessary to carry out our oversight and legislative duties.
>
> . . . You testified in January that the warrantless wiretapping program had been terminated and that henceforth surveillance would be conducted pursuant to authorization from the FISA Court. To consider any changes to FISA, it is critical

that this Committee understand how the Department and the FISA Court have interpreted FISA and the perceived flaws that led the Administration to operate a warrantless surveillance program outside of FISA's provisions for over five years.

*Id.* at 2.

## ARGUMENT

In opposing the government's motion for summary judgment, plaintiff does not dispute that *some* portion of the responsive records is likely to be properly exempt from disclosure under the FOIA exemptions upon which DOJ relies.  Plaintiff submits, however, that the material may not properly be withheld in its *entirety*.  As we show, defendant has not even attempted to comply with the FOIA's fundamental requirement to conduct a "segregability" analysis, and the circumstances surrounding the withheld material strongly suggest that segregable portions of the disputed FISC material can, in fact, be disclosed without harm to national security or other cognizable interests.  As such, plaintiff respectfully requests that the Court conduct an *in camera* review of the withheld material to identify those portions that must be disclosed.

### I.  The Court Should Apply the FOIA Consistently with its Core Purpose of Government Disclosure and Informed Public Debate

The Freedom of Information Act is grounded in the "fundamental principle of public access to Government documents," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989), and in the American public's right to know "what their Government is up to."  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation and internal quotation marks omitted).  The basic purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Accordingly, the drafters of the FOIA intended "that the courts interpret this legislation broadly, as a disclosure statute and not as an excuse to withhold

information from the public." 112 Cong. Rec. 13654 (June 20, 1966) (statement of then-Rep. Donald Rumsfeld).

The FOIA directs government agencies to disclose certain types of records upon request. *See* 5 U.S.C. § 552(a)(3). The statute contains nine exemptions from its broad mandate of disclosure, *see* 5 U.S.C. § 552(b), "'[b]ut these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' Accordingly, these exemptions 'must be narrowly construed.'" *John Doe Agency*, 493 U.S. at 152 (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

In a FOIA case, "[t]he government is entitled to summary judgment if no material facts are in dispute and if it demonstrates either that withheld or redacted documents are not required to be disclosed under § 552(a) or are exempt from disclosure under § 552(b)." *Billington v. U.S. Dep't of Justice*, 233 F.3d 581, 583-84 (D.C. Cir. 2000). "Very importantly, 'the burden is on the agency to sustain its action.'" *Founding Church of Scientology of Wash., D.C., Inc. v. NSA*, 610 F.2d 824, 830 (D.C. Cir. 1979) (quoting 5 U.S.C. § 552(a)(4)(B)). Consequently, when the government contends that documents are exempt from disclosure, "[t]he government bears the burden of proving that the withheld information falls within the exemptions it invokes," *Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003), "even when the underlying facts are viewed in the light most favorable to the requester." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

As the Senate Judiciary Committee has noted in its efforts to obtain the FISC material at issue here, an understanding of how the "the FISA Court ha[s] interpreted FISA" is critical to the public debate on the surveillance program and proposed changes to the statute. Plaintiff's Exhibit C at 2. Indeed, the public oversight mechanism provided by the FOIA is central to open and

democratic debate on critical policy issues such as this.  As the Supreme Court has observed, the Act is "a means for citizens to know 'what the Government is up to.'  This phrase should not be dismissed as a convenient formalism.  *It defines a structural necessity in a real democracy*." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-172 (2004) (emphasis added; citation omitted).  In its *de novo* review of the agency's withholding decision, 5 U.S.C. § 552(a)(4)(B), the Court should seek to vindicate the Act's core purpose of facilitating informed democratic debate on critical issues of public policy.[2]

## II.  DOJ has Failed to Comply with the FOIA's Segregability Requirement

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  The D.C. Circuit has made clear that "[t]he 'segregability' requirement applies to all documents and all exemptions in the FOIA."  *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984); *see also Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992).  This comports with the policy of disclosure and prevents the withholding of entire documents, *see Billington*, 233 F.3d at 586, unless the agency can demonstrate that the non-exempt portions of a document are "inextricably intertwined with exempt portions." *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1976)).

So important is the segregability requirement to FOIA's broad disclosure mandate that trial courts have an affirmative duty to consider the issue of segregability *sua sponte*. *Trans-*

---

[2]  As this Court noted in another FOIA case seeking disclosure of information about the surveillance program, "a meaningful and truly democratic debate on the legality and propriety of the . . . surveillance program cannot be based solely upon information that the Administration voluntarily chooses to disseminate."  *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 n.9 (D.D.C. 2006) (citation and internal quotation marks omitted).

*Pacific Policing Agreement*, 177 F.3d at 1028; *see also Billington*, 233 F.3d at 586. In fact, "[i]t is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Schiller*, 964 F.2d at 1210 (citations and internal quotation marks omitted); *see also Billington*, 233 F.3d at 586.

In this case, the government has not conducted any segregation analysis, nor made any apparent effort to segregate non-exempt, releasable material from the withheld records. Instead, defendant DOJ hopes the general assertion that the records relate to the surveillance program is sufficient to persuade the Court to assume blanket withholding is appropriate. Importantly, the government's memorandum in support of summary judgment does not address segregability at all, nor does the sole declaration on which it relies. *See* Olsen Decl. Nonetheless, the government has invoked three FOIA exemptions to conceal every word of the material responsive to plaintiff's request.[3]

The government's indiscriminate approach plainly warrants judicial scrutiny. FOIA's segregability requirement obliges an agency to perform a "segregability analysis" that distinguishes exempt from non-exempt material within each document that is responsive to the FOIA request. *See Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C. Cir. 1973) ("An entire document is not exempt merely because an isolated portion need not be disclosed. Thus, the agency may not sweep a document under a general allegation of exemption, even if that general allegation is correct with regard to part of the information."). Furthermore, even if an agency can show that certain material in a document is exempt but cannot be reasonably segregated from non-exempt information, that agency must also "describe what proportion of the information is non-exempt

---

[3] In its letter to plaintiff dated March 9, 2007, defendant DOJ asserted that the responsive material was being withheld pursuant to Exemptions 1, 3, 6 and 7(C). Defendant's Exhibit D at 1. The agency appears to have abandoned its reliance on Exemption 6 in this litigation.

and how that material is dispersed throughout the document," such that "both litigants and judges will be better positioned to test the validity of the agency's claim that the non-exempt material is not segregable." *Mead Data Cent. Inc.*, 566 F.2d at 261.

The government has not made any effort to comply with these standards. Moreover, the circumstances of this particular case reinforce the conclusion that the government's generalized explanation are wholly inadequate as a basis for finding that no reasonably segregable portions exist.

## A. **FISA Contemplates Public Disclosure**

First, the Foreign Intelligence Surveillance Act itself contemplates that the kind of material at issue in this case can be presented and described in "unclassified form." As recently amended, the statute provides, in pertinent part,

(1) The [Foreign Intelligence Surveillance Court and the Foreign Intelligence Surveillance Court of Review] may establish such *rules and procedures*, and take such actions, as are reasonably necessary to administer their responsibilities under this Act.

(2) The *rules and procedures* established under paragraph (1), and any modifications of such rules and procedures, shall be recorded, and shall be transmitted to the following:

(A) All of the judges on the [Foreign Intelligence Surveillance Court].
(B) All of the judges on the [Foreign Intelligence Surveillance Court of Review].
(C) The Chief Justice of the United States.
(D) The Committee on the Judiciary of the Senate.
(E) The Select Committee on Intelligence of the Senate.
(F) The Committee on the Judiciary of the House of Representatives.
(G) The Permanent Select Committee on Intelligence of the House of Representatives.

(3) The transmissions required by paragraph (2) *shall be submitted in unclassified form*, but may include a classified annex.

50 U.S.C. § 1803(f) (*as amended by* Pub. L. 109-177, 120 Stat. 192 (March 9, 2006)) (emphases added).

There is no question that the material withheld in this case includes such "rules and procedures."  As noted, White House spokesman Tony Snow announced on January 17 that "[t]he FISA Court has published the rules under which such [surveillance] activities may be conducted," that "the Foreign Intelligence Surveillance Court has put together its guidelines and its rules [governing the conduct of such surveillance]," and that the Administration's electronic surveillance activities will "continue[] under the rules that have been laid out by the court." Press Briefing by Tony Snow, Jan. 17, 2007; Complaint, ¶ 8; Answer, ¶ 8.  The government's declarant, Mr. Olsen, states that "[t]he material withheld . . . consists of orders signed by the FISC and procedures that regulate the acquisition, retention and dissemination of information about United States persons, including persons who are not the targets of FISA collection." Olsen Decl., ¶ 11.  It is thus clear that at least some of the material at issue here is precisely the type of material that can – and indeed must – be made available in "unclassified form."

## B.  <u>Material Generated by the FISA Judicial Process has been Disclosed</u>

Second, despite the government's suggestion that *every* bit of material emanating from the FISA judicial process is "routinely classified," Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 13, such material has, in fact, been publicly disclosed when, as in this case, the judicial deliberations touched upon significant issues of public concern.  Thus, in the first (and to date, only) proceeding before the Foreign Intelligence Surveillance Court of Review, the court's opinion was released with only minor redactions. *In re Sealed Case No. 02-001*, 310 F.3d 717, 720 n.3 (F.I.S.C.R. 2002) ("The bracketed information is classified and has been redacted from the public version of the

opinion.").[4]  Likewise, defendant DOJ released a public version of its brief in that proceeding, Plaintiff's Exhibit E (attached hereto), further demonstrating that discussion of matters arising under FISA are indeed susceptible to "reasonable segregation" and public disclosure.

The government's brief in *In re Sealed Case No. 02-001* discussed in detail – *and quoted* – the FISC order and opinion that were under review by the appellate court.  *See, e.g., id.* at 17-22.  Indeed, the FISC opinion of May 17, 2002, is itself publicly available.  Plaintiff's Exhibit F (attached hereto).  It is thus clear that, notwithstanding the government's suggestion of a need for *total* secrecy, there is a strong precedent for public disclosure of the type of material at issue here, subject to appropriate and limited redaction.

### C.  FISC's Presiding Judge does not Object to Disclosure

Finally, this case presents an unusual circumstance in which the presiding judge of the Foreign Intelligence Surveillance Court – which produced the disputed material – has clearly and unequivocally indicated that she has "no objection" to the request of the Senate Judiciary Committee that the material be made available to the Committee and "public to the extent possible."  Plaintiff's Exhibits A & B.  It is likely that Judge Kollar-Kotelly's lack of objection stems from the fact that the requested material, like the earlier FISC and FISCR material made public, primarily addresses *legal issues*, as opposed to *operational details*.  Indeed, Sens. Leahy and Specter, in their recent letter to the Attorney General "emphasize[d] that [they] are seeking the legal justifications and analysis underlying these matters and not the specific operational details or information obtained by the surveillance."  Plaintiff's Exhibit C at 3.

---

[4] To enable the Court to see that only a small amount of information was redacted from the Court of Review's opinion, plaintiff is filing herewith, as Plaintiff's Exhibit D, the slip opinion released by the court.

Plaintiff does not dispute that the government has met its burden of demonstrating that the documents contain *some* exempt material. That showing, however, is not enough to meet the segregability standard set forth by the D.C. Circuit: "the focus in the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent. Inc.*, 566 F.2d at 260. As the D.C. Circuit has long recognized, "unless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Id.* at 261. The fact that the requested documents concern a matter of national security does not insulate the government from FOIA's segregability command.

### III. *In Camera* Review of the Withheld Material is Necessary for the Court to Conduct a Meaningful *De Novo* Review of DOJ's Actions

Plaintiff respectfully requests that the Court conduct an *in camera* review of the withheld records. In reviewing the validity of an agency's exemption claims, the Court "may examine the contents of such agency records *in camera* to determine whether such records or any part thereof shall be withheld." 5 U.S.C. § 552(a)(4)(B). The decision whether to undertake *in camera* review is left to the trial court's discretion. *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998). "*In camera* review is particularly appropriate when the documents withheld are brief and limited in number." *Maynard v. CIA*, 986 F.2d 547, 558 (1st Cir. 1993) (citations omitted); *see also Donovan v. FBI*, 806 F.2d 55, 59 (2d Cir. 1986) ("*in camera* inspection has been found to be appropriate when only a small number of documents are to be examined") (citation omitted).[5]

---

[5] There is some confusion as to the number of documents at issue here. In its March 9, 2007, response to EFF's request, defendant DOJ stated unequivocally that it had "located two

Summary judgment without *in camera* review is appropriate only where the government's affidavits "provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith." *Ctr. for Auto Safety*, 731 F.2d at 22; *see also Allen v. CIA*, 636 F.2d 1287, 1291 (D.C. Cir. 1980), *overruled on other grounds*, *Founding Church of Scientology of Wash. D.C., Inc. v. Smith*, 721 F.2d 828, 830 (D.C. Cir. 1983). "While in camera examination need not be automatic, in many situations it will plainly be necessary and appropriate." *Ray*, 587 F.2d at 1191 (quoting the Conference Report on the 1974 FOIA Amendments, S. Rep. No. 93-1200 at 2 (1974), as reprinted in 1974 U.S.C.C.A.N. 6285, 6287) (internal quotation marks omitted). In this case, as discussed above, the government's failure to even consider the segregability issue should leave the Court profoundly concerned that the government has withheld information to an unjustified extent. In light of the clear failure of the agency to comply with the Act's segregability requirements, and of the strong public interest in the material at issue, the Court should exercise its discretion to review *in camera* the withheld documents.

### A. *In Camera* Review Can Compensate for Plaintiff's Information Disadvantage

As the D.C. Circuit has explained, Congress intended that "the *de novo* review mandated by the Freedom of Information Act be extremely thorough so as to insure that agencies do not impermissibly expand by unreviewed interpretations the particular types of matters Congress has exempted from disclosure." *Allen*, 636 F.2d at 1297 (citation and internal quotation marks

---

documents that are responsive to [the] request." Defendant's Exhibit D. The agency now asserts that it "intended to indicate that it had located two documents or categories of documents that were responsive to EFF's request," and that any clarification of the matter "cannot be further discussed in an unclassified setting." Olsen Decl., ¶ 9. In any event, DOJ has at no time asserted that there are a large number of responsive documents.

omitted).  Even in the context of matters classified for national security reasons the courts are

empowered to conduct an in camera review in order to satisfy their obligation to conduct a *de*

*novo* review.  *See Ray*, 587 F.2d at 1201- 15 (Wright, J. concurring) (discussing the legislative

history of the 1974 amendments to the FOIA).  Thus, not even national security claims of the

sort relied upon here can require courts to "relinquish[] their independent responsibility" to

undertake a thorough *de novo* evaluation of the government's exemption claims, reviewing

documents *in camera* if necessary.  *Goldberg v. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987).

Thorough judicial review of the government's exemption claims is particularly

appropriate in light of the requester's informational disadvantage, peculiar to the context of

FOIA litigation:

> [I]t is anomalous but obviously inevitable that the party with the greatest interest
> in obtaining disclosure is at a loss to argue with desirable legal precision for the
> revelation of the concealed information.  Obviously the party seeking disclosure
> cannot know the precise contents of the documents sought; secret information is,
> by definition, unknown to the party seeking disclosure. . . .  In a very real sense,
> only one side to the controversy (the side opposing disclosure) is in a position
> confidently to make statements categorizing information . . . .

*Vaughn*, 484 F.2d at 823; *see also Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994) ("[T]he

plaintiff is handicapped in this endeavor by the fact that only the agency truly knows the content

of the withheld material.  Except in cases in which the court takes the entire set of responsive

documents *in camera*, even the court does not know." (citations omitted)).  "In an effort to

compensate" for this disadvantage on the part of FOIA requesters, "the trial court, as the trier of

fact, may and often does examine the document *in camera* to determine whether the Government

has properly characterized the information as exempt." *Vaughn*, 484 F.2d at 825.

**B.  The Court has Broad Discretion to Conduct *In Camera* Review
and the Public Interest in the Material Warrants its Exercise**

The D.C. Circuit has encouraged *in camera* review of FOIA documents in a variety of

circumstances.  The Circuit has long held *in camera* review to be appropriate where "agency

affidavits are insufficiently detailed to permit meaningful review of exemption claims" or

"evidence of agency bad faith is before the court." *Lam Lek Chong v. U.S. Drug Enforcement

Admin.*, 929 F.2d 729, 735 (D.C. Cir. 1991); *see also, e.g.*, *Allen*, 636 F.2d at 1298.  At the same

time, the Court has made clear that these are not the only circumstances under which *in camera*

review is justified.  *See, e.g., Spirko*, 147 F.3d at 996 ("[i]n camera inspection does not depend

on a finding or even tentative finding of bad faith" (quoting *Ray v. Turner*, 587 F.2d 1187, 1195

(D.C. Cir. 1978)) (internal quotation marks omitted)).  On the contrary, as the court of appeals

has repeatedly emphasized, trial courts have broad discretion over whether to conduct *in camera*

review.  *See, e.g., Carter v. Dep't of Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987); *Ctr. for

Auto Safety*, 731 F.2d at 20; *see also Spirko*, 147 F.3d at 996 ("With such broad discretion vested

in the district court, this court has yet to identify particular circumstances under which *in camera*

inspection would be inappropriate . . . ." (emphasis in original)).  "The ultimate criterion is

simply this: Whether the district judge believes that *in camera* inspection is needed in order to

make a responsible *de novo* determination on the claims of exemption."  *Spirko*, 147 F.3d at 996

(quoting *Ray*, 587 F.2d at 1195) (internal quotation marks omitted); *see also Carter*, 830 F.2d at

392; *Ctr. for Auto Safety*, 731 F.2d at 21.

This case clearly warrants *in camera* review, as there is a "greater call for *in camera*

inspection" in "cases that involve a strong public interest in disclosure."  *Allen*, 636 F.2d at 1299;

*see also Jones*, 41 F.3d at 243.  As the D.C. Circuit has explained:

> When citizens request information to ascertain whether a particular agency is properly serving its public function, the agency often deems it in its best interest to stifle or inhibit the probes.  It is in these instances that the judiciary plays an important role in reviewing the agency's withholding of information.  But since it is in these instances that the representations of the agency are most likely to be protective and perhaps less than accurate, the need for *in camera* inspection is greater.

*Allen*, 636 F.2d at 1299.

The public interest in the contents of the withheld documents is exceptionally high.  The FOIA request at issue seeks records related to the Administration's belated resort to the FISC for approval of an extremely controversial surveillance program that intercepts the communications of Americans. The subject of this request – government spying on communications – has serious implications for the constitutionally protected rights of speech and privacy and the statutory regime that regulates electronic surveillance within the United States.

The legality and propriety of the surveillance program has been the subject of sustained, intense public concern.  As noted, it took less than a day after its first public disclosure for Sen. Arlen Specter, then-Chairman of the Senate Judiciary Committee, to pledge that the Senate would hold hearings to investigate the NSA's warrantless surveillance.  *Specter Says Senate to Probe Report U.S. Broke Law on Spying,* Bloomberg.com, Dec. 16, 2005.  Within just a few days of the revelation of the surveillance program, dozens of news stories appeared across the country. [6]

---

[6]  *See*, *e.g.*, James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, Dec. 16, 2005, at A1; Maura Reynolds and Greg Miller, *Congress Wants Answers About Spying on U.S. Citizens*, Pittsburgh Post-Gazette, Dec. 16, 2005; Steven Thomma, *Spying Could Create Backlash on Congress; Public Reaction Hinges on Identity of Targets*, San Jose Mercury News, Dec. 16, 2005; Christine Hauser, *Bush Declines to Discuss Report on Eavesdropping*, New York Times, Dec. 16, 2005; Katherine Shrader, *Lawmakers Say Reported Spy Program Shocking, Call For Investigations*, San Diego Union Tribune, Dec. 16, 2005; Caren Bohan and Thomas Ferraro, *Bush Defends Eavesdropping and Patriot Act*, ABC News, Dec. 17, 2005; Dan Eggen and Charles Lane, *On Hill, Anger and Calls for Hearing Greet News of*

Since then, concern by Congress, the media and the public has continued unabated.  As

Sens. Leahy and Specter have noted in their repeated efforts to obtain access to the material at

issue here, the FISC's actions of January 2007 do not resolve the controversy surrounding the

surveillance program, but merely add new issues to the public debate:

> [T]he Administration has offered a legislative proposal that it contends seeks to
> "modernize" the Foreign Intelligence Surveillance Act (FISA).  . . .  The draft
> legislation would make dramatic and far-reaching changes to a critical national
> security authority.  Before we can even begin to consider any such legislative
> proposal, we must be given appropriate access to the information necessary to
> carry out our oversight and legislative duties.
>
> . . .  You testified in January that the warrantless wiretapping program had been
> terminated and that henceforth surveillance would be conducted pursuant to
> authorization from the FISA Court.  To consider any changes to FISA, it is critical
> that this Committee understand how the Department and the FISA Court have
> interpreted FISA and the perceived flaws that led the Administration to operate a
> warrantless surveillance program outside of FISA's provisions for over five years.

Plaintiff's Exhibit C at 2.

It is clear that the strong public interest in the subject of EFF's FOIA request weighs

heavily in favor of *in camera* review of the withheld documents.  The need for such review is

bolstered by the government's failure to address the critical issue of segregability.  "It is error for

a district court to simply approve the withholding of an entire document without entering a

---

*Stateside Surveillance*, Washington Post, Dec. 17, 2005, at A1; Jennifer Loven, *Bush Defends
Secret Spying in U.S.*, San Francisco Chronicle, Dec. 17, 2005; Barton Gellman and Dafna
Linzer, *Pushing the Limits of Wartime Powers*, Washington Post, Dec. 18, 2005, at A1; John
Diamond, *NSA's Surveillance of Citizens Echoes 1970s Controversy*, USA Today, Dec. 18,
2005; James Kuhnhenn, *Bush Defends Spying in U.S.*, San Jose Mercury News, Dec. 18, 2005;
Fred Barbash and Peter Baker, *Gonzales Defends Eavesdropping Program*, Washington Post,
Dec. 19, 2005; Todd J. Gillman, *Bush Assails Disclosure of Domestic Spying Program*, San Jose
Mercury News, Dec. 19, 2005; David Stout, *Bush Says U.S. Spy Program is Legal and Essential*,
New York Times, Dec. 19, 2005; James Gerstenzang, *Bush Vows to Continue Domestic
Surveillance*, L.A. Times, Dec. 19, 2005; Terence Hunt, *Bush Says NSA Surveillance Necessary,
Legal*, Washington Post, Dec. 19, 2005; George E. Condon, *Bush Says Spying Is Needed To
Guard US*, San Diego Union Tribune, Dec. 20, 2005; Jeff Zeleny, *No 'Unchecked Power' In
Domestic Spy Furor*, Chicago Tribune, Dec. 20, 2005.

finding on segregability, or the lack thereof," *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (internal quotation and citation omitted); *see Schiller*, 964 F.2d at 1209 (remanding case because NLRB had failed to "correlate[] the claimed exemptions to particular passages in the [exempt] memos"). Here, the government does not even assert that there are no "reasonably segregable" portions of the withheld material, and the Court thus cannot make the necessary finding.

 "A judge has discretion to order *in camera* inspection on the basis of an uneasiness, on a doubt that he wants satisfied before he takes responsibility for a *de novo* determination." *Spirko*, 147 F.3d at 996 (quoting *Ray*, 587 F.2d at 1195) (internal quotation marks omitted). Plaintiff submits that substantial doubt exists here, and urges the Court to review the withheld material *in camera*.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment should be denied and plaintiff's motion for *in camera* review should be granted.

Respectfully submitted,

  /s/David L. Sobel
DAVID L. SOBEL
D.C. Bar No. 360418

MARCIA HOFMANN
D.C. Bar. No. 484136

Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

# Plaintiff's Exhibit A

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 07-0403 (TFH)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
and Cross-Motion for *In Camera* Review

PATRICK J. LEAHY, VERMONT, CHAIRMAN

EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, Jr., DELAWARE
HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
BENJAMIN L. CARDIN, MARYLAND
SHELDON WHITEHOUSE, RHODE ISLAND

ARLEN SPECTER, PENNSYLVANIA
ORRIN G. HATCH, UTAH
CHARLES E. GRASSLEY, IOWA
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
SAM BROWNBACK, KANSAS
TOM COBURN, OKLAHOMA

BRUCE A. COHEN, *Chief Counsel and Staff Director*
MICHAEL O'NEILL, *Republican Chief Counsel and Staff Director*

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

January 17, 2007

The Honorable Colleen Kollar-Kotelly
Presiding Judge
U.S. Foreign Intelligence Surveillance Court
DOJ Building, Room 6725
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Dear Judge Kollar-Kotelly:

Attorney General Gonzales revealed today that the Foreign Intelligence Surveillance Court issued orders on January 10, 2007 authorizing the government to engage in electronic surveillance of communications into or out of the United States by terrorism suspects, subject to approval of the Court. I enclose a copy of the letter he sent to us and also note that the Department of Justice briefed the media on these matters at 2:30 this afternoon.

On behalf of the Senate Judiciary Committee, we ask that you provide the Committee with copies of the orders and opinions. We also request that you make the Court's decision public to the extent possible.

These are matters of significant interest to the Judiciary Committee and the Congress and to the American people, as well. We all have an interest in ensuring that the government is performing surveillance necessary to prevent acts of terrorism and that it is doing so in ways that protect the basic rights of all Americans, including the right to privacy.

Sincerely,

PATRICK LEAHY
Chairman

ARLEN SPECTER
Ranking Member

Encl.



# The Attorney General
Washington, D.C.

January 17, 2007

The Honorable Patrick Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable Arlen Specter
Ranking Minority Member
Committee of the Judiciary
United States Senate
Washington, D.C. 20510

Dear Chairman Leahy and Senator Specter:

I am writing to inform you that on January 10, 2007, a Judge of the Foreign Intelligence Surveillance Court issued orders authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization. As a result of these orders, any electronic surveillance that was occurring as part of the Terrorist Surveillance Program will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court.

In the spring of 2005—well before the first press account disclosing the existence of the Terrorist Surveillance Program—the Administration began exploring options for seeking such FISA Court approval. Any court authorization had to ensure that the Intelligence Community would have the speed and agility necessary to protect the Nation from al Qaeda—the very speed and agility that was offered by the Terrorist Surveillance Program. These orders are innovative, they are complex, and it took considerable time and work for the Government to develop the approach that was proposed to the Court and for the Judge on the FISC to consider and approve these orders.

The President is committed to using all lawful tools to protect our Nation from the terrorist threat, including making maximum use of the authorities provided by FISA and taking full advantage of developments in the law. Although, as we have previously explained, the Terrorist Surveillance Program fully complies with the law, the orders the Government has obtained will allow the necessary speed and agility while providing substantial advantages. Accordingly, under these circumstances, the President has

Letter to Chairman Leahy and Senator Specter
January 17, 2007
Page 2

determined not to reauthorize the Terrorist Surveillance Program when the current
authorization expires.

The Intelligence Committees have been briefed on the highly classified details of
these orders. In addition, I have directed Steve Bradbury, Acting Assistant Attorney
General for the Office of Legal Counsel, and Ken Wainstein, Assistant Attorney General
for National Security, to provide a classified briefing to you on the details of these orders.

Sincerely,

Alberto R. Gonzales
Attorney General

cc:    The Honorable John D. Rockefeller, IV
       The Honorable Christopher Bond
       The Honorable Sylvester Reyes
       The Honorable Peter Hoekstra
       The Honorable John Conyers, Jr.
       The Honorable Lamar S. Smith

# Plaintiff's Exhibit B

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 07-0403 (TFH)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
and Cross-Motion for *In Camera* Review

# UNITED STATES FOREIGN
# INTELLIGENCE SURVEILLANCE COURT
### *Washington, D.C.*

*Honorable Colleen Kollar-Kotelly*
*Presiding Judge*

January 17, 2007

Honorable Patrick Leahy
Chairman, United States Senate
Committee on the Judiciary
Senate Office Building
Washington, DC 20510-6275

Honorable Arlen Specter
Ranking Member, United States Senate
Committee on the Judiciary
Senate Office Building
Washington, DC 20510-6275

Dear Chairman Leahy and Ranking Member Specter:

I am writing in response to your request that I provide the Committee on the Judiciary with
"copies of the orders and opinions" issued in the matter referenced in Attorney General Alberto R.
Gonzales' letter to you, dated January 17, 2007. As the presiding judge of the Foreign Intelligence
Surveillance Court (FISC), I have no objection to this material being made available to the Committee.
However, the Court's practice is to refer any requests for classified information to the Department of
Justice. In this instance, the documents that are responsive to your request contain classified
information and, therefore, I would ask you to discuss the matter with the Attorney General or his
representatives. If the Executive and Legislative Branches reach agreement for access to this material,
the Court will, of course, cooperate with the agreement.

Sincerely,

Colleen Kollar-Kotelly
Presiding Judge

# Plaintiff's Exhibit C

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 07-0403 (TFH)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
and Cross-Motion for *In Camera* Review

PATRICK J. LEAHY, VERMONT, CHAIRMAN

EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, JR., DELAWARE
HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
BENJAMIN L. CARDIN, MARYLAND
SHELDON WHITEHOUSE, RHODE ISLAND

ARLEN SPECTER, PENNSYLVANIA
ORRIN G. HATCH, UTAH
CHARLES E. GRASSLEY, IOWA
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
SAM BROWNBACK, KANSAS
TOM COBURN, OKLAHOMA

BRUCE A. COHEN, *Chief Counsel and Staff Director*
MICHAEL O'NEILL, *Republican Chief Counsel and Staff Director*

# United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

May 21, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Gonzalez:

Last week we heard dramatic and deeply troubling testimony from former Deputy Attorney General Comey. He testified that in March 2004, when he was Acting Attorney General, he informed the White House that the Department of Justice had concluded an ongoing classified surveillance program had "no legal basis" and would not certify it. He then described how you, then Counsel to the President, and former White House Chief of Staff Andrew Card arrived at the hospital bedside of an extremely ill Attorney General Ashcroft and attempted to persuade him to certify the program. When you failed, because Mr. Ashcroft refused, Mr. Comey testified that the program was nonetheless certified over the objections of the Department of Justice. That apparently prompted a number of high-ranking Justice officials to consider resigning en masse.

This incident obviously raises very serious questions about your personal behavior and commitment to the rule of law. Mr. Comey's testimony also demonstrates vividly how essential it is that this Committee understands the legal underpinnings of the surveillance program that was the subject of that incident, and how the legal justification evolved over time. The stonewalling by you and the Administration must end. The Committee on the Judiciary is charged with overseeing and legislating on constitutional protections, civil and criminal justice, civil liberties, and the Judiciary, all subjects that this matter impacts. We intend to do our job.

This Committee has made no fewer than eight formal requests over the past 18 months – to the White House, the Attorney General, or other Department of Justice officials – seeking documents and information related to this surveillance program. These requests have sought the Executive Branch legal analysis of this program and documents reflecting its authorization by the President. You have rebuffed all requests for documents and your answers to our questions have been wholly inadequate and, at times, misleading.

The Honorable Alberto Gonzales
May 21, 2007
Page 2 of 3

We note also that the Administration has offered a legislative proposal that it contends seeks to "modernize" the Foreign Intelligence Surveillance Act (FISA).  As you know, the Judiciary Committee has historically overseen changes to FISA and it is this Committee's responsibility to review the Administration's proposal with great care.  The draft legislation would make dramatic and far-reaching changes to a critical national security authority.  Before we can even begin to consider any such legislative proposal, we must be given appropriate access to the information necessary to carry out our oversight and legislative duties.

This Administration has asserted that it established its program of warrantless wiretapping by the NSA because it deemed FISA's requirements to be incompatible with the needs of the intelligence community in fighting terrorism.  You testified in January that the warrantless wiretapping program had been terminated and that henceforth surveillance would be conducted pursuant to authorization from the FISA Court.  To consider any changes to FISA, it is critical that this Committee understand how the Department and the FISA Court have interpreted FISA and the perceived flaws that led the Administration to operate a warrantless surveillance program outside of FISA's provisions for over five years.

Your consistent stonewalling and misdirection have prevented this Committee from carrying out its constitutional oversight and legislative duties for far too long.  We understand that much of the information we seek may currently be classified, but that can be no excuse for failing to provide relevant information to all members of this Committee and select, cleared staff.  We will, of course, handle it with the greatest care and consistent with security requirements.

Therefore, we reiterate our requests for the following documents and ask that you provide them to this Committee no later than June 5, 2007:

1) Please provide all documents that reflect the President's authorization and reauthorization of the warrantless electronic surveillance program that you have called the Terrorist Surveillance Program, including any predecessor programs, from 2001 to the present;

2) Please provide all memoranda or other documents containing analysis or opinions from the Department of Justice, the National Security Agency, the Department of Defense, the White House, or any other entity within the Executive Branch on legality of or legal basis for the warrantless electronic surveillance program, including documents that describe why the desired surveillance would not or could not take place consistent with the requirements and procedures of FISA from 2001 to the present;

The Honorable Alberto Gonzales
May 21, 2007
Page 3 of 3

3) Please provide all documents reflecting communications with the Foreign
   Intelligence Surveillance Court (FISC) about the warrantless electronic
   surveillance program or the types of surveillance that previously were conducted
   as part of that program, that contain legal analysis, arguments, or decisions
   concerning the interpretation of FISA, the Fourth Amendment, the Authorization
   for the Use of Military Force, or the President's authority under Article II of the
   Constitution, including the January 2007 FISC orders to which you refer in your
   January 17, 2007 letter to us and all other opinions or orders of the FISA court
   with respect to this surveillance;

4) If you do not consider the surveillance program that was the subject of discussion
   during the hospital visit and other events that former Deputy Attorney General
   James Comey described in his May 15, 2007 testimony before the Senate
   Judiciary Committee to be covered by the requests made above, please provide all
   documents described in those requests relevant to that program, as well.

We emphasize that we are seeking the legal justifications and analysis underlying these
matters and not the specific operational details or information obtained by the
surveillance.

Sincerely,

PATRICK LEAHY
Chairman

ARLEN SPECTER
Ranking Member

# Plaintiff's Exhibit D

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 07-0403 (TFH)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
and Cross-Motion for *In Camera* Review

Note: This opinion is subject to formal revision before publication in the Federal Reporter.

# United States Foreign Intelligence Surveillance Court of Review

―――――――

Argued September 9, 2002                    Decided November 18, 2002

In re: Sealed Case No. 02-001

―――

Consolidated with
02-002

―――

On Motions for Review of Orders of the United States
Foreign Intelligence Surveillance Court
(Nos. 02-662 and 02-968)

―――

*Theodore B. Olson*, Solicitor General, argued the cause for appellant the United States, with whom *John Ashcroft*, Attorney General, *Larry D. Thompson*, Deputy Attorney General, *David S. Kris*, Associate Deputy Attorney General, *James A. Baker*, Counsel for Intelligence Policy, and *Jonathan L. Marcus*, Attorney Advisor, were on the briefs.

*Ann Beeson*, *Jameel Jaffer*, *Steven R. Shapiro*, for *amicus curiae* American Civil Liberties Union, with whom *James X. Dempsey* for Center for Democracy and Technology, *Kate Martin* for Center for National Security Studies, *David L. Sobel* for Electronic Privacy Information Center, and *Lee Tien* for Electronic Frontier Foundation, were on the brief.

*John D. Cline*, *Zachary A. Ives*, and *Joshua Dratel*, for *amicus curiae* National Association of Criminal Defense Lawyers.

Before:   GUY, *Senior Circuit Judge, Presiding*; SILBERMAN and LEAVY, *Senior Circuit Judges*.

Opinion for the Court filed *Per Curiam*.

*Per Curiam*:   This is the first appeal from the Foreign Intelligence Surveillance Court to the Court of Review since the passage of the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801-1862 (West 1991 and Supp. 2002), in 1978.   This appeal is brought by the United States from a FISA court surveillance order which imposed certain restrictions on the government.   Since the government is the only party to FISA proceedings, we have accepted briefs filed by the American Civil Liberties Union (ACLU)[1] and the National Association of Criminal Defense Lawyers (NACDL) as *amici curiae*.

Not surprisingly this case raises important questions of statutory interpretation, and constitutionality.   After a careful review of the briefs filed by the government and *amici*, we conclude that FISA, as amended by the Patriot Act,[2] supports the government's position, and that the restrictions imposed by the FISA court are not required by FISA or the Constitution. We therefore remand for further proceedings in accordance with this opinion.

---

[1]   Joining the ACLU on its brief are the Center for Democracy and Technology, Center for National Security Studies, Electronic Privacy Information Center, and Electronic Frontier Foundation.

[2]   Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001).

## I.

The court's decision from which the government appeals imposed certain requirements and limitations accompanying an order authorizing electronic surveillance of an "agent of a foreign power" as defined in FISA. There is no disagreement between the government and the FISA court as to the propriety of the electronic surveillance; the court found that the government had shown probable cause to believe that the target is an agent of a foreign power and otherwise met the basic requirements of FISA. The government's application for a surveillance order contains detailed information to support its contention that the target, who is a United States person, is aiding, abetting, or conspiring with others in international terrorism. [

]³  The FISA

court authorized the surveillance, but imposed certain restrictions, which the government

contends are neither mandated nor authorized by FISA.  Particularly, the court ordered that

> law enforcement officials shall not make recommendations to
> intelligence officials concerning the initiation, operation,
> continuation or expansion of FISA searches or surveillances.
> Additionally, the FBI and the Criminal Division [of the
> Department of Justice] shall ensure that law enforcement
> officials do not direct or control the use of the FISA procedures
> to enhance criminal prosecution, and that advice intended to
> preserve the option of a criminal prosecution does not
> inadvertently result in the Criminal Division's directing or
> controlling the investigation using FISA searches and
> surveillances toward law enforcement objectives.

To ensure the Justice Department followed these strictures the court also fashioned what the

government refers to as a "chaperone requirement"; that a unit of the Justice Department, the

Office of Intelligence Policy and Review (OIPR) (composed of 31 lawyers and 25 support

staff), "be invited" to all meetings between the FBI and the Criminal Division involving

consultations for the purpose of coordinating efforts "to investigate or protect against foreign

attack or other grave hostile acts, sabotage, international terrorism, or clandestine intelligence

---

³  The bracketed information is classified and has been redacted from the public version
of the opinion.

4

activities by foreign powers or their agents." If representatives of OIPR are unable to attend such meetings, "OIPR shall be apprized of the substance of the meetings forthwith in writing so that the Court may be notified at the earliest opportunity."

These restrictions are not original to the order appealed.[4] They are actually set forth in an opinion written by the former Presiding Judge of the FISA court on May 17 of this year. But since that opinion did not accompany an order conditioning an approval of an electronic surveillance application it was not appealed. It is, however, the basic decision before us and it is its rationale that the government challenges. The opinion was issued after an oral argument before all of the then-serving FISA district judges and clearly represents the views of all those judges.[5]

We think it fair to say, however, that the May 17 opinion of the FISA court does not clearly set forth the basis for its decision. It appears to proceed from the assumption that FISA constructed a barrier between counterintelligence/intelligence officials and law enforcement officers in the Executive Branch–indeed, it uses the word "wall" popularized by certain commentators (and journalists) to describe that supposed barrier. Yet the opinion does not support that assumption with any relevant language from the statute.

_____

   [4] To be precise, there are two surveillance orders on appeal, one renewing the other with identical conditions.

   [5] The argument before all of the district judges, some of whose terms have since expired, was referred to as an "en banc" although the statute does not contemplate such a proceeding. In fact, it specifically provides that if one judge declines to approve an application the government may not seek approval from another district judge, but only appeal to the Court of Review. 50 U.S.C. §§ 1803(a), (b).

The "wall" emerges from the court's implicit interpretation of FISA. The court apparently believes it can approve applications for electronic surveillance only if the government's objective is *not* primarily directed toward criminal prosecution of the foreign agents for their foreign intelligence activity. But the court neither refers to any FISA language supporting that view, nor does it reference the Patriot Act amendments, which the government contends specifically altered FISA to make clear that an application could be obtained even if criminal prosecution is the primary counter mechanism.

Instead the court relied for its imposition of the disputed restrictions on its statutory authority to approve "minimization procedures" designed to prevent the acquisition, retention, and dissemination within the government of material gathered in an electronic surveillance that is unnecessary to the government's need for foreign intelligence information. 50 U.S.C. § 1801(h).

### Jurisdiction

This court has authority "to review the denial of any application" under FISA. *Id*. § 1803(b). The FISA court's order is styled as a grant of the application "as modified." It seems obvious, however, that the FISA court's order actually denied the application to the extent it rejected a significant portion of the government's proposed minimization procedures and imposed restrictions on Department of Justice investigations that the government opposes. Indeed, the FISA court was clear in rejecting a portion of the application. Under these circumstances, we have jurisdiction to review the FISA court's order; to conclude otherwise

6

would elevate form over substance and deprive the government of judicial review of the minimization procedures imposed by the FISA court. *See Mobile Comm. Corp. v. FCC*, 77 F.3d 1399, 1403-04 (D.C. Cir.) (grant of station license subject to condition that is unacceptable to applicant is subject to judicial review under statute that permits such review when application for license is denied), *cert. denied*, 519 U.S. 823 (1996).

## II.

The government makes two main arguments. The first, it must be noted, was not presented to the FISA court; indeed, insofar as we can determine it has never previously been advanced either before a court or Congress.[6] That argument is that the supposed pre-Patriot Act limitation in FISA that restricts the government's intention to use foreign intelligence information in criminal prosecutions is an illusion; it finds no support in either the language of FISA or its legislative history. The government does recognize that several courts of appeals, while upholding the use of FISA surveillances, have opined that FISA may be used only if the government's primary purpose in pursuing foreign intelligence information is not criminal prosecution, but the government argues that those decisions, which did not carefully analyze the statute, were incorrect in their statements, if not incorrect in their holdings.

---

[6] Since proceedings before the FISA court and the Court of Review are *ex parte*–not adversary–we can entertain an argument supporting the government's position not presented to the lower court.

Alternatively, the government contends that even if the primary purpose test was a legitimate construction of FISA prior to the passage of the Patriot Act, that Act's amendments to FISA eliminate that concept.  And as a corollary, the government insists the FISA court's construction of the minimization procedures is far off the mark both because it is a misconstruction of those provisions *per se,* as well as an end run around the specific amendments in the Patriot Act designed to deal with the real issue underlying this case.  The government, moreover, contends that the FISA court's restrictions, which the court described as minimization procedures, are so intrusive into the operation of the Department of Justice as to exceed the constitutional authority of Article III judges.

The government's brief, and its supplementary brief requested by this court, also set forth its view that the primary purpose test is not required by the Fourth Amendment.  The ACLU and NACDL argue, *inter alia*, the contrary; that the statutes are unconstitutional unless they are construed as prohibiting the government from obtaining approval of an application under FISA if its "primary purpose" is criminal prosecution.

### The 1978 FISA

We turn first to the statute as enacted in 1978.[7]  It authorizes a judge on the FISA court

---

[7]    As originally enacted, FISA covered only electronic surveillance.  It was amended in 1994 to cover physical searches.  Pub. L. No. 103-359, 108 Stat. 3444 (Oct. 14, 1994).  Although only electronic surveillance is at issue here, much of our statutory analysis applies to FISA's provisions regarding physical searches, 50 U.S.C. §§ 1821-1829, which mirror to a great extent those regarding electronic surveillance.

to grant an application for an order approving electronic surveillance to "obtain foreign intelligence information" if "there is probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power," and that "each of the facilities or places at which the surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(3). As is apparent, the definitions of agent of a foreign power and foreign intelligence information are crucial to an understanding of the statutory scheme.[8] The latter means

> (1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against–
>
>> A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
>>
>> B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or
>>
>> C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

*Id*. § 1801(e)(1).[9]

---

[8]    Foreign power is defined broadly to include, *inter alia,* "a group engaged in international terrorism or activities in preparation therefor" and "a foreign-based political organization, not substantially composed of United States persons." 50 U.S.C. §§ 1801(a)(4), (5).

[9]    A second definition of foreign intelligence information includes information necessary to "the national defense or the security of the United States," or "the conduct of the foreign affairs of the United States." 50 U.S.C. § 1801(e)(2). This definition generally involves information referred to as "affirmative" or "positive" foreign intelligence information rather than the "protective" or "counterintelligence" information at issue here.

9

The definition of an agent of a foreign power, if it pertains to a U.S. person (which is the only category relevant to this case), is closely tied to criminal activity. The term includes any person who "knowingly engages in clandestine intelligence gathering activities . . . which activities involve or may involve a violation of the *criminal statutes* of the United States," or "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor." *Id*. §§ 1801(b)(2)(A), (C) (emphasis added). International terrorism refers to activities that "involve violent acts or acts dangerous to human life that are a violation of the *criminal laws* of the United States or of any State, or that would be a *criminal violation* if committed within the jurisdiction of the United States or any State." *Id*. § 1801(c)(1) (emphasis added). Sabotage means activities that "involve a violation of chapter 105 of [the criminal code], or that would involve such a violation if committed against the United States." *Id*. § 1801(d). For purposes of clarity in this opinion we will refer to the crimes referred to in section 1801(a)-(e) as foreign intelligence crimes.[10]

In light of these definitions, it is quite puzzling that the Justice Department, at some point during the 1980s, began to read the statute as limiting the Department's ability to obtain FISA orders if it intended to prosecute the targeted agents–even for foreign intelligence crimes. To be sure, section 1804, which sets forth the elements of an application for an order, required a national security official in the Executive Branch–typically the Director of the

---

[10] Under the current version of FISA, the definition of "agent of a foreign power" also includes U.S. persons who enter the United States under a false or fraudulent identity for or on behalf of a foreign power. Our term "foreign intelligence crimes" includes this fraudulent conduct, which will almost always involve a crime.

FBI–to certify that "the purpose" of the surveillance is to obtain foreign intelligence information (amended by the Patriot Act to read "a significant purpose").    But as the government now argues, the definition of foreign intelligence information includes  evidence of crimes such as espionage, sabotage or terrorism.    Indeed, it is virtually impossible to read the 1978 FISA to exclude from its purpose the prosecution of foreign intelligence crimes, most importantly because, as we have noted, the definition of an agent of a foreign power–if he or she is a U.S. person–is grounded on criminal conduct.

It does not seem that FISA, at least as originally enacted, even contemplated that the FISA court would inquire into the government's purpose in seeking foreign intelligence information.    Section 1805, governing the standards a FISA court judge is to use in determining whether to grant a surveillance order, requires the judge to find that

> the application which has been filed contains all statements and certifications required by section 1804 of this title and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement made under section 1804(a)(7)(E) of this title and any other information furnished under section 1804(d) of this title.

50 U.S.C. § 1805(a)(5).[11]    And section 1804(a)(7)(E) requires that the application include "a statement of the basis of the certification that–(i) the information sought is the type of foreign intelligence information designated; and (ii) such information cannot reasonably be obtained by normal investigative techniques."    That language certainly suggests that, aside from the

---

[11]    Section 1804(d) simply provides that "[t]he judge may require the applicant to furnish such other information as may be necessary to make the determinations required by section 1805 of this title."

probable cause, identification of facilities, and minimization procedures the judge is to determine and approve (also set forth in section 1805), the only other issues are whether electronic surveillance is necessary to obtain the information and whether the information sought is actually foreign intelligence information–not the government's proposed use of that information.[12]

Nor does the legislative history cast doubt on the obvious reading of the statutory language that foreign intelligence information includes evidence of foreign intelligence crimes. To the contrary, the House Report explained:

> [T]he term "foreign intelligence information," especially as defined in subparagraphs (e)(1)(B) and (e)(1)(C), *can include evidence of certain crimes* relating to sabotage, international terrorism, or clandestine intelligence activities. With respect to information concerning U.S. persons, foreign intelligence information includes information necessary to protect against clandestine intelligence activities of foreign powers or their agents. Information about a spy's espionage activities obviously is within this definition, and it is *most likely at the same time evidence of criminal activities*.

H.R. REP. NO. 95-1283 (hereinafter "H. REP.") at 49 (1978) (emphasis added).

The government argues persuasively that arresting and prosecuting terrorist agents of, or spies for, a foreign power may well be the best technique to prevent them from successfully

---

[12]     At oral argument before the FISA judges, the court asked government counsel whether a companion provision of FISA, section 1822(c), that gives the court *jurisdiction* over physical searches "for *the purpose* of obtaining foreign intelligence information," obliged the court to consider the government's "primary purpose." We think that language points in the opposite direction since it would be more than a little strange for Congress to require a court to make a searching inquiry into the investigative background of a FISA application before concluding the court had jurisdiction over the application.

continuing their terrorist or espionage activity.   The government might wish to surveil the agent

for some period of time to discover other participants in a conspiracy or to uncover a foreign

power's plans, but typically at some point the government would wish to apprehend the agent

and it might be that only a prosecution would provide sufficient incentives for the agent to

cooperate with the government.   Indeed, the threat of prosecution might be sufficient to "turn

the agent."   It would seem that the Congress actually anticipated the government's argument

and explicitly approved it.  The House Report said:

> *How this information may be used* "to protect" against
> clandestine intelligence activities *is not prescribed* by the
> definition of foreign intelligence information, although, of
> course, how it is used may be affected by minimization
> procedures . . . .  And no information acquired pursuant to this bill
> could be used for other than lawful purposes . . . .   *Obviously,
> use of "foreign intelligence information" as evidence in a
> criminal trial is one way the Government can lawfully protect
> against clandestine intelligence activities, sabotage, and
> international terrorism.*   The bill, therefore, explicitly
> recognizes that information which is evidence of crimes
> involving [these activities] can be sought, retained, and used
> pursuant to this bill.

*Id*. (emphasis added).  The Senate Report is on all fours:

> U.S. persons may be authorized targets, and the surveillance is
> part of an investigative process often designed to protect against
> the commission of serious crimes such as espionage, sabotage,
> assassination, kidnaping, and terrorist acts committed by or on
> behalf of foreign powers.   *Intelligence and criminal law
> enforcement tend to merge in this area*. . . .  [S]urveillances
> conducted under [FISA] need not stop once conclusive evidence
> of a crime is obtained, but instead may be extended longer where
> protective measures other than arrest and prosecution are more
> appropriate.

S. REP. NO. 95-701 (hereinafter "S. REP.") at 10-11 (1978) (emphasis added).

Congress was concerned about the government's use of FISA surveillance to obtain information not truly intertwined with the government's efforts to protect against threats from foreign powers. Accordingly, the certification of purpose under section 1804(a)(7)(B) served to

> prevent the practice of targeting, for example, a foreign power for electronic surveillance when the true purpose of the surveillance is to gather information about an individual for other than foreign intelligence purposes. It is also designed to make explicit that the sole purpose of such surveillance is to secure "foreign intelligence information," as defined, and not to obtain some other type of information.

H. REP. at 76; *see also* S. REP. at 51. But Congress did not impose any restrictions on the government's use of the foreign intelligence information to prosecute agents of foreign powers for foreign intelligence crimes. Admittedly, the House, at least in one statement, noted that FISA surveillances "are not primarily for the purpose of gathering evidence of a crime. They are to obtain foreign intelligence information, which when it concerns United States persons must be necessary to important national concerns." H. REP. at 36. That, however, was an observation, not a proscription. And the House as well as the Senate made clear that prosecution is one way to combat foreign intelligence crimes. *See id*.; S. REP. at 10-11.

The origin of what the government refers to as the false dichotomy between foreign intelligence information that is evidence of foreign intelligence crimes and that which is not appears to have been a Fourth Circuit case decided in 1980. *United States v. Truong Dinh*

14

*Hung*, 629 F.2d 908 (4th Cir. 1980). That case, however, involved an electronic surveillance carried out prior to the passage of FISA and predicated on the President's executive power. In approving the district court's exclusion of evidence obtained through a warrantless surveillance subsequent to the point in time when the government's investigation became "primarily" driven by law enforcement objectives, the court held that the Executive Branch should be excused from securing a warrant only when "the object of the search or the surveillance is a foreign power, its agents or collaborators," and "the surveillance is conducted 'primarily' for foreign intelligence reasons." *Id*. at 915. Targets must "receive the protection of the warrant requirement if the government is primarily attempting to put together a criminal prosecution." *Id*. at 916. Although the *Truong* court acknowledged that "almost all foreign intelligence investigations are in part criminal" ones, it rejected the government's assertion that "if surveillance is to any degree directed at gathering foreign intelligence, the executive may ignore the warrant requirement of the Fourth Amendment." *Id.* at 915.

Several circuits have followed *Truong* in applying similar versions of the "primary purpose" test, despite the fact that *Truong* was not a FISA decision. (It was an interpretation of the Constitution, in the context of measuring the boundaries of the President's inherent executive authority, and we discuss *Truong*'s constitutional analysis at length in Section III of this opinion.) In one of the first major challenges to a FISA search, *United States v. Megahey,* 553 F. Supp. 1180 (E.D.N.Y. 1982), *aff'd sub nom. United States v. Duggan,* 743 F.2d 59 (2d Cir. 1984), the district court acknowledged that while Congress clearly viewed arrest and prosecution as one of the possible outcomes of a FISA investigation, surveillance under FISA

15

would nevertheless be "appropriate only if foreign intelligence surveillance is the Government's primary purpose." *Id*. at 1189-90. Six months earlier, another judge in the same district had held that the *Truong* analysis did not govern FISA cases, since a FISA order was a warrant that met Fourth Amendment standards. *United States v. Falvey,* 540 F. Supp. 1306, 1314 (E.D.N.Y. 1982). *Falvey*, however, was apparently not appealed and *Megahey* was. The Second Circuit, without reference to *Falvey*, and importantly in the context of affirming the conviction, approved *Megahey*'s finding that the surveillance was not "directed towards criminal investigation or the institution of a criminal prosecution." *Duggan*, 743 F.2d at 78 (quoting *Megahey*, 553 F. Supp. at 1190). Implicitly then, the Second Circuit endorsed the *Megahey* dichotomy. Two other circuits, the Fourth and the Eleventh, have similarly approved district court findings that a surveillance was primarily for foreign intelligence purposes without any discussion–or need to discuss–the validity of the dichotomy. *See United States v. Pelton,* 835 F.2d 1067, 1075-76 (4th Cir. 1987), *cert. denied*, 486 U.S. 1010 (1988); *United States v. Badia,* 827 F.2d 1458, 1464 (11th Cir. 1987), *cert. denied*, 485 U.S. 937 (1988).

Then, the First Circuit, seeing *Duggan* as following *Truong*, explicitly interpreted FISA's purpose wording in section 1804(a)(7)(B) to mean that "[a]lthough evidence obtained under FISA subsequently may be used in criminal prosecutions, the investigation of criminal activity cannot be the primary purpose of the surveillance." *United States v. Johnson,* 952 F.2d 565, 572 (1st Cir. 1991) (citations omitted), *cert. denied*, 506 U.S. 816 (1992). Notably, however, the Ninth Circuit has refused

16

> to draw too fine a distinction between criminal and intelligence investigations. "International terrorism," by definition, requires the investigation of activities that constitute crimes. That the government may later choose to prosecute is irrelevant. . . . FISA is meant to take into account "[t]he differences between ordinary criminal investigations to gather evidence of specific crimes and foreign counterintelligence investigations to uncover and monitor clandestine activities . . . ."

*United States v. Sarkissian,* 841 F.2d 959, 964 (9th Cir. 1988) (citations omitted).

Neither *Duggan* nor *Johnson* tied the "primary purpose" test to *actual* statutory language. In *Duggan* the court stated that "[t]he requirement that foreign intelligence information be the primary objective of the surveillance is plain," and the district court was correct in "finding that 'the purpose of the surveillance in this case, both initially and throughout, was to secure foreign intelligence information and was not, as [the] defendants assert, directed towards criminal investigation or the institution of a criminal prosecution.'" *Duggan,* 743 F.2d at 77-78 (quoting *Megahey,* 553 F. Supp. at 1190).[13] Yet the court never explained why it apparently read foreign intelligence information to exclude evidence of crimes–endorsing the district court's implied dichotomy–when the statute's definitions of foreign intelligence and foreign agent are actually cast in terms of criminal conduct. (It will be recalled that the type of foreign intelligence with which we are concerned is really counterintelligence, *see supra* note 9.) And *Johnson* did not even focus on the phrase "foreign intelligence information" in its interpretation of the "purpose" language in section

---

[13]    Interestingly, the court noted that the *FISA judge* "is not to second guess the Executive Branch official's certification that the objective of the surveillance is foreign intelligence information." *Duggan,* 743 F.2d at 77.

17

1804(a)(7)(B).  *Johnson,* 952 F.2d at 572.

It is almost as if *Duggan*, and particularly *Johnson*, assume that the government seeks foreign intelligence information (counterintelligence) for its own sake–to expand its pool of knowledge–because there is no discussion of how the government would use that information outside criminal prosecutions.  That is not to say that the government could have no other use for that information.  The government's overriding concern is to stop or frustrate the agent's or the foreign power's activity by any means, but if one considers the actual ways in which the government would foil espionage or terrorism it becomes apparent that criminal prosecution analytically cannot be placed easily in a separate response category.  It may well be that the government itself, in an effort to conform to district court holdings, accepted the dichotomy it now contends is false.  Be that as it may, since the cases that "adopt" the dichotomy do affirm district court opinions permitting the introduction of evidence gathered under a FISA order, there was not much need for the courts to focus on the issue with which we are confronted.

In sum, we think that the FISA as passed by Congress in 1978 clearly did *not* preclude or limit the government's use or proposed use of foreign intelligence information, which included evidence of certain kinds of criminal activity, in a criminal prosecution.  In order to understand the FISA court's decision, however, it is necessary to trace developments and understandings within the Justice Department post-*Truong* as well as after the passage of the Patriot Act.  As we have noted, some time in the 1980s–the exact moment is shrouded in historical mist–the Department applied the *Truong* analysis to an interpretation of the FISA

18

statute.  What is clear is that in 1995 the Attorney General adopted "Procedures for Contacts Between the FBI and the Criminal Division Concerning Foreign Intelligence and Foreign Counterintelligence Investigations."

Apparently to avoid running afoul of the primary purpose test used by some courts, the 1995 Procedures limited contacts between the FBI and the Criminal Division in cases where FISA surveillance or searches were being conducted by the FBI for foreign intelligence (FI) or foreign counterintelligence (FCI) purposes.[14]  The procedures state that "the FBI and Criminal Division should ensure that advice intended to preserve the option of a criminal prosecution does not inadvertently result in either the fact or the appearance of the Criminal Division's *directing or controlling* the FI or FCI investigation toward law enforcement objectives."  1995 Procedures at 2, ¶ 6 (emphasis added).  Although these procedures provided for significant information sharing and coordination between criminal and FI or FCI investigations, based at least in part on the "directing or controlling" language, they eventually came to be narrowly interpreted within the Department of Justice, and most particularly by OIPR, as requiring OIPR to act as a "wall" to prevent the FBI intelligence officials from communicating with the Criminal Division regarding ongoing FI or FCI investigations.  *See Final Report of the Attorney General's Review Team on the Handling of the Los Alamos National Laboratory Investigation* (AGRT Report), Chapter 20 at 721-34 (May 2000).  Thus, the focus became the nature of the underlying investigation, rather than the general purpose of

---

[14]  We certainly understand the 1995 Justice Department's effort to avoid difficulty with the FISA court, or other courts; and we have no basis to criticize any organization of the Justice Department that an Attorney General desires.

the surveillance.   Once prosecution of the target was being considered, the procedures, as interpreted by OIPR in light of the case law, prevented the Criminal Division from providing any meaningful advice to the FBI.  *Id.*

The Department's attitude changed somewhat after the May 2000 report by the Attorney General and a July 2001 Report by the General Accounting Office both concluded that the Department's concern over how the FISA court or other federal courts might interpret the primary purpose test has inhibited necessary coordination between intelligence and law enforcement officials.   *See id.* at 721-34;[15] General Accounting Office, *FBI Intelligence Investigations:   Coordination Within Justice on Counterintelligence Criminal Matters is Limited* (July 2001) (GAO-01-780) (GAO Report) at 3.   The AGRT Report also concluded, based on the text of FISA and its legislative history, that not only should the purpose of the investigation not be inquired into by the courts, but also that Congress affirmatively anticipated that the underlying investigation might well have a criminal as well as foreign counterintelligence objective.   AGRT Report at 737.   In response to the AGRT Report, the Attorney General, in January 2000, issued additional, interim procedures designed to address coordination problems identified in that report.   In August 2001, the Deputy Attorney General issued a memorandum clarifying Department of Justice policy governing intelligence sharing and establishing additional requirements.   (These actions, however, did not replace the 1995

---

[15]   According to the Report, within the Department the primary proponent of procedures that cordoned off criminal investigators and prosecutors from those officers with counterintelligence responsibilities was the deputy counsel of OIPR.   *See* AGRT Report at 714 & n.949.   He was subsequently transferred from that position and made a senior counsel.   He left the Department and became the Legal Advisor to the FISA court.

Procedures.)   But it does not appear that the Department thought of these internal procedures as "minimization procedures" required under FISA.[16]   Nevertheless, the FISA court was aware that the procedures were being followed by the Department and apparently adopted elements of them in certain cases.

### The Patriot Act and the FISA Court's Decision

The passage of the Patriot Act altered and to some degree muddied the landscape.   In October 2001, Congress amended FISA to change "the purpose" language in 1804(a)(7)(B) to "a significant purpose."   It also added a provision allowing "Federal officers who conduct electronic surveillance to acquire foreign intelligence information" to "consult with Federal law enforcement officers to coordinate efforts to investigate or protect against" attack or other grave hostile acts, sabotage or international terrorism, or clandestine intelligence activities, by foreign powers or their agents.   50 U.S.C. § 1806(k)(1).   And such coordination "shall not preclude" the government's certification that a significant purpose of the surveillance is to obtain foreign intelligence information, or the issuance of an order authorizing the surveillance.   *Id*. § 1806(k)(2).   Although the Patriot Act amendments to FISA expressly sanctioned consultation and coordination between intelligence and law enforcement officials, in response to the first applications filed by OIPR under those amendments, in

---

[16]   There are other detailed, classified procedures governing the acquisition, retention, and dissemination of foreign intelligence and non-foreign intelligence information that have been submitted to and approved by the FISA court as "minimization procedures."   Those classified minimization procedures are not at issue here.

November 2001, the FISA court for the first time adopted the 1995 Procedures, as augmented by the January 2000 and August 2001 Procedures, as "minimization procedures" to apply in all cases before the court.[17]

The Attorney General interpreted the Patriot Act quite differently.  On March 6, 2002, the Attorney General approved new "Intelligence Sharing Procedures" to implement the Act's amendments to FISA.  The 2002 Procedures supersede prior procedures and were designed to permit the complete exchange of information and advice between intelligence and law enforcement officials.  They eliminated the "direction and control" test and allowed the exchange of advice between the FBI, OIPR, and the Criminal Division regarding "the initiation, operation, continuation, or expansion of FISA searches or surveillance."  On March 7, 2002, the government filed a motion with the FISA court, noting that the Department of Justice had adopted the 2002 Procedures and proposing to follow those procedures in all matters before the court.  The government also asked the FISA court to vacate its orders adopting the prior procedures as minimization procedures in all cases and imposing special "wall" procedures in certain cases.

Unpersuaded by the Attorney General's interpretation of the Patriot Act, the court ordered that the 2002 Procedures be adopted, *with modifications*, as minimization procedures to apply in all cases.  The court emphasized that the definition of minimization procedures had

---

[17]    In particular, the court adopted Part A of the 1995 Procedures, which covers "Contacts During an FI or FCI Investigation in which FISA Surveillance or Searches are being Conducted."  The remainder of the 1995 Procedures addresses contacts in cases where FISA is not at issue.

not been amended by the  Patriot Act, and reasoned that the 2002 Procedures "cannot be used

by the government to amend the Act in ways Congress has not."  The court explained:

> Given our experience in FISA surveillances and searches, we find
> that these provisions in sections II.B and III [of the 2002
> Procedures], particularly those which authorize criminal
> prosecutors to advise FBI intelligence officials on the initiation,
> operation, continuation or expansion of FISA's intrusive seizures,
> are designed to enhance the acquisition, retention and
> dissemination of *evidence for law enforcement purposes,
> instead* of being consistent with the need of the United States to
> "obtain, produce, and disseminate *foreign intelligence
> information*" . . . as mandated in §1801(h) and § 1821(4).

May 17, 2001 Opinion at 22 (emphasis added by the FISA court).[18]  The FISA court also

adopted a new rule of court procedure, Rule 11, which provides that "[a]ll FISA applications

shall include informative descriptions of any ongoing criminal investigations of FISA targets,

as well as the substance of any consultations between the FBI and criminal prosecutors at the

Department of Justice or a United States Attorney's Office."

Undeterred, the government submitted the application at issue in this appeal on July 19,

2002, and expressly proposed using the 2002 Procedures *without modification*.  In an order

---

[18]   In describing its experience with FISA searches and surveillance, the FISA court's
opinion makes reference to certain applications each of which contained an FBI agent's
affidavit that was inaccurate, particularly with respect to assertions regarding the information
shared with criminal investigators and prosecutors.   Although we do not approve any
misrepresentations that may have taken place, our understanding is that those affidavits were
submitted during 1997 through early 2001, and therefore any inaccuracies may have been
caused in part by the confusion within the Department of Justice over implementation of the
1995 Procedures, as augmented in January 2000.  In any event, while the issue of the candor
of the FBI agent(s) involved properly remains under investigation by the Department of
Justice's Office of Professional Responsibility, the issue whether the wall between the FBI
and the Criminal Division required by the FISA court has been maintained is moot in light of
this court's opinion.

issued the same day, the FISA judge hearing the application granted an order for surveillance of the target but modified the 2002 Procedures consistent with the court's May 17, 2002 *en banc* order. It is the July 19, 2002 order that the government appeals, along with an October 17, 2002 order granting, with the same modifications as the July 19 order, the government's application for renewal of the surveillance in this case. Because those orders incorporate the May 17, 2002 order and opinion by reference, however, that order and opinion are before us as well.

* * * *

Essentially, the FISA court took portions of the Attorney General's augmented 1995 Procedures–adopted to deal with the primary purpose standard–and imposed them generically as minimization procedures. In doing so, the FISA court erred. It did not provide any constitutional basis for its action–we think there is none–and misconstrued the main statutory provision on which it relied. The court mistakenly categorized the augmented 1995 Procedures as FISA minimization procedures and then compelled the government to utilize a modified version of those procedures in a way that is clearly inconsistent with the statutory purpose.

Under section 1805 of FISA, "the judge shall enter an ex parte order as requested or as modified approving the electronic surveillance if he finds that . . . the proposed minimization procedures meet the definition of minimization procedures under section 1801(h) of this title." 50 U.S.C. § 1805(a)(4). The statute defines minimization procedures in pertinent part

as:

> (1) specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;

> (2) procedures that require that nonpublicly available information, which is not foreign intelligence information, as defined in subsection (e)(1) of this section, shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance.

Section 1801(h) also contains the following proviso:

> (3) notwithstanding paragraphs (1) and (2), procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes. . . .

*Id*. § 1801(h).

As is evident from the face of section 1801(h), minimization procedures are designed to protect, as far as reasonable, against the acquisition, retention, and dissemination of nonpublic information which is not foreign intelligence information. If the data is not foreign intelligence information as defined by the statute, the procedures are to ensure that the government does not use the information to identify the target or third party, unless such identification is necessary to properly understand or assess the foreign intelligence

information that is collected.   *Id*. § 1801(h)(2).   By minimizing *acquisition*, Congress envisioned that, for example, "where a switchboard line is tapped but only one person in the organization is the target, the interception should probably be discontinued where the target is not a party" to the communication.   H. REP. at 55-56.   By minimizing *retention*, Congress intended that "information acquired, which is not necessary for obtaining[,] producing, or disseminating foreign intelligence information, be destroyed where feasible."   H. REP. at 56. Furthermore, "[e]ven with respect to information needed for an approved purpose, *dissemination* should be restricted to those officials with a need for such information."   *Id*. (emphasis added).

The minimization procedures allow, however, the retention and dissemination of non-foreign intelligence information which is evidence of *ordinary crimes* for preventative or prosecutorial purposes.   *See* 50 U.S.C. § 1801(h)(3).   Therefore, if through interceptions or searches, evidence of "a serious crime totally unrelated to intelligence matters" is incidentally acquired, the evidence is "*not* . . . required to be destroyed."   H. REP. at 62 (emphasis added). As we have explained, under the 1978 Act, "evidence of certain crimes like espionage would itself constitute 'foreign intelligence information,' as defined, because it is necessary to protect against clandestine intelligence activities by foreign powers or their agents."   H. REP. at 62; *see also id.* at 49.   In light of these purposes of the minimization procedures, there is simply no basis for the FISA court's reliance on section 1801(h) to limit criminal prosecutors' ability to advise FBI intelligence officials on the initiation, operation, continuation, or expansion of FISA surveillances to obtain foreign intelligence information, even if such

26

information includes evidence of a foreign intelligence crime.

The FISA court's decision and order not only misinterpreted and misapplied minimization procedures it was entitled to impose, but as the government argues persuasively, the FISA court may well have exceeded the constitutional bounds that restrict an Article III court. The FISA court asserted authority to govern the internal organization and investigative procedures of the Department of Justice which are the province of the Executive Branch (Article II) and the Congress (Article I). Subject to statutes dealing with the organization of the Justice Department, however, the Attorney General has the responsibility to determine how to deploy personnel resources. As the Supreme Court said in *Morrison v. Olson* in cautioning the Special Division of the D.C. Circuit to avoid unauthorized administrative guidance of Independent Counsel, "[t]he gradual expansion of the authority of the Special Division might in another context be a bureaucratic success story, but it would be one that would have serious constitutional ramifications." 487 U.S. 654, 684 (1988).[19]

\* \* \* \*

We also think the refusal by the FISA court to consider the legal significance of the Patriot Act's crucial amendments was error. The government, in order to avoid the

---

[19] In light of *Morrison v. Olson* and *Mistretta v. United States*, 488 U.S. 361 (1989), we do not think there is much left to an argument made by an opponent of FISA in 1978 that the statutory responsibilities of the FISA court are inconsistent with Article III case and controversy responsibilities of federal judges because of the secret, non-adversary process. *See Foreign Intelligence Electronic Surveillance: Hearings on H.R. 5794, 9745, 7308, and 5632 Before the Subcomm. on Legislation of the Permanent Select Comm. on Intelligence*, 95th Cong., 2d Sess. 221 (1978) (statement of Laurence H. Silberman).

requirement of meeting the "primary purpose" test, specifically sought an amendment to section 1804(a)(7)(B) which had required a certification "that the purpose of the surveillance is to obtain foreign intelligence information" so as to delete the article "the" before "purpose" and replace it with "a." The government made perfectly clear to Congress why it sought the legislative change. Congress, although accepting the government's explanation for the need for the amendment, adopted language which it perceived as not giving the government quite the degree of modification it wanted. Accordingly, section 1804(a)(7)(B)'s wording became "that *a significant* purpose of the surveillance is to obtain foreign intelligence information" (emphasis added). There is simply no question, however, that Congress was keenly aware that this amendment relaxed a requirement that the government show that its primary purpose was other than criminal prosecution.

No committee reports accompanied the Patriot Act but the floor statements make congressional intent quite apparent. The Senate Judiciary Committee Chairman Senator Leahy acknowledged that "[p]rotection against these foreign-based threats by any lawful means is within the scope of the definition of 'foreign intelligence information,' and the use of FISA to gather evidence for the enforcement of these laws was contemplated in the enactment of FISA." 147 Cong. Rec. S11004 (Oct. 25, 2001). "This bill . . . break[s] down traditional barriers between law enforcement and foreign intelligence. This is not done just to combat international terrorism, but for any criminal investigation that overlaps a broad definition of 'foreign intelligence.'" 147 Cong. Rec. S10992 (Oct. 25, 2001) (statement of Sen. Leahy). And Senator Feinstein, a "strong support[er]," was also explicit. The ultimate objective was

28

to make it

> easier to collect foreign intelligence information under the
> Foreign Intelligence Surveillance Act, FISA. Under current law,
> authorities can proceed with surveillance under FISA only if the
> primary purpose of the investigation is to collect foreign
> intelligence.
>
> But in today's world things are not so simple. In many cases,
> surveillance will have two key goals–the gathering of foreign
> intelligence, and the gathering of evidence for a criminal
> prosecution. Determining which purpose is the "primary"
> purpose of the investigation can be difficult, and will only
> become more so as we coordinate our intelligence and law
> enforcement efforts in the war against terror.
>
> Rather than forcing law enforcement to decide which purpose is
> primary–law enforcement or foreign intelligence gathering, this
> bill strikes a new balance. It will now require that a "significant"
> purpose of the investigation must be foreign intelligence
> gathering to proceed with surveillance under FISA.
> The effect of this provision will be to make it easier for law
> enforcement to obtain a FISA search or surveillance warrant for
> those cases where the subject of the surveillance is both a
> potential source of valuable intelligence and the potential target
> of a criminal prosecution. Many of the individuals involved in
> supporting the September 11 attacks may well fall into both of
> these categories.

147 Cong. Rec. S10591 (Oct. 11, 2001).

To be sure, some Senate Judiciary Committee members including the Chairman were

concerned that the amendment might grant too much authority to the Justice Department–and

the FISA court. Senator Leahy indicated that the change to significant purpose was "very

problematic" since it would "make it easier for the FBI to use a FISA wiretap to obtain

information where the Government's most important motivation for the wiretap is for use in

a criminal prosecution." 147 Cong. Rec. S10593 (Oct. 11, 2001).    Therefore he suggested that "it will be up to the courts to determine how far law enforcement agencies may use FISA for criminal investigation and prosecution *beyond* the scope of the statutory definition of 'foreign intelligence information.'" 147 Cong. Rec. S11004 (Oct. 25, 2001) (emphasis added). But the only dissenting vote against the act was cast by Senator Feingold.  *For the Record: Senate Votes,* 59 CONG. QUARTERLY (WKLY.) 39, Oct. 13, 2001, at 2425.  Senator Feingold recognized that the change to "significant purpose" meant that the government could obtain a FISA warrant "even if the primary purpose is a criminal investigation," and was concerned that this development would not respect the protections of the Fourth Amendment.  147 Cong. Rec. S11021 (Oct. 25, 2001).

In sum, there can be no doubt as to Congress' intent in amending section 1804(a)(7)(B). Indeed, it went further to emphasize its purpose in breaking down barriers between criminal law enforcement and intelligence (or counterintelligence) gathering by adding section 1806(k):

> (k) Consultation with Federal law enforcement officer
>
>> (1) Federal officers who conduct electronic surveillance to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against
>>
>>> (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; or
>>>
>>> (B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

(2) Coordination authorized under paragraph (1) shall not preclude the certification required by section [1804](a)(7)(B) of this title or the entry of an order under section [1805] of this title.

The FISA court noted this amendment but thought that Congress' approval of consultations was not equivalent to authorizing law enforcement officers to give *advice* to officers who were conducting electronic surveillance nor did it sanction law enforcement officers "directing or controlling" surveillances. However, dictionary definitions of "consult" include giving advice. *See, e.g.,* OXFORD ENGLISH DICTIONARY ONLINE (2d ed. 1989). Beyond that, when Congress explicitly authorizes consultation and coordination between different offices in the government, without even suggesting a limitation on who is to direct and control, it necessarily implies that either could be taking the lead.

Neither *amicus* brief defends the reasoning of the FISA court. NACDL's brief makes no attempt to interpret FISA or the Patriot Act amendments but rather argues the primary purpose test is constitutionally compelled. The ACLU relies on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, to interpret FISA, passed 10 years later. That technique, to put it gently, is hardly an orthodox method of statutory interpretation. FISA was passed to deal specifically with the subject of foreign intelligence surveillance. The ACLU does argue that Congress' intent to preclude law enforcement officials initiating or controlling foreign intelligence investigations is revealed by FISA's

exclusion of the Attorney General–a law enforcement official–from the officers who can certify the foreign intelligence purpose of an application under section 1804.    The difficulty with that argument is that the Attorney General supervises the Director of the FBI who is both a law enforcement and counterintelligence officer.    The Attorney General or the Deputy Attorney General, moreover, must approve *all* applications no matter who certifies that the information sought is foreign intelligence information.  50 U.S.C. § 1804(a).[20]

The ACLU insists that the significant purpose amendment only "clarified" the law permitting FISA surveillance orders "even if foreign intelligence is not its *exclusive* purpose" (emphasis added).    In support of this rather strained interpretation, which ignores the legislative history of the Patriot Act, the ACLU relies on a *September 10, 2002* hearing of the Judiciary Committee (the day after the government's oral presentation to this court) at which certain senators made statements–somewhat at odds with their floor statements prior to the passage of the Patriot Act–as to what they had intended the year before.  The D.C. Circuit has described such post-enactment legislative statements as "legislative future" rather than legislative history, not entitled to authoritative weight.  *See General Instrument Corp. v. FCC*, 213 F.3d 724, 733 (D.C. Cir. 2000).

Accordingly, the Patriot Act amendments clearly disapprove the primary purpose test. And as a matter of straightforward logic, if a FISA application can be granted even if "foreign intelligence" is only a significant–not a primary–purpose, another purpose can be primary.

---

[20]    Furthermore, the Attorney General of Deputy Attorney General must approve the use in a criminal proceeding of information acquired pursuant to FISA.  50 U.S.C. § 1806(b).

One other legitimate purpose that could exist is to prosecute a target for a foreign intelligence crime. We therefore believe the Patriot Act amply supports the government's alternative argument but, paradoxically, the Patriot Act would seem to conflict with the government's first argument because by using the term "significant purpose," the Act now implies that another purpose is to be distinguished from a foreign intelligence purpose.

The government heroically tries to give the amended section 1804(a)(7)(B) a wholly benign interpretation. It concedes that "the 'significant purpose' amendment recognizes the *existence* of the dichotomy between foreign intelligence and law enforcement," but it contends that "it cannot be said to recognize (or approve) its *legitimacy*." Supp. Br. of U.S. at 25 (emphasis in original). We are not persuaded. The very letter the Justice Department sent to the Judiciary Committee in 2001 defending the constitutionality of the significant purpose language implicitly accepted as legitimate the dichotomy in FISA that the government now claims (and we agree) was false. It said, "it is also clear that while FISA states that 'the' purpose of a search is for foreign surveillance, that need not be the only purpose. Rather, law enforcement considerations can be taken into account, so long as the surveillance also has a legitimate foreign intelligence purpose." The senatorial statements explaining the significant purpose amendments which we described above are all based on the same understanding of FISA which the Justice Department accepted–at least until this appeal. In short, even though we agree that the original FISA did not contemplate the "false dichotomy," the Patriot Act actually did–which makes it no longer false. The addition of the word "significant" to section 1804(a)(7)(B) imposed a requirement that the government have a measurable foreign

33

intelligence purpose, other than just criminal prosecution of even foreign intelligence crimes. Although section 1805(a)(5), as we discussed above, may well have been intended to authorize the FISA court to review only the question whether the information sought was a type of foreign intelligence information, in light of the significant purpose amendment of section 1804 it seems section 1805 must be interpreted as giving the FISA court the authority to review the government's purpose in seeking the information.

That leaves us with something of an analytic conundrum. On the one hand, Congress did not amend the definition of foreign intelligence information which, we have explained, includes evidence of foreign intelligence crimes. On the other hand, Congress accepted the dichotomy between foreign intelligence and law enforcement by adopting the significant purpose test. Nevertheless, it is our task to do our best to read the statute to honor congressional intent. The better reading, it seems to us, excludes from the purpose of gaining foreign intelligence information a sole objective of criminal prosecution. We therefore reject the government's argument to the contrary. Yet this may not make much practical difference. Because, as the government points out, when it commences an electronic surveillance of a foreign agent, typically it will not have decided whether to prosecute the agent (whatever may be the subjective intent of the investigators or lawyers who initiate an investigation). So long as the government entertains a realistic option of dealing with the agent other than through criminal prosecution, it satisfies the significant purpose test.

The important point is–and here we agree with the government–the Patriot Act amendment, by using the word "significant," eliminated any justification for the FISA court to

34

balance the relative weight the government places on criminal prosecution as compared to other counterintelligence responses. If the certification of the application's purpose articulates a broader objective than criminal prosecution–such as stopping an ongoing conspiracy–and includes other potential non-prosecutorial responses, the government meets the statutory test. Of course, if the court concluded that the government's sole objective was merely to gain evidence of past criminal conduct–even foreign intelligence crimes–to punish the agent rather than halt ongoing espionage or terrorist activity, the application should be denied.

The government claims that even prosecutions of *non*-foreign intelligence crimes are consistent with a purpose of gaining foreign intelligence information so long as the government's objective is to stop espionage or terrorism by putting an agent of a foreign power in prison. That interpretation transgresses the original FISA. It will be recalled that Congress intended section 1804(a)(7)(B) to prevent the government from targeting a foreign agent when its "true purpose" was to gain non-foreign intelligence information–such as evidence of ordinary crimes or scandals. *See supra* at p.14. (If the government inadvertently came upon evidence of ordinary crimes, FISA provided for the transmission of that evidence to the proper authority. 50 U.S.C. § 1801(h)(3).) It can be argued, however, that by providing that an application is to be granted if the government has only a "significant purpose" of gaining foreign intelligence information, the Patriot Act allows the government to have a primary objective of prosecuting an agent for a non-foreign intelligence crime. Yet we think that would be an anomalous reading of the amendment. For we see not the slightest indication that

Congress meant to give that power to the Executive Branch. Accordingly, the manifestation of such a purpose, it seems to us, would continue to disqualify an application. That is not to deny that ordinary crimes might be inextricably intertwined with foreign intelligence crimes. For example, if a group of international terrorists were to engage in bank robberies in order to finance the manufacture of a bomb, evidence of the bank robbery should be treated just as evidence of the terrorist act itself. But the FISA process cannot be used as a device to investigate wholly unrelated ordinary crimes.

One final point; we think the government's purpose as set forth in a section 1804(a)(7)(B) certification is to be judged by the national security official's articulation and not by a FISA court inquiry into the origins of an investigation nor an examination of the personnel involved. It is up to the Director of the FBI, who typically certifies, to determine the government's national security purpose, as approved by the Attorney General or Deputy Attorney General. This is not a standard whose application the FISA court legitimately reviews by seeking to inquire into which Justice Department officials were instigators of an investigation. All Justice Department officers–including those in the FBI–are under the control of the Attorney General. If he wishes a particular investigation to be run by an officer of any division, that is his prerogative. There is nothing in FISA or the Patriot Act that suggests otherwise. That means, perforce, if the FISA court has reason to doubt that the government has any real non-prosecutorial purpose in seeking foreign intelligence information it can demand further inquiry into the certifying officer's purpose–or perhaps even the Attorney General's or Deputy Attorney General's reasons for approval. The important point is that the relevant

purpose is that of those senior officials in the Executive Branch who have the responsibility of appraising the government's national security needs.

<div align="center">

**III**.

</div>

Having determined that FISA, as amended, does not oblige the government to demonstrate to the FISA court that its primary purpose in conducting electronic surveillance is *not* criminal prosecution, we are obliged to consider whether the statute as amended is consistent with the Fourth Amendment. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Although the FISA court did not explicitly rely on the Fourth Amendment, it at least suggested that this provision was the animating principle driving its statutory analysis. The FISA court indicated that its disapproval of the Attorney General's 2002 Procedures was based on the need to safeguard the "privacy of Americans in these highly intrusive surveillances and searches," which implies the invocation of the Fourth Amendment. The government, recognizing the Fourth Amendment's shadow effect on the FISA court's opinion, has affirmatively argued that FISA is constitutional. And some of the very senators who fashioned the Patriot Act amendments expected that the federal courts, including presumably the FISA court, would carefully consider that question. Senator Leahy believed that "[n]o matter what statutory

change is made . . . the court may impose a constitutional requirement of 'primary purpose' based on the appellate court decisions upholding FISA against constitutional challenges over the past 20 years."  147 Cong. Rec. S11003 (Oct. 25, 2001).  Senator Edwards stated that "the FISA court will still need to be careful to enter FISA orders only when the requirements of the Constitution as well as the statute are satisfied."  147 Cong. Rec. S10589 (Oct. 11, 2001).

We are, therefore, grateful to the ACLU and NACDL for their briefs that vigorously contest the government's argument.  Both  NACDL (which, as we have noted above, presents only the argument that the statute as amended is unconstitutional) and the ACLU rely on two propositions.  The first is not actually argued; it is really an assumption–that a FISA order does not qualify as a warrant within the meaning of the Fourth Amendment.  The second is that any government surveillance whose *primary purpose* is criminal prosecution *of whatever kind* is *per se* unreasonable if not based on a warrant.

The FISA court expressed concern that unless FISA were "construed" in the fashion that it did, the government could use a FISA order as an improper substitute for an ordinary criminal warrant under Title III.  That concern seems to suggest that the FISA court thought Title III procedures are constitutionally mandated if the government has a prosecutorial objective regarding an agent of a foreign power. But in *United States v. United States District Court (Keith)*, 407 U.S. 297, 322 (1972)–in which the Supreme Court explicitly declined to consider foreign intelligence surveillance–the Court indicated that, even with respect to domestic national security intelligence gathering for prosecutorial purposes where a warrant was mandated, Title III procedures were not constitutionally required:  "[W]e do not hold that

38

the same type of standards and procedures prescribed by Title III are necessarily applicable to this case.    We recognize that domestic security surveillance may involve different policy and practical considerations from the surveillance of 'ordinary crime.'"    Nevertheless, in asking whether FISA procedures can be regarded as reasonable under the Fourth Amendment, we think it is instructive to compare those procedures and requirements with their Title III counterparts. Obviously, the closer those FISA procedures are to Title III procedures, the lesser are our constitutional concerns.

### Comparison of FISA Procedures with Title III

It is important to note that while many of FISA's requirements for a surveillance order differ from those in Title III, few of those differences have any constitutional relevance.    In the context of ordinary crime, beyond requiring searches and seizures to be reasonable, the Supreme Court has interpreted the warrant clause of the Fourth Amendment to require three elements:

> First, warrants must be issued by neutral, disinterested magistrates.    Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense.    Finally, "warrants must particularly describe the 'things to be seized,'" as well as the place to be searched.

*Dalia v. United States,* 441 U.S. 238, 255 (1979) (citations omitted).

With limited exceptions not at issue here, both Title III and FISA require prior judicial scrutiny of an application for an order authorizing electronic surveillance.    50 U.S.C. § 1805;

18 U.S.C. § 2518.  And there is no dispute that a FISA judge satisfies the Fourth Amendment's requirement of a "neutral and detached magistrate."  *See United States v. Cavanagh*, 807 F.2d 787, 790 (9th Cir. 1987) (FISA court is a "detached and neutral body"); *see also Keith*, 407 U.S. at 323 (in domestic national security context, suggesting that a request for prior court authorization could, in sensitive cases, be made to any member of a specially designated court).

The statutes differ to some extent in their probable cause showings.  Title III allows a court to enter an *ex parte* order authorizing electronic surveillance if it determines on the basis of the facts submitted in the government's application that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" a specified predicate offense.  18 U.S.C. § 2518(3)(a).  FISA by contrast requires a showing of probable cause that the target is a foreign power or an agent of a foreign power.  50 U.S.C. § 1805(a)(3). We have noted, however, that where a U.S. person is involved, an "agent of a foreign power" is defined in terms of criminal activity.[21]  Admittedly, the definition of one category of U.S.-person agents of foreign powers–that is, persons engaged in espionage and clandestine intelligence activities for a foreign power–does not necessarily require a showing of an imminent violation of criminal law.  *See* 50 U.S.C. § 1801(b)(2)(A) (defining such activities as those which "involve" or "*may* involve" a violation of criminal statutes of the United States).

---

[21]  The term "foreign power," which is not directly at issue in this case, is not defined solely in terms of criminal activity.  For example, although the term includes a group engaged in international terrorism, which would involve criminal activity, it also includes any foreign government.  50 U.S.C. § 1801(a)(1).

Congress clearly intended a lesser showing of probable cause for these activities than that applicable to ordinary criminal cases. *See* H. REP. at 39-40, 79. And with good reason–these activities present the type of threats contemplated by the Supreme Court in *Keith* when it recognized that the focus of security surveillance "may be less precise than that directed against more conventional types of crime" even in the area of *domestic* threats to national security. *Keith*, 407 U.S. at 322. Congress was aware of *Keith*'s reasoning, and recognized that it applies *a fortiori* to foreign threats. *See* S. REP. at 15. As the House Report notes with respect to clandestine intelligence activities:

> The term "may involve" not only requires less information regarding the crime involved, but also permits electronic surveillance at some point prior to the time when a crime sought to be prevented, as for example, the transfer of classified documents, actually occurs.

H. REP. at 40. Congress allowed this lesser showing for clandestine intelligence activities–but not, notably, for other activities, including terrorism–because it was fully aware that such foreign intelligence crimes may be particularly difficult to detect.[22] At the same time, however, it provided another safeguard not present in Title III–that is, the requirement that there be probable cause to believe the target is acting "for or on behalf of a foreign power." Under the definition of "agent of a foreign power" FISA surveillance could not be authorized

> against an American reporter merely because he gathers information for publication in a newspaper, even if the

---

[22] For example, a federal agent may witness a "meet" or "drop" where information is being passed but be unable to determine precisely what information is being transmitted and therefore be unable to show that a crime is involved or what specific crime is being committed. *See* H. REP. at 39-40*; see also* S. REP. at 23.

> information was classified by the Government. Nor would it be
> authorized against a Government employee or former employee
> who reveals secrets to a reporter or in a book for the purpose of
> informing the American people. This definition would not
> authorize surveillance of ethnic Americans who lawfully gather
> political information and perhaps even lawfully share it with the
> foreign government of their national origin. It obviously would
> not apply to lawful activities to lobby, influence, or inform
> Members of Congress or the administration to take certain
> positions with respect to foreign or domestic concerns. Nor
> would it apply to lawful gathering of information preparatory to
> such lawful activities.

H. REP. at 40. Similarly, FISA surveillance would not be authorized against a target engaged

in purely domestic terrorism because the government would not be able to show that the target

is acting for or on behalf of a foreign power. As should be clear from the foregoing, FISA

applies only to certain carefully delineated, and particularly serious, foreign threats to national

security.

Turning then to the first of the particularity requirements, while Title III requires

probable cause to believe that particular communications concerning the specified crime will

be obtained through the interception, 18 U.S.C. § 2518(3)(b), FISA instead requires an official

to designate the type of foreign intelligence information being sought, and to certify that the

information sought is foreign intelligence information. When the target is a U.S. person, the

FISA judge reviews the certification for clear error, but this "standard of review is not, of

course, comparable to a probable cause finding by the judge." H. REP. at 80. Nevertheless,

FISA provides additional protections to ensure that only pertinent information is sought. The

certification must be made by a national security officer–typically the FBI Director–and must

be approved by the Attorney General or the Attorney General's Deputy. Congress recognized that this certification would "assure[] written accountability within the Executive Branch" and provide "an internal check on Executive Branch arbitrariness." H. REP. at 80. In addition, the court may require the government to submit any further information it deems necessary to determine whether or not the certification is clearly erroneous. *See* 50 U.S.C. § 1804(d).

With respect to the second element of particularity, although Title III generally requires probable cause to believe that the facilities subject to surveillance are being used or are about to be used in connection with commission of a crime or are leased to, listed in the name of, or used by the individual committing the crime, 18 U.S.C. § 2518(3)(d), FISA requires probable cause to believe that each of the facilities or places at which the surveillance is directed is being used, or is about to be used, by a foreign power or agent. 50 U.S.C. § 1805(a)(3)(B). In cases where the targeted facilities are not leased to, listed in the name of, or used by the individual committing the crime, Title III requires the government to show a nexus between the facilities and communications regarding the criminal offense. The government does not have to show, however, anything about the target of the surveillance; it is enough that "*an individual*"–not necessarily the target–is committing a crime. 18 U.S.C. §§ 2518(3)(a), (d); *see United States v. Kahn*, 415 U.S. 143, 157 (1974) ("when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under [Title III]"). On the other hand, FISA requires probable cause to believe the target is an agent of a foreign power (that is, the individual committing a foreign intelligence crime) who

43

uses or is about to use the targeted facility.  Simply put, FISA requires less of a nexus between the facility and the pertinent communications than Title III, but more of a nexus between the target and the pertinent communications.  *See* H. REP. at 73 ("the target of a surveillance is the individual or entity or about whom or from whom information is sought").

There are other elements of Title III that at least some circuits have determined are constitutionally significant–that is, necessity, duration of surveillance, and minimization.  *See, e.g., United States v. Falls,* 34 F.3d 674, 680 (8th Cir. 1994).  Both statutes have a "necessity" provision, which requires the court to find that the information sought is not available through normal investigative procedures.  *See* 18 U.S.C. § 2518(3)(c); 50 U.S.C. §§ 1804(a)(7)(E)(ii), 1805(a)(5).  Although the court's clearly erroneous review under FISA is more limited than under Title III, this greater deference must be viewed in light of FISA's additional requirement that the certification of necessity come from an upper level Executive Branch official.  The statutes also have duration provisions; Title III orders may last up to 30 days, 18 U.S.C. § 2518(5), while FISA orders may last up to 90 days for U.S. persons.  50 U.S.C. § 1805(e)(1).  This difference is based on the nature of national security surveillance, which  is "often long range and involves the interrelation of various sources and types of information."  *Keith*, 407 U.S. at 322; *see also* S. REP. at 16, 56.  Moreover, the longer surveillance period is balanced by continuing FISA court oversight of minimization procedures during that period.  50 U.S.C. § 1805(e)(3); *see also* S. REP. at 56.  And where Title III requires minimization of what is

acquired,[23] as we have discussed, for U.S. persons, FISA requires minimization of what is acquired, retained, and disseminated. The FISA court notes, however, that in practice FISA surveillance devices are normally left on continuously, and the minimization occurs in the process of indexing and logging the pertinent communications. The reasonableness of this approach depends on the facts and circumstances of each case. *Scott v. United States,* 436 U.S. 128, 140-43 (1978) (acquisition of virtually all conversations was reasonable under the circumstances). Less minimization in the acquisition stage may well be justified to the extent the intercepted communications are "ambiguous in nature or apparently involve[] guarded or coded language," or "the investigation is focusing on what is thought to be a widespread conspiracy [where] more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Id.* at 140. Given the targets of FISA surveillance, it will often be the case that intercepted communications will be in code or a foreign language for which there is no contemporaneously available translator, and the activities of foreign agents will involve multiple actors and complex plots. [

]

    *Amici* particularly focus on the differences between the two statutes concerning

---

    [23] Title III requires agents to conduct surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5).

notice.[24]   Title III requires notice to the target (and, within the discretion of the judge, to other persons whose communications were intercepted) once the surveillance order expires.   18 U.S.C. § 2518(8)(d).   FISA does not require notice to a person whose communications were intercepted unless the government "intends to enter into evidence or otherwise use or disclose" such communications in a trial or other enumerated official proceedings.   50 U.S.C. § 1806(c).   As the government points out, however, to the extent evidence obtained through a FISA surveillance order is used in a criminal proceeding, notice to the defendant is required. Of course, where such evidence is not ultimately going to be used for law enforcement, Congress observed that "[t]he need to preserve secrecy for sensitive counterintelligence sources and methods justifies elimination of the notice requirement." S. REP. at 12.

Based on the foregoing, it should be evident that while Title III contains some protections that are not in FISA, in many significant respects the two statutes are equivalent, and in some, FISA contains additional protections.[25]    Still, to the extent the two statutes

---

[24]    *Amici* also emphasize that Title III generally entitles a defendant to obtain the surveillance application and order to challenge to the legality of the surveillance, 18 U.S.C. § 2518(9), while FISA does not normally allow a defendant to obtain the same if the Attorney General states that disclosure or an adversary hearing would harm national security, 50 U.S.C. § 1806(f).   Under such circumstances, the judge conducts an *in camera* and *ex parte* review to determine whether the electronic surveillance was lawful, whether disclosure or discovery is necessary, and whether to grant a motion to suppress.   *Id*. §§ 1806(f), (g).    Clearly, the decision whether to allow a defendant to obtain FISA materials is made by a district judge on a case by case basis, and the issue whether such a decision protects a defendant's constitutional rights in any given case is not before us.

[25]    In addition to the protections already discussed, FISA has more extensive reporting requirements than Title III, *compare* 18 U.S.C. § 2519(2) *with* 50 U.S.C. § 1808(a)(1), and is subject to close and continuing oversight by Congress as a check against Executive Branch abuses.   S. REP. at 11-12.   Also, the Patriot Act contains sunset provisions, *see* Section 224(a)

diverge in constitutionally relevant areas–in particular, in their probable cause and particularity showings–a FISA order may not be a "warrant" contemplated by the Fourth Amendment. The government itself does not actually claim that it is, instead noting only that there is authority for the proposition that a FISA order is a warrant in the constitutional sense. *See Cavanagh,* 807 F.2d at 790 (concluding that FISA order can be considered a warrant since it is issued by a detached judicial officer and is based on a reasonable showing of probable cause); *see also Pelton,* 835 F.2d at 1075 (joining *Cavanagh* in holding that FISA procedures meet constitutional requirements); *Falvey,* 540 F. Supp. at 1314 (holding that unlike in *Truong,* a congressionally crafted warrant that met Fourth Amendment standards was obtained authorizing the surveillance). We do not decide the issue but note that to the extent a FISA order comes close to meeting Title III, that certainly bears on its reasonableness under the Fourth Amendment.

### Did Truong Articulate the Appropriate Constitutional Standard?

Ultimately, the question becomes whether FISA, as amended by the Patriot Act, is a reasonable response based on a balance of the legitimate need of the government for foreign intelligence information to protect against national security threats with the protected rights of citizens. *Cf. Keith*, 407 U.S. at 322-23 (in domestic security context, holding that standards different from those in Title III "may be compatible with the Fourth Amendment if they are

_____

of Patriot Act, Pub. L. 107-56, 115 Stat. 272 (Oct. 26, 2001), thus allowing Congress to revisit the Act's amendments to FISA.

reasonable both in relation to the legitimate need of the government for intelligence information and the protected rights of our citizens"). To answer that question–whether the Patriot Act's disavowal of the primary purpose test is constitutional–besides comparing the FISA procedures with Title III, it is necessary to consider carefully the underlying rationale of the primary purpose test.

It will be recalled that the case that set forth the primary purpose test *as constitutionally required* was *Truong*. The Fourth Circuit thought that *Keith*'s balancing standard implied the adoption of the primary purpose test. We reiterate that *Truong* dealt with a pre-FISA surveillance based on the President's constitutional responsibility to conduct the foreign affairs of the United States. 629 F.2d at 914. Although *Truong* suggested the line it drew was a constitutional minimum that would apply to a FISA surveillance, *see id.* at 914 n.4, it had no occasion to consider the application of the statute carefully. The *Truong* court, as did all the other courts to have decided the issue, held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information.[26] It was incumbent upon the court, therefore, to determine the boundaries of that constitutional authority in the case before it. We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power. The question before us is the reverse, does FISA amplify the President's power by providing a

---

[26] Although the plurality opinion in *Zweibon v. Mitchell*, 516 F.2d 594, 633-51 (D.C. Cir. 1975) (en banc), *cert. denied*, 425 U.S. 944 (1976), suggested the contrary in *dicta*, it did not decide the issue.

mechanism that at least approaches a classic warrant and which therefore supports the government's contention that FISA searches are constitutionally reasonable.

The district court in the *Truong* case had excluded evidence obtained from electronic surveillance after the government's investigation–the court found–had converted from one conducted for foreign intelligence reasons to one conducted primarily as a criminal investigation. (The defendants were convicted based in part on surveillance evidence gathered before that point.) The district judge had focused on the date that the Criminal Division had taken a central role in the investigation. The court of appeals endorsed that approach stating:

> We think that the district court adopted the proper test, because once surveillance becomes primarily a criminal investigation, the courts are entirely competent to make the usual probable cause determination, and because, importantly, individual privacy interests come to the fore *and government foreign policy concerns recede* when the government is primarily attempting to form the basis of a criminal prosecution.

*Id.* at 915 (emphasis added).

That analysis, in our view, rested on a false premise and the line the court sought to draw was inherently unstable, unrealistic, and confusing. The false premise was the assertion that once the government moves to criminal prosecution, its "foreign policy concerns" recede. As we have discussed in the first part of the opinion, that is simply not true as it relates to counterintelligence. In that field the government's primary purpose is to halt the espionage or terrorism efforts, and criminal prosecutions can be, and usually are, interrelated with other techniques used to frustrate a foreign power's efforts. Indeed, the Fourth Circuit itself, rejecting defendant's arguments that it should adopt a "solely foreign intelligence purpose

49

test," acknowledged that "almost all foreign intelligence investigations are in part criminal investigations." *Id*. (It would have been more accurate to refer to counterintelligence investigations.)

The method the court endorsed for determining when an investigation became primarily criminal was based on the organizational structure of the Justice Department. The court determined an investigation became primarily criminal when the Criminal Division played a lead role. This approach has led, over time, to the quite intrusive organizational and personnel tasking the FISA court adopted. Putting aside the impropriety of an Article III court imposing such organizational strictures (which we have already discussed), the line the *Truong* court adopted–subsequently referred to as a "wall"–was unstable because it generates dangerous confusion and creates perverse organizational incentives. *See, e.g.,* AGRT Report at 723-26.[27] That is so because counterintelligence brings to bear both classic criminal investigation techniques as well as less focused intelligence gathering. Indeed, effective counterintelligence, we have learned, requires the wholehearted cooperation of all the government's personnel who can be brought to the task. A standard which punishes such cooperation could well be thought dangerous to national security.[28] Moreover, by focusing on

---

[27] We are told that the FBI has even thought it necessary because of FISA court rulings to pass off a criminal investigation to another government department when the FBI was conducting a companion counterintelligence inquiry.

[28] The AGRT Report bears this out: "Unfortunately, the practice of excluding the Criminal Division from FCI investigations was not an isolated event confined to the Wen Ho Lee matter. It has been a way of doing business for OIPR, acquiesced in by the FBI, and inexplicably indulged by the Department of Justice. One FBI supervisor has said that it has

the subjective motivation of those who initiate investigations, the *Truong* standard, as administered by the FISA court, could be thought to discourage desirable initiatives.    (It is also at odds with the Supreme Court's Fourth Amendment jurisprudence which regards the subjective motivation of an officer conducting a search or seizure as irrelevant.  *See, e.g., Whren v. United States*, 517 U.S. 806 (1996).)

Recent testimony before the Joint Intelligence Committee amply demonstrates that the *Truong* line is a very difficult one to administer.  Indeed, it was suggested that the FISA court requirements based on *Truong* may well have contributed, whether correctly understood or not, to the FBI missing opportunities to anticipate the September 11, 2001 attacks.[29]  That is not to say that we should be prepared to jettison Fourth Amendment requirements in the interest of national security.    Rather, assuming *arguendo* that FISA orders are not Fourth Amendment warrants, the question becomes, are the searches constitutionally reasonable.  And

only been 'lucky' that a case has not yet been hampered by the rigid interpretation of the rules governing contacts with the Criminal Division.    It may be said that in the Wen Ho Lee investigation, luck ran out."  *Id*. at 708 (citation omitted).

[29]  An FBI agent recently testified that efforts to conduct a criminal investigation of two of the alleged  hijackers were blocked by senior FBI officials–understandably concerned about prior FISA court criticism–who interpreted that court's decisions as precluding a criminal investigator's role.   One agent, frustrated at encountering the "wall," wrote to headquarters: "[S]omeday someone will die–and wall or not–the public will not understand why we were not more effective and throwing every resource we had at certain 'problems.'    Let's hope the National Security Law Unit will stand behind their decisions then, especially since the biggest threat to us now, [Usama Bin Laden], is getting the most 'protection.'"   The agent was told in response that headquarters was frustrated with the issue, but that those were the rules, and the National Security Law Unit does not make them up.  *The Malaysia Hijacking and September 11th:  Joint Hearing Before the Senate and House Select Intelligence Committees* (Sept. 20, 2002) (written statement of New York special agent of the FBI).

in judging reasonableness, the instability of the *Truong* line is a relevant consideration.

The Fourth Circuit recognized that the Supreme Court had never considered the constitutionality of warrantless government searches for foreign intelligence reasons, but concluded the analytic framework the Supreme Court adopted in *Keith*–in the case of domestic intelligence surveillance–pointed the way to the line the Fourth Circuit drew. The Court in *Keith* had, indeed, balanced the government's interest against individual privacy interests, which is undoubtedly the key to this issue as well; but we think the *Truong* court misconceived the government's interest and, moreover, did not draw a more appropriate distinction that *Keith* at least suggested. That is the line drawn in the original FISA statute itself between ordinary crimes and foreign intelligence crimes.

It will be recalled that *Keith* carefully avoided the issue of a warrantless foreign intelligence search: "We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents." 407 U.S. at 321-22.[30] But in indicating that a somewhat more relaxed warrant could suffice in the domestic intelligence situation, the court drew a distinction between the crime involved in that case, which posed a threat to national security, and "ordinary crime." *Id.* at 322. It pointed out that "the focus of domestic surveillance may be less precise than that directed against more conventional types of crimes." *Id.*

The main purpose of ordinary criminal law is twofold: to punish the wrongdoer and to

---

[30]    The Court in a footnote though, cited authority for the view that warrantless surveillance may be constitutional where foreign powers are involved. *Keith,* 407 U.S. at 322 n.20.

deter other persons in society from embarking on the same course. The government's concern with respect to foreign intelligence crimes, on the other hand, is overwhelmingly to stop or frustrate the immediate criminal activity. As we discussed in the first section of this opinion, the criminal process is often used as part of an integrated effort to counter the malign efforts of a foreign power. Punishment of the terrorist or espionage agent is really a secondary objective;[31] indeed, punishment of a terrorist is often a moot point.

### Supreme Court's Special Needs Cases

The distinction between ordinary criminal prosecutions and extraordinary situations underlies the Supreme Court's approval of entirely warrantless and even suspicionless searches that are designed to serve the government's "special needs, beyond the normal need for law enforcement." *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 653 (1995) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks omitted)) (random drug-testing of student athletes).[32] Apprehending drunk drivers and securing the border constitute such unique interests beyond ordinary, general law enforcement. *Id.* at 654 (citing *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444 (1990), and *United States v. Martinez-*

---

[31] To be sure, punishment of a U.S. person's espionage for a foreign power does have a deterrent effect on others similarly situated.

[32] The Court has also allowed searches for certain administrative purposes to be undertaken without particularized suspicion of misconduct. *See*, *e.g., New York v. Burger,* 482 U.S. 691, 702-04 (1987) (warrantless administrative inspection of premises of closely regulated business); *Camara v. Municipal Court*, 387 U.S. 523, 534-39 (1967) (administrative inspection to ensure compliance with city housing code).

*Fuerte*, 428 U.S. 543 (1976)).

A recent case, *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), is relied on by both the government and *amici*. In that case, the Court held that a highway check point designed to catch drug dealers did not fit within its special needs exception because the government's "primary purpose" was merely "to uncover evidence of ordinary criminal wrongdoing." *Id*. at 41-42. The Court rejected the government's argument that the "severe and intractable nature of the drug problem" was sufficient justification for such a dragnet seizure lacking any individualized suspicion. *Id*. at 42. *Amici* particularly rely on the Court's statement that "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *Id.*

But by "purpose" the Court makes clear it was referring not to a subjective intent, which is not relevant in ordinary Fourth Amendment probable cause analysis, but rather to a programmatic purpose. The Court distinguished the prior check point cases *Martinez-Fuerte* (involving checkpoints less than 100 miles from the Mexican border) and *Sitz* (checkpoints to detect intoxicated motorists) on the ground that the former involved the government's "longstanding concern for the protection of the integrity of the border," *id*. at 38 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985)), and the latter was "aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways." *Id*. at 39. The Court emphasized that it was decidedly not drawing a distinction between suspicionless seizures with a "non-law-enforcement primary purpose" and those designed for law enforcement. *Id.* at 44 n.1. Rather, the Court distinguished general crime control

54

programs and those that have another particular purpose, such as protection of citizens against special hazards or protection of our borders. The Court specifically acknowledged that an appropriately tailored road block could be used "to thwart an imminent terrorist attack." *Id.* at 44. The nature of the "emergency," which is simply another word for threat, takes the matter out of the realm of ordinary crime control.[33]


## Conclusion

FISA's general programmatic purpose, to protect the nation against terrorists and espionage threats directed by foreign powers, has from its outset been distinguishable from "ordinary crime control." After the events of September 11, 2001, though, it is hard to imagine greater emergencies facing Americans than those experienced on that date.

We acknowledge, however, that the constitutional question presented by this case–whether Congress's disapproval of the primary purpose test is consistent with the Fourth

---

[33]    *Amici* rely on *Ferguson v. City of Charleston,* 532 U.S. 67 (2001), in arguing that the "special needs" cases acknowledge that the Fourth Amendment is particularly concerned with intrusions whose primary purpose is to gather evidence of crime. In that case, the Court struck down a non-consensual policy of testing obstetrics patients for drug use. The Court stated that "[w]hile the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal." *Id.* at 82-83 (emphasis in original; footnotes omitted). In distinguishing the "special needs" cases, the Court noted that "[i]t is especially difficult to argue that the program here was designed simply to save lives," in light of evidence that the sort of program at issue actually discouraged women from seeking prenatal care. *Id.* at 844 n.23. Thus, *Ferguson* does not involve a situation in which law enforcement is directly connected to the prevention of a special harm.

Amendment–has no definitive jurisprudential answer. The Supreme Court's special needs cases involve random stops (seizures) not electronic searches. In one sense, they can be thought of as a greater encroachment into personal privacy because they are not based on any particular suspicion. On the other hand, wiretapping is a good deal more intrusive than an automobile stop accompanied by questioning.

Although the Court in *City of Indianapolis* cautioned that the threat to society is not dispositive in determining whether a search or seizure is reasonable, it certainly remains a crucial factor. Our case may well involve the most serious threat our country faces. Even without taking into account the President's inherent constitutional authority to conduct warrantless foreign intelligence surveillance, we think the procedures and government showings required under FISA, if they do not meet the minimum Fourth Amendment warrant standards, certainly come close. We, therefore, believe firmly, applying the balancing test drawn from *Keith*, that FISA as amended is constitutional because the surveillances it authorizes are reasonable.

Accordingly, we reverse the FISA court's orders in this case to the extent they imposed conditions on the grant of the government's applications, vacate the FISA court's Rule 11, and remand with instructions to grant the applications as submitted and proceed henceforth in accordance with this opinion.

# Plaintiff's Exhibit E

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 07-0403 (TFH)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
and Cross-Motion for *In Camera* Review

REDACTED
COPY

No. 02-001

IN THE UNITED STATES FOREIGN INTELLIGENCE SURVEILLANCE
COURT OF REVIEW

IN RE

ON APPEAL FROM
THE UNITED STATES FOREIGN INTELLIGENCE SURVEILLANCE COURT

BRIEF FOR THE UNITED STATES

JOHN ASHCROFT
Attorney General

LARRY D. THOMPSON
Deputy Attorney General

THEODORE B. OLSON
Solicitor General

DAVID S. KRIS
Associate Deputy Attorney General

JAMES A. BAKER
Counsel for Intelligence Policy

JONATHAN L. MARCUS
Attorney Advisor
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
(202) 514-2882

TABLE OF CONTENTS (U)

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . 1

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . 3

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . 3

  I.   STATUTORY FRAMEWORK . . . . . . . . . . . . . . . 3

  II.  THE FISA APPLICATION AND THE FISC'S
      ORDER IN THIS CASE . . . . . . . . . . . . . . . 8

      A.  The Foreign Counterintelligence Investigation . 8

      B.  The Criminal Investigation . . . . . . . . . 10

      C.  Coordination Between the Counterintelligence and
          Criminal Investigations . . . . . . . . . 12

          1.  The March 2002 Procedures . . . . . . . 13

          2.  The FISC's May 2002 Order . . . . . . . 17

          3.  The FISC's May 2002 Opinion . . . . . . 20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 27

  I.   THE FISC ERRED IN USING "MINIMIZATION" PROVISIONS TO
     LIMIT THE PURPOSE OF FISA SEARCHES AND SURVEILLANCE AND
     CONSULTATIONS BETWEEN INTELLIGENCE AND LAW ENFORCEMENT
     OFFICIALS . . . . . . . . . . . . . . . . . . . . 27

  II.  CONSULTATIONS TO COORDINATE LAW ENFORCEMENT AND
     INTELLIGENCE EFFORTS TO PROTECT NATIONAL SECURITY FROM
     FOREIGN THREATS CANNOT JUSTIFY DENIAL OF A FISA
     APPLICATION . . . . . . . . . . . . . . . . . . . 30

A.  FISA May Be Used Primarily, or Exclusively, to Obtain Evidence for a Prosecution Designed to Protect the United States Against Foreign Spies and Terrorists . . . . . . . . . . . . . . . . 30

B.  FISA May Be Used Primarily to Obtain Evidence for a Prosecution if the Government Also Has a Significant Non-Law Enforcement Foreign Intelligence Purpose . . . . . . . . . . . . . 49

C.  The FISC Erred in Denying in Part the FISA Application in This Case . . . . . . . . . . 57

    1.  The Ban on "Direction or Control" . . . . 60

    2.  The Chaperone Requirement . . . . . . . 64

III. AS AMENDED BY THE USA PATRIOT ACT, FISA IS CONSTITUTIONAL . . . . . . . . . . . . . . . . 67

A.  FISA May Be Used Primarily, or Exclusively, to Obtain Evidence for a Prosecution Designed to Protect the United States Against Foreign Spies and Terrorists . . . . . . . . . . . . . . 67

B.  FISA May Be Used Primarily to Obtain Evidence for a Prosecution if the Government Also Has a Significant Non-Law Enforcement Foreign Intelligence Purpose . . . . . . . . . . . 74

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 78

TABLE OF AUTHORITIES (U)

CASES:

Page

Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) . . 51

Carlisle v. United States, 517 U.S. 416 (1996)
. . . . . . . . 51

Chagnon v. Bell, 642 F.2d 1248 (D.C. Cir. 1980) . . . . . . . 77

Chicago & Southern Air Lines v. Waterman,
333 U.S. 103 (1948) . . . . . . . . . . . . . . . . . 70

City of Indianapolis v. Edmond, 531 U.S. 32 (2000)
. . . . . 72

Dickerson v. United States, 530 U.S. 428 (2000) . . . . . . 66

Ferguson v. City of Charleston, 121 S. Ct. 1281 (2001) . . . 74

Global Relief Foundation v. O'Neill, 2002 WL 1285829
(N.D. Ill. June 11, 2002) . . . . 10

Haig v. Agee, 453 U.S. 280 (1981) . . . . . . . . . . . . 70

In re Sealed Case, 151 F.3d 1059
(D.C. Cir. 1998) . . . . . . . . . . . . . . . . 2,3

Mobile Communications Corp. of America v. FCC,
77 F.3d 1399 (D.C. Cir. 1996) . . . . . . . . . . . 2

Scott v. United States, 436 U.S. 128 (1978) . . . . . 27,28,29

United States v. Armstrong, 517 U.S. 456 (1996) . . . . . . 56

United States v. Badia, 827 F.2d 1458
(11th Cir. 1987) . . . . . . . . . . . . . . . . . 46

United States v. Brito, 136 F.3d 397
(5th Cir. 1998) . . . . . . . . . . . . . . . . 52

United States v. Curtiss-Wright Export Corp.,
299 U.S. 304 (1936) . . . . . . . . . . . . . . . 70

United States v. Duggan, 743 F.2d 59
(2d Cir. 1984) . . . . . . . . . . . . . . . . 46,49,56,70

United States v. Johnson, 952 F.2d 565
    (1st Cir. 1992)  . . . . . . . . . . . . . . . .

United States v. Morton, 467 U.S. 822 (1984) . . . . . . . . . 46

United States v. Pelton, 835 F.2d 1067
    (4th Cir. 1987)  . . . . . . . . . . . . . . . 30

United States v. Roberts, 913 F.2d 211
    (5th Cir. 1990) . . . . . . . . . . . . . . . . 46

United States v. Sarkissian, 841 F.2d 959
    (9th Cir. 1988) . . . . . . . . . . . . . . . . 52

United States v. Soto-Silva, 129 F.3d 340
    (5th Cir. 1997) . . . . . . . . . . . . . . . 47,48

United States v. Truong Dinh Hung, 629 F.2d 908
    (4th Cir. 1980) . . . . . . . . . . . . . . . 52

United States v. United States District Court (Keith),
    407 U.S. 297 (1972) . . . . . . . . . 46,47,50,51,54,70,76
    . . . . . . . . . . . . . . . . 26,68-71,74

STATUTES and RULES:

12 U.S.C. § 1114 . . . . . . . . . . . . . . . . .

15 U.S.C. § 1681(u) . . . . . . . . . . . . . . . . 63

18 U.S.C. § 2510(5) . . . . . . . . . . . . . . . 63

18 U.S.C. § 2709 . . . . . . . . . . . . . . . . 28

18 U.S.C. § 3491 . . . . . . . . . . . . . . . . 63

18 U.S.C. § 3505 . . . . . . . . . . . . . . . . 63

18 U.S.C. § 3506 . . . . . . . . . . . . . . . . 63

18 U.S.C. § 6001-6003 . . . . . . . . . . . . . . 63

28 U.S.C. § 1651(a) . . . . . . . . . . . . . . . 63

50 U.S.C. § 1801 . . . . . . . . . . . . . . . . 2
    . . . . . . . . . . . . . . . . 1,4

50 U.S.C. § 1801(a)(1)  . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1801(a)(4)  . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1801(a)-(c)  . . . . . . . . . . . . . . . . . . 31

50 U.S.C. § 1801(b)(1)(A)  . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1801(b)(2)(C)  . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1801(b)(2)(E)  . . . . . . . . . . . . . . . . . . 8

50 U.S.C. § 1801(c)  . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1801(e)(1)  . . . . . . . . . . . . . . . . 6,24,31,43

50 U.S.C. § 1801(e)(1)(A)-(C)  . . . . . . . . . . . . . . . . 35

50 U.S.C. § 1801(e)(1)(B)  . . . . . . . . . . . . . . . . . 37

50 U.S.C. § 1801(e)(1)(C)  . . . . . . . . . . . . . . . . . 37

50 U.S.C. § 1801(e)(2)  . . . . . . . . . . . . . . . . . . 31

50 U.S.C. § 1801(g)  . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1801(h)  . . . . . . . . . . . . . . . . . 6,7,20,22,37

50 U.S.C. § 1801(h)(1)  . . . . . . . . . . . . . . . . 23,27,42,44

50 U.S.C. § 1801(h)(3)  . . . . . . . . . . . . . . . . . . 42,44

50 U.S.C. § 1803(a)  . . . . . . . . . . . . . . . . . . . 1,4,7

50 U.S.C. § 1803(b)  . . . . . . . . . . . . . . . . . . . 2,4,8

50 U.S.C. § 1804  . . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1804(a)(3)  . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1804(a)(4)(A)  . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1804(a)(5),  . . . . . . . . . . . . . . . . . . 6

50 U.S.C. § 1804(a)(7)(A)-(B)  . . . . . . . . . . . . . . . . 6

50 U.S.C. § 1804(a)(7)(B) . . . . . . . . . . . . . 3,14,30,35,49

50 U.S.C. § 1805 . . . . . . . . . . . . . . . . . 6,7

50 U.S.C. § 1805(c) . . . . . . . . . . . . . . . . . 7

50 U.S.C. § 1806(a) . . . . . . . . . . . . . . . 24,32,37

50 U.S.C. § 1806(b) . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1806(c) . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1806(e) . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1806(k) . . . . . . . . . . . . 3,14,17,21,34,35

50 U.S.C. § 1806(k)(1)(A)-(C) . . . . . . . . . . . . 35

50 U.S.C. § 1811 . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1821 . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1821(4) . . . . . . . . . . . . . . 6,7,20,22

50 U.S.C. § 1821(4)(A) . . . . . . . . . . . . 23,27,42,44

50 U.S.C. § 1821(4)(C) . . . . . . . . . . . . . . 42,44

50 U.S.C. § 1822(b)-(d) . . . . . . . . . . . . . . . 4

50 U.S.C. § 1822(c) . . . . . . . . . . . . . . . . 1,7

50 U.S.C. § 1822(d) . . . . . . . . . . . . . . . . . 8

50 U.S.C. § 1823 . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1823(a)(3) . . . . . . . . . . . . . . . 5

50 U.S.C. § 1823(a)(4)(A) . . . . . . . . . . . . . . 5

50 U.S.C. § 1823(a)(7)(A)-(B) . . . . . . . . . . . . 6

50 U.S.C. § 1823(a)(7)(B) . . . . . . . . . . . . 14,30,35,49

50 U.S.C. § 1823(a)(5)  . . . . . . . . . . . . . . . . . . 6

50 U.S.C. § 1824  . . . . . . . . . . . . . . . . . 6,7,35

50 U.S.C. § 1824(c)  . . . . . . . . . . . . . . . . . . . 7

50 U.S.C. § 1825(a)  . . . . . . . . . . . . . . . . . 24,32

50 U.S.C. § 1825(c)  . . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1825(d)  . . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1825(f)  . . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1825(k)  . . . . . . . . . . . . . 14,17,21,34,35

50 U.S.C. § 1825(k)(1)(A)-(C)  . . . . . . . . . . . . . . 35

50 U.S.C. § 1829  . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 103-359, 108 Stat. 3423 (Oct. 14, 1994) . . . . . . 4

H.R. Rep. No. 95-1283, 95th Cong., 2d Sess. (1978) . . . .7,28-29,
                                                     31-32, 36-39,
                                                     41, 43-44, 53,
                                                     55, 72

S. Rep. No. 95-604, 95th Cong., 2d Sess. (1978) . . . . . . 39

S. Rep. No. 95-701, 95th Cong., 2d Sess. (1978) . . 28,32,39,40,
67,70-72, 75

S. Rep. No. 103-296, 103d Cong., 2d Sess. (1994) . . . . . . 39

The USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272
     (Oct. 26, 2001)  . . . . . 4,6,12-14,21-24,26,30,34,41,45,
                                49,51-54,66,67,74


MISCELLANEOUS:

Fund for the Republic, Digest of the Public Record of Communism
in the United States (New York 1955) . . . . . . . . . . . 71

General Accounting Office, *FBI Intelligence Investigations:
Coordination Within Justice on Counterintelligence Criminal
Matters is Limited* (July 2001) (GAO-01-780) . . . . . . . . 59

*Final Report of the Attorney General's Review Team on the
Handling of the Los Alamos National Laboratory Investigation,*
Chapter 20, at 721-734 (May 2000) . . . . . . . . . . . 19,59,61

*Meriam-Webster's Collegiate Dictionary* (10th ed. 1998) . . . 51

IN THE UNITED STATES FOREIGN INTELLIGENCE SURVEILLANCE
COURT OF REVIEW

No. 02-001

IN RE

ON APPEAL FROM
THE UNITED STATES FOREIGN INTELLIGENCE SURVEILLANCE COURT

BRIEF FOR THE UNITED STATES

JURISDICTION (U)

This is an appeal by the United States from the partial
denial of an application for orders authorizing electronic
surveillance under the Foreign Intelligence Surveillance Act of
1978, as amended, 50 U.S.C. §§ 1801-1862 (FISA). The Foreign
Intelligence Surveillance Court (FISC) (Baker, J.), which had
jurisdiction under 50 U.S.C. §§ 1803(a) and 1822(c), entered its
judgment, and provided a written statement of reasons for its
decision, on July 19, 2002. In accord with 50 U.S.C. § 1803(a)
and Rule 6 of the Rules of the FISC, the United States moved for
transmittal of the record, under seal, to this Court on July 24,
2002. This Court's jurisdiction rests on 50 U.S.C. § 1803(b).
(U)

Although the FISC's order is not styled as a "denial," but
rather as a grant of the FISA application as "as modified," it
qualifies as a "denial" for purposes of establishing this Court's
jurisdiction.  July 2002 Order at 9.  As detailed below, the
government's application proposed that the electronic
surveillance be authorized on certain terms, and the FISC's order
rejected those terms and imposed restrictions on the government's
investigation.  Thus, the government's application was denied in
part.  See, e.g., *Mobile Communications Corp. of Am. v. FCC*, 77
F.3d 1399, 1403-1404 (D.C. Cir. 1996) (grant of station license
subject to condition that is unacceptable to applicant is denial
of license subject to judicial review under statute that permits
such review when applications for license are denied; otherwise
the FCC could "foreclose judicial review of a de facto denial by
couching its decision as an approval subject to some intolerable
condition").[1]  (U)

---

[1] To the extent any doubt remains as to this Court's
jurisdiction, we ask the Court to rely on the All Writs Act,
which provides that "[t]he Supreme Court and all courts
established by Act of Congress may issue all writs necessary or
appropriate in aid of their respective jurisdictions and
agreeable to the usages and principles of law."  28 U.S.C.
§ 1651(a).  Where, as here, a lower court issues a decision
denying effect to key provisions of a recently enacted federal
statute, mandamus is appropriate.  See, e.g., *In re Sealed Case*,
151 F.3d 1059, 1063 (D.C. Cir. 1998) (per curiam) (granting
mandamus where right to it is "clear and indisputable" and "no
other adequate means to attain the relief exist") (internal
quotation marks omitted).  (U)

### QUESTION PRESENTED (U)

Whether the FISC erred in denying in relevant part an application for orders authorizing electronic surveillance where a "significant purpose" of the surveillance is to obtain foreign intelligence information, 50 U.S.C. § 1804(a)(7)(B), and intelligence officers conducting the electronic surveillance intend to "consult with Federal law enforcement officers to coordinate efforts to investigate [and] protect against * * * international terrorism," 50 U.S.C. § 1806(k). (U)

### STATEMENT (U)

I.    STATUTORY FRAMEWORK (U)

The Foreign Intelligence Surveillance Act of 1978 (FISA) governs electronic surveillance and physical searches of foreign powers and their agents inside the United States. The statute establishes two special courts: The FISC, which is comprised of 11 district court judges appointed by the Chief Justice, and this Court, which is comprised of three district court or court of appeals judges appointed by the Chief Justice.[2] 50 U.S.C. §§ 1803(a) and (b). The FISC has jurisdiction to grant or deny

---

[2] As enacted in 1978, FISA provided for a FISC comprised of seven district court judges. The "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (USA Patriot Act), Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), raised the number of judges from seven to 11, of whom no fewer than three must reside within 20 miles of the District of Columbia. (U)

applications for orders authorizing electronic surveillance and
physical searches under the procedures set forth in FISA, and
this Court has jurisdiction to review the denial of any
application made under FISA.  *Ibid.*; 50 U.S.C. § 1822(b)-(d).³
(U)

Applications for court orders authorizing searches or
surveillance under FISA are made to the FISC under oath by a
federal officer with the approval of the Attorney General, the
Acting Attorney General, or the Deputy Attorney General.  50
U.S.C. §§ 1801(g), 1804, 1823.  The application must identify or
describe the target of the search or surveillance, and establish
that the target is either a "foreign power" or an "agent of a
foreign power."  50 U.S.C. §§ 1804(a)(3), 1804(a)(4)(A),
1823(a)(3), 1823(a)(4)(A).  A "foreign power" is defined to
include, among other things, a "foreign government or any
component thereof," and a "group engaged in international
terrorism."  50 U.S.C. §§ 1801(a)(1), (4).  The statute defines

---

³ As enacted in 1978, FISA permitted applications for and
orders authorizing electronic surveillance, but did not refer to
physical searches.  50 U.S.C. §§ 1801-1811.  In 1994, the statute
was amended to permit applications for and orders authorizing
physical searches.  Pub. L. No. 103-359, 108 Stat. 3423, 3443
(Oct. 14, 1994); 50 U.S.C. §§ 1821-1829.  The procedures
governing FISA physical searches are similar to those governing
FISA electronic surveillance.  Although this case does not
involve a physical search, we cite both the electronic
surveillance and parallel physical search provisions of FISA in
this brief.  (U)

"agent of a foreign power" to include any person who "knowingly
engages in * * * international terrorism * * * for or on behalf
of a foreign power," and any person "other than a United States
person" - i.e., someone other than a U.S. citizen or permanent
resident alien - who is a "member" of a group engaged in
international terrorism.  50 U.S.C. §§ 1801(b)(1)(A), (b)(2)(C),
(i).  "International terrorism" is defined by FISA to require
activities that (1) involve violent or dangerous acts that
violate U.S. law (or would do so if committed here); (2) appear
to be intended to "intimidate or coerce" a civilian population,
to "influence" government policy through "intimidation or
coercion," or to "affect the conduct of government by
assassination or kidnapping"; and (3) either "occur totally
outside the United States, or transcend national boundaries" in
various ways.  50 U.S.C. § 1801(c).  (U)

     Each FISA application must include a certification from a
high-ranking Executive Branch official, such as the Director of
the FBI, that the official "deems the information sought [by the
search or surveillance] to be foreign intelligence information,"
and that "a significant purpose" of the search or surveillance is
to obtain "foreign intelligence information."[4]  50 U.S.C.

_____

     [4] As originally enacted in 1978, FISA required a
certification that "the purpose" of the search or surveillance

5

§§ 1804(a)(7)(A)-(B), 1823(a)(7)(A)-(B). FISA defines the term
"foreign intelligence information" to include information
necessary to "protect" the United States from espionage and
international terrorism committed by foreign powers or their
agents. 50 U.S.C. § 1801(e)(1). Each FISA application must also
propose "minimization procedures" for the conduct of the search
or surveillance. 50 U.S.C. §§ 1804(a)(5), 1823(a)(5), 1801(h),
1821(4). (U)

An individual judge of the FISC reviews each FISA
application following its submission. 50 U.S.C. §§ 1805, 1824.
To approve an application, the judge must find that it
establishes "probable cause" to believe that the target of the
search or surveillance is a foreign power or an agent of a
foreign power. *Ibid.* The judge must also find that the proposed
minimization procedures are "reasonably designed * * * to
minimize the acquisition and retention, and prohibit the
dissemination, of nonpublicly available information concerning
unconsenting United States persons consistent with the need of
the United States to obtain, produce, and disseminate foreign
intelligence information." *Ibid.*; 50 U.S.C. §§ 1801(h), 1821(4).

---

was to obtain foreign intelligence information. The standard was
changed to "a significant purpose" in the USA Patriot Act. See
Argument II.B, *infra*. (U)

Finally, where the target of the search or surveillance is a
"United States person" – a U.S. citizen or permanent resident
alien – the judge must find that the Executive Branch's
certification that a significant purpose of the search or
surveillance is to obtain foreign intelligence information is not
"clearly erroneous." 50 U.S.C. §§ 1805, 1824; H.R. Rep. No. 95-
1283, Part I, 95th Cong., 2d Sess. (1978), at 80-81 [hereinafter
House Report]. (U)

If the judge grants the FISA application, he signs an order
identifying or describing the target and the facilities or places
to be searched or surveilled, and directing that minimization
procedures be followed, among other things. 50 U.S.C.
§§ 1805(c), 1824(c). If the FISC judge denies a FISA
application, he must "provide immediately for the record a
written statement of each reason for [the] decision." 50 U.S.C.
§§ 1803(a), 1822(c). Once an individual judge has denied an
application, no other FISC judge may consider it; this Court is
the only forum in which the FISC judge's decision may be
reviewed. Ibid. There is no provision in FISA for a notice of
appeal from the denial of an application; instead, "on motion of
the United States, the record shall be transmitted, under seal,
to" this Court. Ibid.; see FISC Rule 6. Thereafter, this Court
may either affirm or reverse the FISC judge's decision; if this

7

Court "determines that the application was properly denied," then it too must "provide for the record a written statement of each reason for its decision." 50 U.S.C. §§ 1803(b), 1822(d). The Supreme Court has jurisdiction to review this Court's decision by writ of certiorari. *Ibid.* (U)

II. THE FISA APPLICATION AND THE FISC'S ORDER IN THIS CASE (U)

    A. <u>The Foreign Counterintelligence Investigation</u>. (U)

9

B.    The Criminal Investigation.    (U)

11

C.    <u>Coordination Between the Counterintelligence and
      Criminal Investigations</u>.   (U)

The FISA application in this case stated that, upon approval
of the FISC, the government would follow the coordination
standards set forth in Intelligence Sharing Procedures adopted by
the Attorney General on March 6, 2002.  App. 1:2.[5]  As detailed
below, the Attorney General adopted those Procedures to implement
the USA Patriot Act, which changed the standards governing
coordination between intelligence and law enforcement officials
under FISA.  The new Procedures were submitted to the FISC on

---

[5] "App." refers to the Appendix filed with the FISA
Application in this case, and is followed by a tab number, and
where applicable, a document number, and/or a page number.   (U)

March 7, 2002, and were rejected in part and rewritten in part by the FISC in an order and opinion issued on May 17, 2002. App. 6. In the current case, the FISC likewise rejected the government's request to follow the March 2002 Procedures and granted the FISA application on condition that the government obey the FISC's May 2002 order. See July 2002 Order 6-7. The following paragraphs describe the main provisions of the March 2002 Procedures, the FISC's May 2002 order modifying the Procedures, and the FISC's May 2002 opinion explaining the reasons for its order. (U)

1. The March 2002 Procedures. The Department's March 2002 Intelligence Sharing Procedures are designed to ensure that foreign intelligence (FI) and foreign counterintelligence (FCI) investigations "are conducted lawfully, particularly in light of requirements imposed by [FISA]," and to "promote the effective coordination and performance of the [Department's] criminal and counterintelligence functions." App. 1:2 at 1. They identify two important amendments to FISA made by the USA Patriot Act that authorize more effective coordination between intelligence and law enforcement officials. First, the Procedures explain, while prior law provided that "FISA could be used only for the 'primary purpose' of obtaining 'foreign intelligence information,'" the USA Patriot Act "allows FISA to be used for 'a significant purpose,' rather than the primary purpose, of obtaining foreign

intelligence information." *Id.* at 2 (quoting 50 U.S.C. §§ 1804(a)(7)(B), 1823(a)(7)(B)). Thus, the Procedures explain, the Patriot Act "allows FISA to be used <u>primarily</u> for a law enforcement purpose, as long as a significant foreign intelligence purpose remains" (emphasis in original). *Ibid.* (U)

Second, the Patriot Act "expressly authorizes intelligence officers who are using FISA to 'consult' with federal law enforcement officers to 'coordinate efforts to investigate or protect against' foreign threats to national security," including international terrorism. App. 1:2 at 2 (quoting 50 U.S.C. §§ 1806(k), 1825(k)). Under this authority, the Procedures explain, intelligence and law enforcement officers may exchange a "full range of information and advice" concerning their efforts to protect against international terrorism (and the other specified threats). *Ibid.* The Procedures further explain that robust coordination is permitted because the Patriot Act provides expressly that such coordination "'shall not' preclude the government's certification of a significant foreign intelligence purpose or the issuance of a FISA warrant" by the FISC. *Ibid.* (quoting 50 U.S.C. §§ 1806(k), 1825(k)). (U)

In keeping with that understanding of the USA Patriot Act, the Procedures generally permit the total exchange of information and advice between intelligence and law enforcement officials,

14

emphasizing that "[t]he overriding need to protect the national security from foreign threats compels a full and free exchange of information and ideas." App. 1:2 at 2. Part II.A of the Procedures, which governs information-sharing, provides that prosecutors "shall have access to all information developed in full field FI and FCI investigations" that are conducted by the FBI, including investigations in which FISA is being used, "except as limited by orders issued by the [FISC], controls imposed by the originators of sensitive material, and restrictions established by the Attorney General or the Deputy Attorney General in particular cases." *Id.* at 2-3. The FBI's principal obligation is to keep prosecutors "apprised of all information" from such investigations "that is necessary to the ability of the United States to investigate and protect against foreign attack, sabotage, terrorism, and clandestine intelligence activities." *Id.* at 3. To implement these requirements, prosecutors are granted access to FBI files and memoranda. *Ibid.*[6] (U)

---

[6] These provisions, and the advice-giving provisions described in the next paragraph of the text, apply to the Department's Criminal Division and to a United States Attorney's Office in any case involving international terrorism. In espionage cases, the U.S. Attorneys receive information from and provide advice to the FBI as authorized by the Criminal Division. See March 2002 Procedures, Parts II and III. (U)

Part II.B of the Procedures, which governs advice-giving, allows prosecutors to provide advice to the FBI about the conduct of an FI or FCI investigation, including advice about the use of FISA.  App. 1:2 at 4.  It directs the FBI, the Office of Intelligence Policy and Review (OIPR), which represents the Department before the FISC, and prosecutors to meet regularly, and as needed, to conduct consultations.  *Ibid.*  The Procedures explicitly permit consultations directly between prosecutors and the FBI, without OIPR present.  *Ibid.*  The Procedures describe the range of permitted consultations as follows:

> Consultations may include the exchange of advice and recommendations on <u>all issues</u> necessary to the ability of the United States to investigate or protect against foreign attack, sabotage, terrorism, and clandestine intelligence activities, including protection against the foregoing through criminal investigation and prosecution, subject to the limits set forth above.  Relevant issues include, but are not limited to, the strategy and goals for the investigation; the law enforcement and intelligence methods to be used in conducting the investigation; the interaction between intelligence and law enforcement components as part of the investigation; and the initiation, operation, continuation, or expansion of FISA searches or surveillance.

*Ibid.* (emphasis added).  The Procedures explain that "[s]uch consultations are necessary to the ability of the United States to coordinate efforts to investigate and protect against foreign threats to national security as set forth in 50 U.S.C. 1806(k), 1825(k)."  *Ibid.*  (U)

16

2.   The FISC's May 2002 Order.   In its May 2002 order, the
FISC accepted some aspects of the Department's March 2002
Procedures and rejected others.   The FISC accepted in full the
information-sharing provisions of the Procedures, Part II.A.   See
App. 6:2 at 2; App. 6:3 at 25.   Thus, the FISC approved the
Department's standards generally allowing wholesale dissemination
of information from FI and FCI investigations to law enforcement
officials, subject to specific limits imposed in particular
cases.   (U)

However, the FISC rejected much of Part II.B of the
Procedures, which allows law enforcement officials to give advice
to intelligence officials.   Instead of allowing consultation and
coordination on "all issues" necessary to protect the United
States from foreign threats to national security, the FISC held
that prosecutors and intelligence agents may consult on the
following matters, "among other things":

> [1] exchanging information already acquired; [2]
> identifying categories of information needed and being
> sought; [3] preventing either [the law enforcement or
> counterintelligence] investigation or interest from
> obstructing or hindering the other; [4] [preventing
> the] compromise of either investigation; and [5]
> [formulating] long term objectives and overall strategy
> of both investigations in order to ensure that the
> overlapping intelligence and criminal interests of the
> United States are both achieved.

App. 6:2 at 2-3.   (U)

17

Notwithstanding that authorization to provide advice, however, the FISC imposed three limits on advice-giving. First, it held that law enforcement officials may "not make recommendations to intelligence officials concerning the initiation, operation, continuation or expansion of FISA searches or surveillances," and warned law enforcement officials not to "direct or control the use of FISA procedures to enhance criminal prosecution." App. 6:2 at 3. Thus, for example, law enforcement officials may not nominate targets for FISA searches or surveillance. Nor may they recommend that an existing FISA search or surveillance be conducted in a particular way or seek particular information. (U)

Second, the FISC instructed the FBI and prosecutors to "ensure that advice designed to preserve the option of a criminal prosecution does not inadvertently result in [prosecutors'] directing or controlling the investigation using FISA searches and surveillances toward law enforcement objectives." App. 6:2 at 3. The FISC's approval of advice designed to "preserve" the option of a criminal prosecution, and its ban on advice amounting to prosecutorial "direction or control" of an investigation, led the government to file a motion for clarification. App. 5. The motion inquired whether the FISC intended to permit advice designed to "enhance," rather than merely to "preserve," a

18

criminal prosecution, a distinction addressed at length in a
major report on FISA that was the subject of extended discussions
between the FISC and the government. See IV *Final Report of the
Attorney General's Review Team on the Handling of the Los Alamos
National Laboratory Investigation*, Chapter 20, at 721-734 (May
2000) (hereinafter AGRT Report); App. 2:2 at 7-8, 22-23. The
motion asked the FISC either to delete the reference to
"preserv[ing]" advice or to explain in more detail the scope of
any ban on "enhancing" advice. The FISC did neither. Compare
App. 4:1 at 3 with App. 6:1 at 1-2, and App. 6:2 at 3.[7] (U)

Third and finally, the FISC imposed a "chaperone"
requirement, holding that prosecutors may not consult with
intelligence agents unless they first invite OIPR to participate
in the consultation, and that OIPR must participate unless it is
"unable" to do so. If OIPR does not participate, the FISC held,
it "shall be apprised of the substance of the meetings forthwith
in writing so that the [FISC] may be notified at the earliest
opportunity." App. 6:2 at 3. The FISC also adopted a new rule
to the same effect: "All FISA applications shall include

---

[7] The language quoted in the text is from the FISC's May
2002 order. App. 6:2. The motion for clarification (App. 5) was
filed in response to nearly identical language in an order issued
on April 22, 2002. App. 4:1. The May 2002 order was issued in
response to the motion for clarification. See App. 6:1, 2. (U)

informative descriptions of any ongoing criminal investigations
of FISA targets, as well as the substance of any consultations
between the FBI and criminal prosecutors at the Department of
Justice or a United States Attorney's Office." FISC Rule 11.
(U)

3. The FISC's May 2002 Opinion. The FISC explained the
reasons for its order in a lengthy opinion. At the outset, the
FISC identified "the issue that is before this Court" as "whether
the FISA authorizes electronic surveillances and physical
searches primarily for law enforcement purposes so long as the
Government also has 'a significant' foreign intelligence
purpose." App. 6:3 at 4 n.1 (emphasis in original). However,
the FISC expressly declined to address that issue, explaining
that it would "not reach the question of whether the FISA may be
used primarily for law enforcement purposes." Id. at 6 n.2.
Instead, the FISC held that "[t]he question before the Court
involves straightforward application of the FISA as it pertains
to minimization procedures," and explained that it had "decided
this matter by applying the FISA's standards for minimization
procedures defined in § 1801(h) and § 1821(4) of the Act." Id.

at 4, 6 n.2.  Thus, the Court did not significantly address or interpret the USA Patriot Act.[8]  (U)

The FISC explained that it was relying on minimization standards because "the FISA's definition of minimization procedures has not changed, and [the March 2002 Procedures] cannot be used by the government to amend the Act in ways Congress has not."  App. 6:3 at 22.  The FISC explained its conclusions as follows:

> Given our experience in FISA surveillances and searches, we find that these provisions in sections II.B and III [of the Department's March 2002 Procedures], particularly those which authorize criminal prosecutors to advise FBI intelligence agents on the initiation, operation, continuation or expansion of FISA's intrusive seizures, are designed to enhance the acquisition, retention and dissemination of

---

[8] The FISC's only significant reliance on the USA Patriot Act was to make the new procedures <u>more restrictive</u> than procedures that governed prior to the Act.  Prior intelligence sharing procedures governed consultations between intelligence agents and prosecutors, but not consultations between intelligence agents and law enforcement agents.  See App. 7.  The FISC's order, however, applies at least in part to law enforcement agents because it uses the term "law enforcement officials" rather than "prosecutors."  In response to a motion for clarification (App. 5), the FISC explained that "[t]he Court uses, and intended to use, the term 'law enforcement officials'" in its opinion and order "in conjunction with the source and context from which it originated, i.e., the recent amendments to the FISA."  App. 6:1 at 2 (referring to 50 U.S.C. §§ 1806(k), 1825(k)).  The FISC stated that "[t]he new minimization procedures apply to the minimization process in FISA electronic surveillances and physical searches, and to those involved in the process - including both FBI agents and criminal prosecutors."  Ibid.  (U)

> evidence for law enforcement purposes, instead of being
> consistent with the need of the United States to
> "obtain, produce, and disseminate foreign intelligence
> information" (emphasis added) as mandated in [FISA's
> minimization provisions, 50 U.S.C.] § 1801(h) and §
> 1821(4).

*Ibid.* (emphasis added by the FISC); *see also id.* at 23, 25.
Thus, the FISC concluded that the Department's March 2002
Procedures violated FISA's minimization standards because they
authorized searches and surveillance "for law enforcement
purposes" rather than "foreign intelligence purposes." Yet the
FISC never explained the textual or other basis for this
dichotomy between foreign intelligence and law enforcement, and
it expressly declined even to consider whether FISA itself
authorizes searches or surveillance primarily for a law
enforcement purpose.    (U)

## SUMMARY OF ARGUMENT (U)

1. The FISC's order in this case, and its May 2002 opinion
and order, which substantially reject the Department's March 2002
Intelligence Sharing Procedures, rest on a fundamental
misapplication of FISA and the USA Patriot Act. The most
striking aspect of the FISC's decision is its express refusal
even to consider the meaning of the USA Patriot Act. App. 6:3 at
6 n.2. By relying solely on FISA's "minimization" provisions for
its rulings, the FISC effectively held that the USA Patriot Act

22

made no change in the Department's authority to coordinate
between intelligence and law enforcement officials. Indeed, the
FISC explained that it was modifying the Department's March 2002
Procedures to "reinstate the bright line used in [the
Department's] 1995 procedures, on which the Court has relied."
Id. at 27. That holding was plainly wrong: The USA Patriot Act
provides expressly for increased coordination and was clearly
intended to alter the standards that previously governed such
coordination. (U)

The FISC's decision cannot be sustained as an application of
FISA's minimization standards. Those standards require the
government to follow procedures in conducting a search or
surveillance that are "reasonably designed" to "minimize" the
acquisition of nonpublic information concerning unconsenting U.S.
persons "consistent with the need of the United States to obtain,
produce, and disseminate foreign intelligence information." 50
U.S.C. §§ 1801(h)(1), 1821(4)(A). Minimization procedures are
designed to limit the acquisition, retention, and dissemination
of information that is not otherwise subject to collection under
FISA. They may not be used to prevent the government from
seeking information that FISA clearly permits it to obtain, or
from engaging in consultations that FISA clearly permits it to
conduct. Accordingly, the FISC erred in relying on minimization

23

as an independent check on the government's purpose for using FISA and coordination between intelligence and law enforcement officials. (U)

2. The 1978 version of FISA provides, and the USA Patriot Act's recent amendments to the statute confirm, that it may be used to support law enforcement efforts to protect national security from foreign threats. In its original form, FISA authorized electronic surveillance for "the purpose" of obtaining "foreign intelligence information," which was (and is) defined to include information necessary to "protect against" specified foreign threats to national security, such as espionage and international terrorism. 50 U.S.C. § 1801(e)(1). However, the statute has never prescribed the kinds of efforts, law enforcement or otherwise, that may be used to achieve that protection, other than to require that they be lawful. 50 U.S.C. §§ 1806(a), 1825(a). Indeed, FISA's original legislative history recognized that prosecution of spies and terrorists was one legitimate way to protect national security, and that FISA could be used for the purpose of obtaining evidence for such a prosecution. Thus, a prosecution designed to protect national security from foreign threats was not merely an incidental byproduct of electronic surveillance under FISA; it could be the reason for conducting the surveillance. (U)

24

Despite the plain language and legislative history of the 1978 version of FISA, the FISC and other courts generally have not interpreted it to permit electronic surveillance (or physical searches) primarily to obtain evidence for a prosecution. These decisions pay insufficient heed to the language of FISA. If this Court agrees with those cases, however, FISA may still be used primarily to obtain evidence for a prosecution as long as the statute is also being used for a significant non-law enforcement foreign intelligence purpose. A purpose may be "significant" regardless of the existence or importance of any other purpose. (U)

Under either approach, the FISC erred in denying the FISA application in this case, and in modifying the Department's March 2002 Intelligence Sharing Procedures. If FISA may be used for the purpose of obtaining evidence for a prosecution specifically designed to protect national security, then consultations conducted in furtherance of such a prosecution are obviously permissible. Indeed, such consultations are affirmative evidence of a purpose to obtain foreign intelligence information. In any event, however, such consultations could not render a non-law enforcement purpose "insignificant." That is because the significance of a purpose to obtain foreign intelligence information is not affected by the existence or strength of a

25

purpose to obtain evidence for law enforcement, even if the law enforcement purpose provides the primary motive for using FISA. (U)

3.  FISA and the USA Patriot Act, as interpreted herein, are constitutional. Under the Supreme Court's decision in *United States v. United States District Court (Keith)*, 407 U.S. 297 (1972), it is the nature of the threat, not the nature of the government's response to that threat, which determines the constitutionality of FISA searches and surveillance. Thus, there is no constitutional basis for distinguishing between law enforcement efforts and other means of protecting this country against foreign spies and terrorists. Where the government's purpose is to protect national security, its choice among otherwise lawful methods for achieving the protection does not implicate the Fourth Amendment. (U)

If this Court rejects that argument, FISA may still be used primarily to collect evidence as long as the government has a "significant" non-law enforcement purpose for conducting the search or surveillance. Prior to FISA, every court of appeals to consider the issue upheld unilateral Executive Branch surveillance where the government's "primary purpose" was to obtain foreign intelligence. Given the extensive protections in FISA, including the requirements for judicial review and approval

26

of applications before searches or surveillance may occur, and regular congressional oversight, the change from "primary" to "significant" purpose does not make a FISA search or surveillance unreasonable.  (U)

## ARGUMENT (U)

I.    THE FISC ERRED IN USING "MINIMIZATION" PROVISIONS TO LIMIT THE PURPOSE OF FISA SEARCHES AND SURVEILLANCE AND CONSULTATIONS BETWEEN INTELLIGENCE AND LAW ENFORCEMENT OFFICIALS (U)

Contrary to the FISC's conclusion, minimization procedures do not provide an independent basis for limiting the purpose of FISA searches or surveillance, or consultations between intelligence and law enforcement officials.  Under FISA, "minimization procedures" are defined to be

specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance [or search], to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

50 U.S.C. §§ 1801(h)(1), 1821(4)(A).  These standards do not contemplate limits on the acquisition of information that is otherwise subject to collection under the statute.  Rather, like their counterparts in Title III, they are designed to minimize the acquisition of information that is not otherwise subject to collection under the statute.  See *Scott v. United States*, 436

27

U.S. 128 (1978) (interpreting minimization standards of Title III, 18 U.S.C. § 2510(5)). As the House Report underlying FISA explains, "[b]y minimizing acquisition, the committee envisions, for example, that in a given case, where A is the target of a wiretap, after determining that A's wife is not engaged with him in clandestine intelligence activities, the interception of her calls on the tapped phone, to which A is not a party, probably ought to be discontinued as soon as it is realized that she rather than A was the party." House Report 55; see S. Rep. No. 95-701, 95th Cong., 2d Sess. (1978), at 37-38 [hereinafter Senate Intelligence Report]. Thus, minimization governs the _implementation_ of surveillance to ensure that acquisition (and retention and dissemination) of information is not overbroad in relation to the surveillance's authorized purpose and scope; but minimization has nothing whatsoever to do with _defining_ the authorized purpose and scope of a surveillance.[9]  (U)

_____

[9] The FISC's May 17 opinion may be read to suggest that we agreed with its authority to regulate the purpose of searches and surveillance, and consultations between intelligence and law enforcement officials, under the rubric of minimization. See, e.g., App. 6:3 at 8. That is clearly not the case. See App. 1:3 at 30 n.7. The FISC acknowledged our objection to its reliance on minimization at the July 19, 2002 hearing on the FISA application in this case. (A transcript of the July 19 hearing has not yet been prepared.) Although the FISC's May 2002 Order suggests that the FISC intends to regulate intelligence investigations whether or not FISA is being used, we do not believe that the FISC intends to regulate intelligence investigations prior to the use of FISA.  (U)

28

Indeed, FISA's minimization standards are more generous than those in Title III, because they require minimization only "consistent with" the government's "need to obtain, produce, and disseminate foreign intelligence information." See House Report 56 ("given the nature of the intelligence gathering, minimizing acquisition should not be as strict as under" Title III). Thus, the government is required to take minimization steps only to the extent that those steps do not interfere with its basic entitlement under FISA to acquire, retain, and disseminate foreign intelligence information. Cf. Scott, 436 U.S. at 140 ("there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable."). (U)

Even if minimization could be used to limit the purpose of FISA searches and surveillance, or to restrict coordination between intelligence and law enforcement officials, the FISC still erred. As discussed in Argument II, infra, FISA contains specific provisions that govern the "purpose" of searches and surveillance and the "coordinat[ion]" between intelligence and law enforcement officials. Thus, even if minimization could be used to regulate purpose or coordination, it clearly cannot do so in a way that conflicts with FISA's purpose and coordination provisions themselves. The statute must be read as a whole.

29

See, e.g., *United States v. Morton*, 467 U.S. 822, 828 (1984).
Thus, the meaning of FISA's purpose and coordination provisions,
as originally enacted and as modified by the USA Patriot Act, was
unavoidably before the FISC, as it is now before this Court.   (U)

II.   CONSULTATIONS TO COORDINATE LAW ENFORCEMENT AND INTELLIGENCE
      EFFORTS TO PROTECT NATIONAL SECURITY FROM FOREIGN THREATS
      CANNOT JUSTIFY DENIAL OF A FISA APPLICATION (U)

      A.   FISA May Be Used Primarily, or Exclusively, to Obtain
           Evidence for a Prosecution Designed to Protect the
           United States Against Foreign Spies and Terrorists.  (U)

      1.   Since its enactment in 1978, FISA has authorized
searches or surveillance where the primary or a significant
"purpose of the [search or surveillance] is to obtain foreign
intelligence information."  50 U.S.C. §§ 1804(a)(7)(B),
1823(a)(7)(B).  Thus, distinguishing one purpose from another
under FISA depends initially on the meaning of the term "foreign
intelligence information."  The statute defines that term to
include

      information that relates to, and if concerning a United
      States person is necessary to, the ability of the
      United States to protect against –

           (A) actual or potential attack or other grave
           hostile acts of a foreign power or an agent
           of a foreign power;

           (B) sabotage or international terrorism by a
           foreign power or an agent of a foreign power;
           or

> (C) clandestine intelligence activities by an
> intelligence service or network of a foreign
> power or by an agent of a foreign power.

50 U.S.C. § 1801(e)(1).  (U)

Under this definition, information is foreign intelligence

information only if it is relevant or necessary to help the

United States protect against certain specified threats,

including attack, sabotage, terrorism, and espionage committed by

foreign powers or their agents.  Thus, information concerning

purely domestic threats to the United States - e.g., information

concerning Timothy McVeigh's plan to bomb the Oklahoma City

Federal Building - is not foreign intelligence information.

Correspondingly, information concerning foreign activities that

do not threaten national security - e.g., an international fraud

scheme - is also not foreign intelligence information.  However,

information about an al Qaeda conspiracy to bomb New York is

foreign intelligence information because it concerns

international terrorism committed by a foreign power and is

needed to protect against that threat.  See 50 U.S.C. § 1801(a)-

(c); House Report at 47-50.[10]  (U)

---

[10] A second definition of "foreign intelligence
information," in 50 U.S.C. § 1801(e)(2), includes information
relevant or necessary to "the national defense of the United
States" or "the conduct of the foreign affairs of the United
States."  This definition, which generally involves information
referred to as "affirmative" or "positive" foreign intelligence

Although "foreign intelligence information" must be relevant
or necessary to "protect" against the specified threats, the
statutory definition does not limit how the government may use
the information to achieve that protection.  In other words, the
definition does not discriminate between protection through
diplomatic, economic, military, or law enforcement efforts, other
than to require that those efforts be "lawful."  50 U.S.C. §§
1806(a), 1825(a).[11]  Thus, for example, where information is
relevant or necessary to recruit a foreign spy or terrorist as a
double agent, that information is "foreign intelligence
information" if the recruitment effort will "protect against"
espionage or terrorism.  Similarly, where information is relevant
or necessary to prosecute a foreign spy or terrorist, that

---

rather than "protective" foreign intelligence or
"counterintelligence" information, is not at issue in this case,
and is rarely the object of surveillances in which purpose issues
arise, because affirmative intelligence information is usually
not evidence of a crime.  See Senate Intelligence Report at 11 &
n.4.  (U)

[11] The statute provides that no "information acquired
pursuant to" a search or surveillance may be "disclosed for law
enforcement purposes" or "used in a criminal proceeding" absent
the Attorney General's permission.  50 U.S.C. §§ 1806(b),
1825(c).  This provision is designed to ensure that an aggrieved
party receives notice that he was subject to FISA searches or
surveillance so that he may seek suppression of evidence obtained
or derived from FISA before it is used in a "trial" or other
proceeding.  50 U.S.C. §§ 1806(c) and (e), 1825(d) and (f).  See
House Report 88-90.  (U)

32

information is also "foreign intelligence information" if the prosecution will "protect against" espionage or terrorism. (U)

Prosecution is often a most effective means of protecting national security. For example, the recent prosecution of Ahmed Ressam, who was charged with attempting to destroy Los Angeles International Airport, protected the United States by incapacitating Ressam himself from committing further attacks, and by deterring others who might have contemplated similar action. Moreover, as a result of his conviction and sentence, Ressam agreed to cooperate with the government and provided information about the training that he received at an al Qaeda camp overseas. That kind of prosecution thus protects the United States directly, by neutralizing a threat, and indirectly, by generating additional foreign intelligence information. The same is true of the recent prosecution of Robert Hanssen: By far the best source of intelligence on Hanssen's espionage activities is Hanssen himself; and the government gained access to Hanssen only as a result of his capture, prosecution, and plea agreement. (U)

In sum, information is "foreign intelligence information" if it is relevant or necessary to the ability of the United States to protect against threats posed by foreign spies and terrorists. Such protection may be achieved in several ways, including by prosecuting the spy or terrorist. Information therefore may be

33

"foreign intelligence information" solely by virtue of its importance to such a prosecution. Where the government conducts a search or surveillance for the purpose of obtaining information for use in such a prosecution, it satisfies FISA's standards. (U)

2. The USA Patriot Act confirms this understanding of FISA by incorporating the definition of "foreign intelligence information" into new provisions of the statute that authorize consultations and coordination between federal law enforcement officers and intelligence officers who conduct FISA searches or surveillance. 50 U.S.C. §§ 1806(k), 1825(k). The Patriot Act's "coordination" amendment to FISA provides:

> (1) Federal officers who conduct [electronic surveillance or physical searches] to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against –

> (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

> (B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

> (C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

> (2) Coordination authorized under paragraph (1) shall not preclude the certification required by [50 U.S.C. §§ 1804(a)(7)(B) and 1823(a)(7)(B)] or the entry of an order under [50 U.S.C. §§ 1805 and 1824].

50 U.S.C. §§ 1806(k), 1825(k) (emphasis added). (U)

34

This amendment authorizes "consult[ation]" and "coordinat[ion]" between intelligence and law enforcement officers. It defines the scope of authorized coordination by incorporating verbatim the foreign threats to national security that are specified in the definition of "foreign intelligence information" – attack, sabotage, terrorism, and espionage committed by foreign powers or their agents. Compare 50 U.S.C. §§ 1806(k)(1)(A)-(C) and 1825(k)(1)(A)-(C), with 50 U.S.C. § 1801(e)(1)(A)-(C). The amendment authorizes consultations to coordinate the government's various "efforts to investigate or protect" against such threats. Thus, consultations concerning purely <u>domestic</u> threats to national security (Timothy McVeigh), or foreign activities that do not threaten national security (international fraud schemes), are not within the scope of the coordination amendment. Consultations concerning an al Qaeda conspiracy to bomb New York, however, are within the scope of the provision, for the same reason that information concerning such a conspiracy is "foreign intelligence information."   (U)

By allowing intelligence and law enforcement officials to "coordinate efforts to investigate or protect" against the specified threats, the amendment recognizes that law enforcement investigations and efforts, as well as intelligence investigations and efforts, can "protect" against those threats.

35

It therefore reaffirms the original meaning of "foreign intelligence information" to include information that will "protect" the United States against espionage and terrorism through both intelligence and law enforcement efforts. (U)

In keeping with that idea, the amendment also provides that authorized coordination "shall not preclude" the certification or finding of a purpose to obtain foreign intelligence information. By definition, coordination authorized by the amendment must be in furtherance of a purpose to investigate or protect against the threats specified in the definition of "foreign intelligence information" – e.g., an al Qaeda conspiracy to bomb New York. Such coordination cannot "preclude" a purpose to obtain foreign intelligence information because it is _affirmative_ evidence of such a purpose. (U)

3. The legislative history of FISA confirms what its plain language provides. When it enacted FISA in 1978, Congress understood that prosecution may be used to protect national security against foreign threats, and that FISA may be used to obtain evidence for such a prosecution. Indeed, the House Report underlying the original statute provides explicitly that FISA may be used for the purpose of obtaining information and evidence to support such a prosecution. In a lengthy paragraph, the House

36

Committee directly addressed the precise questions that are presented in this appeal:

> Finally, the term "foreign intelligence information," especially as defined in [50 U.S.C. §§ 1801(e)(1)(B) and (e)(1)(C)], can include evidence of certain crimes relating to sabotage, international terrorism, or clandestine intelligence activities. With respect to information concerning U.S. persons, foreign intelligence information includes information necessary to protect against clandestine intelligence activities of foreign powers or their agents. Information about a spy's espionage activities obviously is within this definition, and it is most likely at the same time evidence of criminal activities. <u>How this information may be used to "protect" against clandestine intelligence activities is not prescribed by the definition of foreign intelligence information</u>, although of course, how it is used may be affected by minimization procedures, see [50 U.S.C. § 1801(h)]. And no information acquired pursuant to this bill could be used for other than lawful purposes, see [50 U.S.C. § 1806(a)]. <u>Obviously, use of "foreign intelligence information" as evidence in a criminal trial is one way the Government can lawfully protect against clandestine intelligence activities, sabotage, and international terrorism. The bill, therefore, explicitly recognizes that information which is evidence of crimes involving clandestine intelligence activities, sabotage, and international terrorism can be sought, retained, and used pursuant to this bill.</u>

House Report at 49 (emphasis added).  (U)

The first underlined passage above makes clear that FISA does not discriminate between law enforcement and non-law enforcement protective methods.  It is enough that the government intends to "protect" national security from foreign threats, and that the information sought is "necessary" to achieve that

37

protection.[12]  In other words, as the House Report elsewhere explains, "evidence of certain crimes like espionage [and terrorism] would itself constitute 'foreign intelligence information,' as defined, because it is necessary to protect against clandestine intelligence activity [and international terrorism] by foreign powers or their agents."  House Report at 62.  (U)

The second underlined passage above makes the same point even more clearly:  By explaining that prosecution is one way to protect national security, and by stating that "evidence" of espionage or terrorism offenses may be "sought" as well as retained and used pursuant to FISA, the Report shows that FISA may be used for the purpose of obtaining such evidence, with the intent that it be offered in a prosecution designed to protect national security from foreign threats.  Thus, prosecution of spies and terrorists is not merely an incidental byproduct of a FISA search or surveillance.  Rather, obtaining evidence for such a prosecution may be the purpose of the surveillance.  See Senate Intelligence Report at 10-11 & n.4.[13]  (U)

---

[12] By "necessary," Congress meant "important and required," or fulfilling a "significant need," not that the information be absolutely essential.  See House Report 47.  (U)

[13] There are some apparently contrary indications in the legislative history.  For example, the House Report "recognize[d]

38

Indeed, while the 1978 legislative history correctly predicts that "prosecution is <u>rarely</u> the objective or the result" of FISA surveillance, and that its "primary purpose * * * is not <u>likely</u> to be the gathering of criminal evidence," House Report 24 n.20, 89 (emphasis added), the legislative history recognizes that FISA allows for that possibility. Indeed, Congress understood that while some FISA surveillance would merely "result in the incidental acquisition of information about crimes," other FISA surveillance "[b]y contrast" would actively "seek[] information needed to deter or anticipate the commission of

_____

full well that the surveillance[s] under [FISA] are not primarily for the purpose of gathering evidence of a crime. They are to obtain foreign intelligence information, which when it comes to United States persons must be necessary to important national security concerns." House Report at 36; see id. at 60; S. Rep. No. 95-604, 95th Cong., 2d Sess. (1978), at 39, 55 [hereinafter Senate Judiciary Report]; Senate Intelligence Report at 41-42, 62. However, read in context, those passages do not undermine the idea that FISA may used to obtain evidence for a prosecution designed to protect national security. For example, after stating that FISA may not be used to gather evidence, but only to protect "important national security concerns," the House Report goes on to explain that "[c]ombating the espionage and covert actions of other nations in this country is an extremely important national concern," and that "[p]rosecution is one way * * * to combat such activities." House Report 36. (U)

The Senate Report underlying the 1994 amendments to FISA, which enacted the statute's provisions authorizing physical searches, does not address the issue. See S. Rep. No. 103-296, 103d Cong., 2d Sess. (1994), at 33-34. (U)

39

crimes." Senate Intelligence Report at 11 & n.4. The Senate
Intelligence Report explains:

> Electronic surveillance for foreign
> counterintelligence and counterterrorism purposes
> requires different standards and procedures. U.S.
> persons may be authorized targets, and the surveillance
> is part of an investigative process often designed to
> protect against the commission of serious crimes such
> as espionage, sabotage, assassination, kidnaping, and
> terrorist acts committed by or on behalf of foreign
> powers. Intelligence and criminal law enforcement tend
> to merge in this area.

*Id.* at 10-11 (emphasis added, footnote omitted). This statement
reflects that FCI investigations, and the use of FISA within
those investigations, may be "designed" for a law enforcement
purpose. As the Report further explains, surveillance "need not
stop once conclusive evidence of a crime is obtained, but instead
may be extended longer where protective measures other than
arrest and prosecution are more appropriate." *Id.* at 11. That
statement reflects a recognition that prosecution is one of many
legitimate "protective" efforts that FISA may be used to support.
Accordingly, insofar as the "purpose" of FISA surveillance is
concerned, prosecution is no different than traditional
counterintelligence efforts like "'[d]oubling' an agent or
feeding him false or useless information," or "[m]onitoring him
to discover other spies, their tradecraft and equipment." House
Report at 36-37. (U)

40

Senator Leahy referred to this legislative history to make precisely the same point in describing the USA Patriot Act's "coordination" amendment:

> I proposed and the Administration agreed to an additional provision in Section 505 that clarifies the boundaries for consultation and coordination between officials who conduct FISA search and surveillance and Federal law enforcement officials including prosecutors. Such consultation and coordination is authorized for the enforcement of laws that protect against international terrorism, clandestine intelligence activities of foreign agents, and other grave foreign threats to the nation. <u>Protection against these foreign-based threats by any lawful means is within the scope of the definition of 'foreign intelligence information,' and the use of FISA to gather evidence for the enforcement of these laws was contemplated in the enactment of FISA.</u> The Justice Department's opinion cites relevant legislative history from the Senate Intelligence Committee's report in 1978, and there is comparable language in the House report.

147 Cong. Rec. S10990-02, at S11004 (October 25, 2001) (emphasis added). This statement makes clear that the drafter of the coordination amendment, who was the Chairman of the Senate Judiciary Committee and one of the principal negotiators of the USA Patriot Act, see *id.* at S11054, understood that FISA may be used to obtain evidence for a prosecution designed to protect national security, and indeed that it had always permitted such use. (U)

4. The text and legislative history of FISA's minimization provisions further confirm that "foreign intelligence

41

information" includes information sought for use in the
prosecution of a foreign spy or terrorist. As noted above
(Argument I, supra), those provisions require reasonable efforts
to minimize the acquisition and retention, and prohibit the
dissemination, of nonpublic information concerning U.S. persons
consistent with the government's need to "obtain, produce, and
disseminate foreign intelligence information." 50 U.S.C. §§
1801(h)(1), 1821(4)(A). The minimization provisions also
provide, "notwithstanding" the rules governing foreign
intelligence information, for retention and dissemination (but
not acquisition) of "evidence of a crime" for "law enforcement
purposes." 50 U.S.C. §§ 1801(h)(3), 1821(4)(C). Thus, FISA has
two key minimization provisions: One governing "foreign
intelligence" and the other governing "evidence of a crime." (U)

However, as the FISC acknowledged, and as the statute's
legislative history makes clear, FISA's "crimes" minimization
provision applies only to crimes that do <u>not</u> pose a foreign
threat to national security - i.e., what the FISC referred to as
crimes that are "not related to the target's intelligence or
terrorist activities." App. 6:3 at 10 n.4. Thus, for example,
the "crimes" provision would apply if electronic surveillance of
a spy revealed that the spy had killed his wife, and would permit
intelligence officials to disseminate information about the

42

murder to law enforcement officials for use in a homicide prosecution. See House Report 62 (referring to "a serious crime totally unrelated to intelligence matters"). But the "crimes" provision does <u>not</u> apply to evidence of crimes that <u>do</u> pose a threat to national security – i.e., it does not permit the dissemination to prosecutors of information concerning Ahmed Ressam's terrorism offenses or Robert Hanssen's espionage. House Report 62; App. 6:3 at 10 n.4.  (U)

Of course, evidence of crimes that threaten national security is disseminated to prosecutors – not under the "crimes" minimization provision, but under the "foreign intelligence" minimization provision. The FISC appeared to recognize this point in approving Part II.A of the Department's March 2002 Intelligence Sharing Procedures. See App. 6:2. In any event, Congress clearly appreciated the point when it enacted FISA in 1978. As the House Report put the matter in explaining why the "crimes" minimization provision does not apply to evidence of espionage and terrorism offenses:

> As noted above, see [50 U.S.C. § 1801(e)(1)], evidence of certain crimes like espionage would itself constitute "foreign intelligence information," as defined, because it is necessary to protect against clandestine intelligence activity by foreign powers or their agents. Similarly, much information concerning international terrorism would likewise constitute evidence of crimes and also be "foreign intelligence information," as defined. This paragraph [the "crimes"

43

> minimization provision) does not relate to information,
> even though it constitutes evidence of a crime, which
> is also needed by the United States in order to obtain,
> produce or disseminate foreign intelligence
> information.

House Report at 62.   (U)

Apart from confirming that "foreign intelligence information" includes evidence of espionage and terrorism offenses, the minimization provisions also confirm that FISA may be used for the purpose of obtaining such evidence.  Unlike the "crimes" provision, which authorizes retention and dissemination of evidence incidentally obtained through FISA, the "foreign intelligence" provision also authorizes acquisition of information.  Compare 50 U.S.C. §§ 1801(h)(1) and 1821(4)(A), with 50 U.S.C. §§ 1801(h)(3) and 1821(4)(C).  Accordingly, the government may not conduct surveillance (exclusively) to acquire evidence of a domestic homicide.  It may, however, conduct FISA surveillance to acquire evidence of espionage or international terrorism, because such evidence is foreign intelligence information, and because its use by prosecutors is consistent with the foreign intelligence "need[s]" of the United States.  (U)

Indeed, the conclusion is the same whether phrased in the language of minimization or the language of purpose: FISA may not be used to "acquire," or for the (exclusive) "purpose" of

44

obtaining, evidence for the prosecution of a domestic homicide, because such information is not "foreign intelligence information." But FISA may be used to "acquire," or for the "purpose" of obtaining, evidence for the prosecution of a foreign spy or terrorist, because such information is "foreign intelligence information."[14]  (U)

5.   Despite the plain language and legislative history of the statute, before the passage of the USA Patriot Act the courts did not endorse the use of FISA to obtain evidence for a prosecution designed to protect national security.  Instead of distinguishing, as FISA's text and legislative history do, between protective and non-protective efforts and purposes, they distinguished between law enforcement and non-law enforcement efforts and purposes.  These courts treated a law enforcement purpose as automatically precluding a protective purpose, as if the two terms are mutually exclusive.  In other words, they treated "foreign intelligence information" as if it does not

---

[14] The FISC erred in concluding that information is "foreign intelligence information" only insofar as it is used by intelligence officials for a non-law enforcement purpose.  See App. 6:3 at 25.  As noted above, FISA allows dissemination of foreign intelligence information only to the extent that there is a foreign intelligence "need" to do so.  Thus, prosecutors may receive such information only because it is foreign intelligence information as disseminated to and used by them – i.e., only because they have an independent foreign intelligence need for the information.  (U)

45

include evidence sought for use in the prosecution of a spy or international terrorist. They held that the "primary purpose" of a FISA search or surveillance must be to obtain "foreign intelligence information" as so defined - i.e., that the primary purpose must be a non-law enforcement purpose. See *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980) (case applying the "primary purpose" test under pre-FISA standards); *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984); *United States v. Badia*, 827 F.2d 1458, 1464 (11th Cir. 1987); *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987); *United States v. Johnson*, 952 F.2d 565, 572 (1st Cir. 1992).    (U)

Insofar as they reject the idea that FISA may be used to collect evidence for law enforcement efforts to protect against foreign spies and terrorists, we believe that these cases were wrongly decided.  However, none of the cases expressly rejected the idea that evidence needed for such a prosecution is "foreign intelligence information."  Indeed, none of the cases even discussed the government's purpose for prosecuting, and from all that appears the government never advanced the idea that prosecution may be used to protect national security, or that FISA may be used to obtain evidence for such a prosecution.  For example, Attorney General Griffin Bell, who testified at the

46

suppression hearing in *Truong*, described prosecution only as an
"incidental" byproduct of a non-criminal counterintelligence
investigation: "Let me say that every one of these
counterintelligence investigations involved, nearly all of them
that I have seen, involves crime in an incidental way. You never
know when you might turn up with something you might want to
prosecute." 629 F.2d at 916 n.5. Thus, while these decisions
clearly distinguish between "law enforcement" and "foreign
intelligence" purposes, they do not squarely address the
distinction between law enforcement efforts designed to protect
against foreign espionage and terrorism and other law enforcement
efforts. (U)

    One court of appeals appears to have taken a different
approach, albeit in dictum. In *United States v. Sarkissian*, 841
F.2d 959 (9th Cir. 1988), the government used FISA wiretap
evidence to obtain convictions for offenses arising from an
international terrorist plot. Relying on the "primary purpose"
test, the defendants challenged the admissibility of the FISA
evidence. The court of appeals did not decide whether "the test
is one of purpose or primary purpose," because it concluded that
both tests were satisfied. *Id.* at 964. The court explained:
"We refuse to draw too fine a distinction between criminal and
intelligence investigations. 'International terrorism,' by

47

definition, requires the investigation of activities that constitute crimes." *Id.* at 965. (U)

The court in *Sarkissian* went on to observe that "FISA is meant to take into account [t]he differences between ordinary criminal investigations to gather evidence of specific crimes and foreign counterintelligence investigations," and stated that "[a]t no point was this case an ordinary criminal investigation." 841 F.2d at 965 (internal quotation omitted). It then cited and described several other cases in which FISA surveillance had been upheld, apparently to illustrate the point that none of them involved "ordinary" investigations: a "conspiracy to manufacture machine guns and silencers for 'Omega-7,' an anti-Castro group"; an "IRA attempt to buy parts for bombs and surface-to-air missiles"; an "Armenian terrorist plot to assassinate [a] Turkish diplomat"; and a case involving "IRA arms smuggling." *Ibid.* (U)

Thus, *Sarkissian* appears to recognize that the important distinction under FISA is not between law-enforcement efforts and non-law enforcement efforts, but between efforts to protect national security from foreign threats (including law enforcement efforts to do so) and other efforts (*e.g.*, efforts to protect against domestic terrorists or international fraud schemes). FISA may not be used primarily to obtain evidence for what *Sarkissian* called "ordinary" prosecutions, but it may be used

48

primarily (or exclusively) to obtain evidence for prosecutions
designed to protect national security from foreign threats.  (U)

    B.   **FISA May Be Used Primarily to Obtain Evidence for a
Prosecution if the Government Also Has a Significant
Non-Law Enforcement Foreign Intelligence Purpose.**  (U)

    At a bare minimum, the difficulty of clearly distinguishing
the line between law enforcement purposes and protective national
security purposes strongly supports allowing the use of FISA
primarily for the purpose of obtaining evidence for a prosecution
as long as the government also has a "significant" non-law
enforcement purpose for obtaining foreign intelligence
information.  Moreover, because a purpose to obtain foreign
intelligence information may be "significant" regardless of the
existence or strength of a purpose to obtain evidence for a
prosecution, consultations between intelligence and law
enforcement personnel cannot preclude the government's
certification of purpose or the FISC's issuance of an
authorization order.  (U)

    1.  Until the USA Patriot Act, FISA required that "the
purpose" of a search or surveillance be to obtain foreign
intelligence information.  50 U.S.C. §§ 1804(a)(7)(B),
1823(a)(7)(B) (amended).  However, the federal courts, including
the FISC, generally read "the purpose" to mean "primary purpose."
See, e.g., *Duggan*, 743 F.2d at 78.  Under the "primary purpose"

49

regime, courts reviewed consultations between intelligence and law enforcement officials in an investigation to determine whether the government's primary purpose for the investigation, and for the FISA search or surveillance conducted within the investigation, was to obtain information for law enforcement. The more consultations that occurred, the more likely courts were to find an improper law enforcement purpose. (U)

For example, the court of appeals in *Truong* determined the government's primary purpose by examining the consultations between intelligence agents (who were conducting the surveillance) and prosecutors (who eventually brought the charges against Truong). The court of appeals agreed with the district court's decision to suppress evidence obtained from electronic surveillance after consultations and coordination had shifted the government's "primary purpose" to prosecution (629 F.2d at 916):

> In this case, the district court concluded that on July 20, 1977, the investigation of Truong had become primarily a criminal investigation. Although the Criminal Division of the Justice Department had been aware of the investigation from its inception, until summer the Criminal Division had not taken a central role in the investigation. On July 19 and July 20, however, several memoranda circulated between the Justice Department and the various intelligence and national security agencies indicating that the government had begun to assemble a criminal prosecution. On the facts of this case, the district court's finding that July 20 was the critical date when the investigation became primarily a criminal investigation was clearly correct. (U)

50

As explained below, the USA Patriot Act eliminated the "primary purpose" standard by enacting a "significant purpose" standard, and thereby also eliminated *Truong's* approach to weighing intelligence and law enforcement purposes to determine which is "primary." Nonetheless, as part of its May 2002 order, the FISC adopted a new Rule 11 that is entirely in keeping with *Truong* and is at odds with the USA Patriot Act. It provides: "All FISA applications shall include informative descriptions of any ongoing criminal investigations of FISA targets, as well as the substance of any consultations between the FBI and criminal prosecutors at the Department of Justice or a United States Attorney's Office." As the discussion below makes clear, Rule 11 cannot be reconciled with the USA Patriot Act. This Court should therefore direct the FISC to rescind the rule. See, *e.g.*, *Carlisle v. United States*, 517 U.S. 416, 426-427 (1996); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-255 (1988). (U)

2. The "significant purpose" test differs from the "primary purpose" test. A purpose is "significant" when it has or is "likely to have influence or effect," or when it is "important." *Meriam-Webster's Collegiate Dictionary* 1091 (10th ed. 1998). Thus, as long as the desire to obtain foreign intelligence information has "influence or effect" on the decision to use FISA, it satisfies the "significant purpose" test. In practice,

51

it may be easier to recognize a significant purpose by considering its opposite: A purpose is "significant" when it is not "insignificant" - i.e., when it is not trivial, incidental, or pretextual. Cf. *United States v. Brito*, 136 F.3d 397, 407 (5th Cir. 1998); *United States v. Roberts*, 913 F.2d 211, 220 (5th Cir. 1990). (U)

By requiring only a "significant" purpose to obtain foreign intelligence information, Congress allowed for other purposes, including a purpose to obtain evidence for use in a prosecution, to be the "primary" reason for conducting a search or surveillance. Cf. *United States v. Soto-Silva*, 129 F.3d 340, 347 (5th Cir. 1997) (finding that defendant who maintained house for "primary purpose" of taking care of her mother also maintained house for "significant purpose" of distributing marijuana). Members of Congress who voted for and against the USA Patriot Act discussed and understood that the "significant purpose" amendment would allow the government to use FISA primarily to collect evidence for use in a criminal prosecution. See 147 Cong. Rec. S11021 (Oct. 25, 2001) (statement of Senator Feingold); see also *id.* at S11025 (statement of Senator Wellstone); *id.* at S10593 (Oct. 11, 2001) (statements of Senators Leahy and Cantwell); see also *id.* at S10591 (Oct. 11, 2001) (statement of Senator Feinstein). (U)

52

The "significant purpose" standard also differs from the "primary purpose" standard because it eliminates the need for courts routinely to compare and weigh competing purposes for using FISA. Unlike "primary," the adjective "significant" is not an inherently relative or comparative term. A purpose may be "significant," in the sense of having "influence or effect," regardless of whether there are other purposes present. Thus, to determine whether a "significant" purpose for using FISA is to obtain foreign intelligence information, courts need not examine the extent of any purpose to obtain evidence for a prosecution. (U)

The legislative history of the USA Patriot Act confirms that Congress intended to eliminate the need to compare purposes. In explaining why the "significant purpose" amendment was enacted, the House Report underlying H.R. 2975 explained:

> Presently, a FISA certification request can only be used where foreign intelligence gathering is the sole or primary purpose of the investigation as interpreted by the courts. This requires law enforcement to evaluate constantly the relative weight of criminal and intelligence purposes when seeking to open a FISA investigation and thereafter as it proceeds.

H.R. Rep. 107-236(1), 107th Cong., 1st Sess., at 60 (Oct. 11, 2001). Thus, the significant purpose amendment was enacted to

53

relieve the government from the obligation to weigh competing intelligence and law enforcement purposes. (U)

Because the "significant purpose" test does not require comparison of intelligence and law enforcement purposes, it also does not require routine review of consultations between intelligence and law enforcement officials. As in *Truong*, such consultations may be relevant to establish that a law enforcement purpose is "primary," but they are very unlikely to establish that an explained and certified purpose to obtain foreign intelligence information is not "significant." The certification typically is made by the Director of the FBI, and is approved by the Attorney General. Whatever transpires in consultations between line attorneys or agents conducting particular investigations, these high-ranking officials determine the government's actual purpose for using FISA. (U)

That is particularly true where, as here, the consultations fall under the rubric of the USA Patriot Act's "coordination" amendment. Even if the coordination amendment is not read to reaffirm the theory that FISA may be used to obtain evidence for a prosecution designed to protect national security, as argued above, it nonetheless provides explicitly that law enforcement and intelligence officials "may consult" with one another to coordinate efforts to protect against espionage and terrorism,

54

among other matters. It also provides that such consultations "shall not preclude the certification" of a significant foreign intelligence purpose "or the entry of an order" authorizing a FISA search or surveillance. At a minimum, therefore, the coordination amendment reinforces the conclusion that where the FISA application demonstrates a significant foreign intelligence purpose, authorized consultations and coordination between intelligence and law enforcement officials cannot undermine that purpose. (U)

Indeed, where law enforcement officials seek evidence to prosecute a spy or terrorist, intelligence officials will always (or almost always) have at least a significant purpose to obtain the same information. As the FISC acknowledged in its opinion,

> most information intercepted or seized has a dual character as both foreign intelligence information and evidence of a crime (e.g., the identity of a spy's handler, his/her communication signals and deaddrop locations; the fact that a terrorist is taking flying lessons, or purchasing explosive chemicals) differentiated primarily by the persons using the information.

App. 6:3 at 10; see id. at 25 ("the information collected through FISA surveillances and searches is both foreign intelligence information and evidence of crime, depending on who is using it"); see also House Report 49, 62. Thus, even where consultations with law enforcement officials influence the

55

purpose or scope of a FISA search or surveillance, the information sought will still be "foreign intelligence information," and a significant purpose will still be to obtain such information for use in non-law enforcement efforts to protect the United States. (U)

To be sure, there may be cases in which review of consultations is appropriate even under the "significant purpose" standard. For example, where the FISA application on its face (or other information before the FISC) strongly suggests an intentionally-false certification of purpose, the safe harbor would not preclude judicial review of the consultations that may have occurred among the officials involved. Cf. *Duggan*, 743 F.2d at 77 & n.6 (citing *Franks* v. *Delaware*, 438 U.S. 154 (1978)). Absent such a strong suggestion, however, routine judicial review of consultations between intelligence and law enforcement officials, as required by the FISC's new Rule 11, is inappropriate. Cf. *United States* v. *Armstrong*, 517 U.S. 456, 465-466 (1996) (court may not order discovery in support of selective prosecution claim absent a threshold showing that the government has acted with both discriminatory effect and "a discriminatory purpose"). (U)

56

C.    **The FISC Erred in Denying in Part the FISA Application in This Case**.    (U)

Whether this Court accepts the argument that FISA may be used to obtain evidence for a prosecution designed to protect national security, as set forth in Part II.A, or the alternative argument that it may be used to obtain evidence for a prosecution if the government also has a significant non-law enforcement purpose, as set forth in Part II.B, the FISC clearly erred in limiting consultations between intelligence and law enforcement officials in this case. As the FISA application makes clear, the government is pursuing a traditional intelligence investigation and other intelligence efforts against the target in order to protect against international terrorism, and it is also pursuing a criminal investigation and other law enforcement efforts against him for the same protective purpose. The consultations envisioned in this case are all intended to coordinate these intelligence and law enforcement efforts to investigate and protect against international terrorism. Thus, by definition, they tend to reveal a purpose to protect national security, whether through traditional intelligence efforts or through law enforcement efforts. If this Court accepts the contention that information sought for a prosecution to protect national security is foreign intelligence information, then these consultations

57

would demonstrate that the FISA surveillance is designed to obtain such information. They would be affirmative evidence of a foreign intelligence purpose. (U)

Alternatively, if this Court rejects that argument, the consultations still could not undermine the significance of a non-law enforcement foreign intelligence purpose. The application explains and certifies that a significant purpose of the surveillance is to monitor the target's terrorist network in this case. There is no basis whatsoever for questioning that assertion on this record. The fact that the government also intends to prosecute in no way detracts from the significance of the non-law enforcement purpose. (U)

The government's efforts to investigate and protect against international terrorism in this case would be aided substantially by adherence to the March 2002 Procedures. At present, the government is conducting two parallel and largely overlapping investigations of the same person, but is compelled to use two separate law enforcement agencies in two separate Departments of the government. That is obviously an inefficient approach. Yet, as the FISA application explains, it is required to ensure that the government does not lose its ability to use FISA in the intelligence investigation. (U)

Although the use of two separate law enforcement agencies to investigate the same target is not a common method of insuring the availability of FISA — other methods include using separate squads of FBI agents with the FISC or another entity serving as the "wall" to regulate consultations between the squads — the difficulty it illustrates is by no means uncommon. Reports from the Executive and Legislative Branches of government alike have found that the "primary purpose" test as applied by the FISC has inhibited necessary coordination between intelligence and law enforcement officials. See IV AGRT Report, Chapter 20, at 721-734; General Accounting Office, *FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters is Limited* (July 2001) (GAO-01-780) (hereinafter GAO Report). As the GAO report summarized matters (GAO Report at page 3):

> Coordination between the FBI and the Criminal Division has been limited in those foreign counterintelligence cases where criminal activity is indicated and [FISA] surveillance and searches have been, or may be, employed. A key factor inhibiting this coordination is the concern over how the Foreign Intelligence Surveillance Court or another federal court might rule on the primary purpose of the surveillance or search in light of such coordination.

These findings, although disturbing, should not be surprising. No large organization can achieve a complex mission unless its related parts are allowed to work together. (U)

59

Two of the FISC's requirements have particularly stifled coordination in this case. First, there is the FISC's warning that prosecutors may not advise intelligence officials in a way that results in "direction or control" of the intelligence investigation. This has chilled the substance of consultations between intelligence and law enforcement officials. Second, there is the rule that prosecutors may not even meet or discuss the case with intelligence agents without first inviting OIPR to participate, and the related requirement that OIPR cannot allow the meeting to occur without its participation unless it is "unable" to do so. This "chaperone" requirement has made it difficult for any consultations to occur at all. The next paragraphs discuss these limitations as they apply in this case. (U)

1.    The Ban on "Direction or Control".    (U)

As we argued in the FISC in support of the March 2002 Procedures, the "direction or control" test has no textual support in FISA or any published decision interpreting the statute. App. 1:3 at 26-30. More importantly, as a practical matter, the FISC has often equated "direction or control" with the giving of any advice designed to "enhance," rather than merely to "preserve," the possibility of prosecution. See, e.g.,

60

App. 5 at 2-6; AGRT Report at 727-734. As we argued in the FISC

(App. 1:3 at 27):

> providing advice, including advice designed to enhance the
> possibility of a criminal prosecution, cannot be equated
> with "direction or control." For example, prosecutors may
> suggest an investigative strategy, propose the use of
> investigative techniques other than FISA (e.g., consensual
> monitoring), and advise on interview tactics, all without
> taking over the investigation as a whole or the FISA
> activity conducted within it.

In its May 2002 opinion, the FISC stated simply that it was "not

persuaded" by these arguments. App. 6:3 at 23. When we pointed

out the apparent inconsistency between the FISC's description of

the advice that prosecutors may give and its continued reliance

on the distinction between "preserving" and "enhancing" advice

(App. 5 at 2-6), the FISC reaffirmed its reliance on the

distinction (App. 6:1 at 1-2).   (U)

62

2.   The Chaperone Requirement.   (U)

65

In sum, the FISC has misinterpreted FISA, and has done so in a way that inhibits necessary coordination. The USA Patriot Act, which the FISC effectively ignored, expressly authorizes coordination between intelligence and law enforcement officials. The Act reflects Congress' recognition that the country and its people can no longer afford a fragmented, blinkered, compartmentalized response to international terrorism and espionage. The FISC has refused to give effect to the Act and the changes it made. This Court should not allow that refusal to stand. (U)

III. AS AMENDED BY THE USA PATRIOT ACT, FISA IS CONSTITUTIONAL
(U)

A.    FISA May Be Used Primarily, or Exclusively, to Obtain
Evidence for a Prosecution Designed to Protect the
United States Against Foreign Spies and Terrorists. (U)

1.    When Congress enacted FISA in 1978, it understood the constitutional significance of authorizing surveillance for the purpose of obtaining evidence to be used against foreign spies and terrorists. The Senate Intelligence Committee's Report on FISA gave the constitutional question "close scrutiny" because the Committee recognized that FISA "departs from ordinary criminal law enforcement procedures in several ways." Senate Intelligence Report at 11.[15] The Committee concluded, however, that those departures were "'reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens,' as required by the Supreme Court's leading decision in this field, *United States* v. *United*

---

[15] Similarly, Members of Congress understood that the USA Patriot Act could raise constitutional questions, and intended for the courts to resolve the meaning of the statute as written. See 147 Cong. Rec. S10547-01, at S10589 (Oct. 11, 2001) (statement of Senator Edwards); *id.* at S10593 (statement of Senator Cantwell). As Senator Leahy put the matter, the USA Patriot Act "adopts 'significant purpose,' and it will be up to the courts to determine how far law enforcement agencies may use FISA for criminal investigation and prosecution beyond the scope of the statutory definition of 'foreign intelligence information.'" *Id.* at S11004 (Oct. 25, 2001). (U)

67

*States District Court (Keith)*, 407 U.S. 297, 323 (1972)." *Id.* at 14. (U)

Today, as in 1978, the *Keith* case remains the leading decision of the Supreme Court in this area. In *Keith*, the Court addressed the "delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval." 407 U.S. at 299. The defendants in *Keith* were domestic terrorists, and the Court therefore did not address "the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." *Id.* at 308. Nor did *Keith* involve "any question or doubt as to the necessity of obtaining a warrant in the surveillance of crimes unrelated to the national security interest" under Title III. *Ibid.* Thus, *Keith* addressed the validity of warrantless electronic surveillance for the purpose of protecting against domestic threats to national security (e.g., Timothy McVeigh).[16] (U)

The Court in *Keith* held that a warrant is required for domestic security surveillance, but that more flexible standards

_____

[16] In *Keith* itself, the prosecution stemmed from "the dynamite bombing of an office of the Central Intelligence Agency in Ann Arbor, Michigan." 407 U.S. at 299. (U)

68

could apply to the issuance of such a warrant.  The Court explained the reasons for its conclusion (407 U.S. at 322):

> We recognize that domestic security surveillance may involve different policy and practical considerations from the surveillance of "ordinary crime."  The gathering of security intelligence is often long range and involves the interrelation of various sources and types of information.  The exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crime specified in Title III.  Often, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency.  Thus, the focus of domestic surveillance may be less precise than that directed against more conventional types of crime.

In light of these "potential distinctions between Title III criminal surveillances and those involving the domestic security," the Court suggested that "Congress may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III." Ibid.  (U)

*Keith's* emphasis on the need for flexibility applies with even greater force to surveillance (or searches) directed at *foreign* threats to national security.  As the Senate Intelligence Committee Report on FISA explained, quoting from *Keith*, "[f]ar more than in domestic security matters, foreign counterintelligence investigations are 'long range' and involve 'the interrelation of various sources and types of information.'"

69

Senate Intelligence Report at 16. Surveillance directed at foreign threats also requires deferential standards of judicial review because it involves an area in which the President, as "Commander-in-Chief and as the Nation's organ for foreign affairs," *Chicago & Southern Air Lines v. Waterman*, 333 U.S. 103, 109 (1948), exercises "very delicate, plenary and exclusive power," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), and in which judicial intervention "is rarely proper." *Haig v. Agee*, 453 U.S. 280, 293 (1981).[17] (U)

These concerns, which justify the use of FISA's different standards, do not recede merely because the government intends to protect national security through law enforcement rather than non-law enforcement efforts. On the contrary, *Keith* makes clear that it is the nature of the <u>threat</u>, not the nature of the government's response to the threat, that determines the constitutionality of national security surveillance. Whether the government intends to prosecute a foreign spy or recruit him as a double agent (or use the threat of the former to accomplish the latter), the investigation will often be long range, involve the

---

[17] Both before and after *Keith*, every federal court of appeals squarely to consider the question held that the government may conduct warrantless foreign intelligence surveillance. *See, e.g., Truong, supra.* The constitutionality of FISA has also been upheld by every court to consider the issue. *See, e.g., Duggan, supra.* (U)

interrelation of various sources and types of information, and
present unusual difficulties because of the special training and
support available to foreign enemies of this country.  As the
Senate Intelligence Committee's Report explained, quoting from a
1955 study on espionage:

> The problems of crime detection in combating
> espionage are not ordinary ones.  Espionage is a crime
> which succeeds only by secrecy.  Moreover, spies work
> not for themselves or private organized crime
> "syndicates," but as agents of national states.  Their
> activities are therefore likely to be carefully
> planned, highly organized, and carried on by techniques
> skillfully designed to prevent detection.

Senate Intelligence Report 13 (quoting Fund for the Republic,
*Digest of the Public Record of Communism in the United States* 29
(New York 1955)).  As the country learned on September 11, the
same is true of many international terrorist groups.   (U)

Nothing in *Keith* suggests that the availability of more
relaxed constitutional standards for a search or surveillance
depends on the absence of a law enforcement purpose.  On the
contrary, the contrast drawn by the Court between domestic
security surveillance and surveillance of "ordinary crime" or
"more conventional types of crime" shows that the Court
understood that domestic security surveillance focuses on crime,
albeit crime of an unusual sort.  See also 407 U.S. at 308, 310
(contrasting surveillance of "crimes unrelated to the national

71

security interest," which are governed by Title III, with surveillance "of those who plot unlawful acts against the Government"). The Court's statement that the "emphasis" of security surveillance is "often" on "prevention" is factually accurate, but also allows for the possibility of an emphasis on prosecution, at least where the prosecution will protect against a "future crisis or emergency." As the Senate Intelligence Report put it, FISA surveillance "need not stop once conclusive evidence of a crime is obtained, but instead may be extended longer where protective measures other than arrest and prosecution are more appropriate." Senate Intelligence Report at 11; see also House Report at 24 n.20, 89. (U)

2. The foregoing analysis is consistent with more recent Supreme Court decisions addressing searches conducted for "special needs." In City of Indianapolis v. Edmond, 531 U.S. 32 (2000), the Court struck down suspicionless highway checkpoints designed to apprehend drug dealers, holding that the government's "general crime control ends" in fighting drug trafficking are not a "special need" justifying lower Fourth Amendment standards. Id. at 40, 43. The Court made clear, however, that there are "special" law-enforcement needs that may justify more relaxed standards. (U)

72

For example, the Court in *Edmond* reviewed and approved prior decisions upholding special needs seizures conducted for the purposes of capturing illegal immigrants and stopping intoxicated motorists, despite the fact that "[s]ecuring the border and apprehending drunk drivers are, of course, law enforcement activities, and law enforcement officers employ arrests and criminal prosecutions in pursuit of these goals." 531 U.S. at 42 (citing *Michigan Dept. of State Police* v. *Sitz*, 496 U.S. 444 (1990), and *United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976)). Indeed, in response to criticism from the dissent, the Court made the point more explicitly:

> THE CHIEF JUSTICE's dissent erroneously characterizes our opinion as resting on the application of a "non-law-enforcement primary purpose test.". Our opinion nowhere describes the purposes of the *Sitz* and *Martinez-Fuerte* checkpoints as being "not primarily related to criminal law enforcement." Rather, our judgment turns on the fact that the primary purpose of the Indianapolis checkpoints is to advance <u>the general interest in crime control</u>.

*Id.* at 44 n.1 (emphasis added). Thus, while the "general interest in crime control" does not justify a departure from ordinary Fourth Amendment standards, a "special" interest concerning a particular type of crime may do so. As explained above, crimes such as espionage and international terrorism,

73

which represent foreign threats to national security, are "special" in the constitutional sense.[18]  (U)

B.   FISA May Be Used Primarily to Obtain Evidence for a Prosecution if the Government Also Has a Significant Non-Law Enforcement Foreign Intelligence Purpose.  (U)

In light of the foregoing argument, it is crystal clear that the Constitution permits FISA to be used where a "significant purpose" of the search or surveillance is to protect national security from foreign threats through non-law enforcement efforts.  The Department explained the constitutionality of the "significant purpose" test for FISA in a letter sent to Congress in support of the USA Patriot Act.  The letter is included as an attachment to the Memorandum of Law at App. 1:3, and is summarized below.  (U)

Relying on *Keith* and other decisions of the Supreme Court, the Department's letter maintains that "the primary purpose test is more demanding than that called for by the Fourth Amendment's reasonableness requirement."  Letter 13.  It explains that

---

[18] In *Ferguson v. City of Charleston*, 121 S. Ct. 1281 (2001), the Supreme Court struck down a non-consensual drug testing policy that applied to pregnant women seeking medical care at a State hospital.  It relied on the fact that the "primary purpose of the [drug testing] program[] was to use the threat of arrest and prosecution in order to force women into treatment" for cocaine abuse.  *Id.* at 1292.  But the Court did not disapprove *Edmond*, or retreat from the statement in *Edmond* that there may be "special law enforcement needs" that justify more relaxed Fourth Amendment standards.  (U)

74

"because the executive can more fully assess the requirements of national security than can the courts, and because the President has a constitutional duty to protect the national security, the courts should not deny him the authority to conduct intelligence searches even when the national security purpose is secondary to criminal prosecution." *Ibid.* Thus, although most courts have adopted the primary purpose test "to police the line between legitimate foreign intelligence searches and pure domestic law enforcement operations," the letter concludes that the test is too strict in part because "the concerns of government with respect to foreign policy will often overlap with those of law enforcement." Letter 11, 12. (U)

The letter closes by observing that "[e]ven at the time of [FISA's] passage in 1978," there was a "growing realization that 'intelligence and criminal law enforcement tend to merge in [the] area' of foreign counterintelligence and counterterrorism." Letter 14 (quoting Senate Intelligence Report at 11). The letter opines that that merger has continued to the point where "the fine distinction between foreign intelligence gathering and domestic law enforcement has broken down" (*ibid.*):

> Terrorists, supported by foreign powers or interests, had lived in the United States for substantial periods of time, received training within the country, and killed thousands of civilians by hijacking civilian airliners. The [September 11] attack, while

75

coordinated from abroad, was carried out from within the United States itself and violated numerous domestic criminal laws. Thus, the nature of the national security threat, while still involving foreign control and requiring foreign counterintelligence, also has a significant domestic component, which may involve domestic law enforcement.

Based on these developments, the letter concludes that "Fourth Amendment doctrine, based as it is ultimately upon reasonableness, will have to take into account that national security threats in the future cannot be so easily cordoned off from domestic criminal investigation." *Ibid.* (U)

Finally, there is one additional reason why the letter's conclusion is not in tension with the result in decisions such as *Truong*, which adopted the "primary purpose" test for <u>warrantless</u> surveillance conducted prior to the enactment of FISA. 629 F.2d at 914 n.4. Even if *Truong* was correctly decided, and the Constitution requires a "primary" intelligence purpose for unilateral Executive Branch surveillance, a "significant" intelligence purpose for FISA surveillance conducted with the prior approval of an Article III court would be reasonable and therefore constitutional under the Fourth Amendment. The reasonableness standard depends on all of the protections for privacy afforded as part of a search or surveillance. Assuming that restrictions on the government's purpose for conducting a

76

search do serve to protect privacy,[19] reductions in those purpose-related protections are reasonable given the added protections afforded by FISA.   (U)

---

[19] The assumption that restrictions on the purpose of FISA searches or surveillance protect privacy is open to question in light of the fact that intelligence and law enforcement officials seek the same information.  Cf. *Chagnon v. Bell*, 642 F.2d 1248, 1262 n.25 (D.C. Cir. 1980) ("official surveillance, whether its purpose be criminal investigation or intelligence gathering, risks infringement of constitutional interests").   (U)

77

SECRET

CONCLUSION (U)

It is respectfully submitted that the judgment of the FISC
in this case, including its adoption of the opinion and order of
May 17, 2002, and its new Rule 11, should be vacated, and the
case remanded with directions to the FISC to grant the FISA
application as submitted. (U)

JOHN ASHCROFT
Attorney General

LARRY D. THOMPSON
Deputy Attorney General

THEODORE B. OLSON
Solicitor General

DAVID S. KRIS
Associate Deputy Attorney General

JAMES A. BAKER
Counsel for Intelligence Policy

JONATHAN L. MARCUS
Attorney Advisor
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
(202) 514-2882

Dated:    August 21, 2002

SECRET
78

# Plaintiff's Exhibit F

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 07-0403 (TFH)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
and Cross-Motion for *In Camera* Review

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

## UNITED STATES
## FOREIGN INTELLIGENCE SURVEILLANCE COURT

IN RE ALL MATTERS SUBMITTED TO THE :

FOREIGN INTELLIGENCE SURVEILLANCE:          **Docket Numbers: Multiple**

**COURT**                                  :          02-429

## MEMORANDUM OPINION
## (AS CORRECTED AND AMENDED)

### I

The Department of Justice has moved this Court to vacate the minimization and "wall"

procedures in all cases now or ever before the Court, including this Court's adoption of the

Attorney General's July 1995 intelligence sharing procedures, which are not consistent with new

intelligence sharing procedures submitted for approval with this motion. The Court has

considered the Government's motion, the revised intelligence sharing procedures, and the

supporting memorandum of law as required by the Foreign Intelligence Surveillance Act

(hereafter the FISA or the Act) at 50 U.S.C. §1805(a)(4) and §1824(a)(4) (hereafter omitting

citations to 50 U.S.C.) to determine whether the proposed minimization procedures submitted

with the Government's motion comport with the definition of minimization procedures under

FILED
KAREN E. SUTTON, CLERK
MAY 1 7 2002
U.S. Foreign Intelligence
Surveillance Court

§1801(h) and §1821(4) of the Act. The Government's motion will be GRANTED, EXCEPT THAT THE PROCEDURES MUST BE MODIFIED IN PART.

The Court's analysis and findings are as follows:

JURISDICTION. Section 1803 of the FISA which established this Court provides that the Court "shall have jurisdiction to hear applications for and grant orders approving electronic surveillance anywhere within the United States under the procedures set forth in this Act." The comparable provision added when the FISA was amended to include physical searches appears in §1822(c) entitled "Jurisdiction of Foreign Intelligence Surveillance Court," and says

> The Foreign Intelligence Surveillance Court shall have jurisdiction to hear applications for and grant orders approving a physical search for the purpose of obtaining foreign intelligence information anywhere in the United States under the procedures set forth in this subchapter. (emphasis added)

Examination of the text of the statute leaves little doubt that the collection of foreign intelligence information is the raison d'etre for the FISA. Starting with its title, foreign intelligence information is the core of the Act:

- foreign intelligence information is defined in §1801(e);
- minimization procedures to protect the privacy rights of Americans, defined in §1801(h), and §1821 (4), must be reasonably designed and consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;
- section 1802(b) which authorizes the Government to file applications for electronic

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

surveillance with this Court, empowers the judges of this Court to grant orders

"approving electronic surveillance of a foreign power or agent of a foreign power

for the purpose of obtaining foreign intelligence information." (emphasis added);

- applications for electronic surveillance and physical search must contain a

certification from a senior Executive Branch official (normally the FBI Director in

U.S. person cases) that "the information sought is foreign intelligence

information," that "a significant purpose of the surveillance is to obtain foreign

intelligence information," that "such [foreign intelligence] information cannot

reasonably be obtained by normal investigative techniques," and "designates the

type of foreign intelligence information being sought." (§1804 (a)(7)) Comparable

requirements apply in applications for physical searches. (§1823 (a)(7)).

- Applications for physical searches must contain a statement of the facts and

circumstances relied on by the FBI affiant to justify his or her belief that the

premises or property to be searched contains foreign intelligence information and

a statement of the nature of the foreign intelligence information being sought.

(§1823 (a)(4)(B) and §1823 (a) (6).

Additionally, the two Presidential Executive orders empowering the Attorney General to

approve the filing of applications for electronic surveillances and physical searches, and granting

the FBI Director and other senior executives the power to make the certifications required under

the Act, specify "the purpose of obtaining foreign intelligence information." (emphasis added)

3

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

(E.O. 12139, May 23, 1979, and E.O. 12949, February 9, 1995). Clearly this Court's jurisdiction is limited to granting orders for electronic surveillances and physical searches for the collection of foreign intelligence information under the standards and procedures prescribed in the Act[1].

SCOPE. Our findings regarding minimization apply only to communications of or concerning U.S. persons as defined in §1801(i) of the act: U.S. citizens and permanent resident aliens whether or not they are the named targets in the electronic surveillances and physical searches. Conversely, this opinion does not apply to communications of foreign powers defined in §1801(a), nor to non-U.S. persons.

METHODOLOGY. The analysis and findings in this opinion are based on traditional statutory construction of the FISA's provisions. The question before the Court involves straight-forward application of the FISA as it pertains to minimization procedures, and raises no constitutional questions that need be decided. Discretion to evaluate proposed minimization procedures has been vested in the Court by the Congress expressly in the Act. (§1805(a)(4) and §1824(a)(4)). The Court's determinations are grounded in the plain language of the FISA, and where applicable, in its legislative history. The statute requires the Court to make the necessary findings, to issue orders "as requested or modified," for electronic surveillances and physical

---

[1] On April 17, 2002 the Government filed a supplemental memorandum of law in support of its March 7, 2002 motion. The supplemental memorandum misapprehends the issue that is before the Court. That issue is whether the FISA authorizes electronic surveillances and physical searches primarily for law enforcement purposes so long as the Government also has "a significant" foreign intelligence purpose. The Court is not persuaded by the supplemental memorandum, and its decision is not based on the issue of its jurisdiction but on the interpretation of minimization procedures.

4

searches, as well as to "assess compliance" with minimization procedures for information concerning U.S. persons. (§1805 and §1824 of the Act).

CONSIDERATION OF THE ISSUE.   Prior to May of 1979, when the FISA became operational, it was not uncommon for courts to defer to the expertise of the Executive Branch in matters of foreign intelligence collection.  Since May 1979, this Court has often recognized the expertise of the government in foreign intelligence collection and counterintelligence investigations of espionage and international terrorism, and accorded great weight to the government's interpretation of FISA's standards.  However, this Court, or on appeal the Foreign Intelligence Surveillance Court of Review having jurisdiction "to review the denial of any application," is the arbiter of the FISA's terms and requirements.  (§1803(b))  The present seven members of the Court have  reviewed and approved several thousand FISA applications, including many hundreds of surveillances and searches of U.S. persons.  The members bring their specialized knowledge to the issue at hand, mindful of the FISA's preeminent role in preserving our national security, not only in the present national emergency, but for the long term as a constitutional democracy under the rule of law.

## II

We turn now to the government's proposed minimization procedures which are to be followed in all electronic surveillances and physical searches past, present, and future.  In addition to the Standard Minimization Procedures for a U.S. Person Agent of a Foreign Power that are filed with the Court, which we continue to approve, the government has submitted new

5

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

supplementary minimization procedures adopted by the Attorney General and promulgated in the

form of a memorandum addressed to the Director of the FBI and other senior Justice Department

executives and dated March 6, 2002. (hereafter the Attorney General's memorandum or the 2002

procedures). The Attorney General's memorandum is divided into three sections entitled:

"I. INTRODUCTION AND STATEMENT OF GENERAL PRINCIPLES,"[2]

"II. INTELLIGENCE SHARING PROCEDURES CONCERNING THE CRIMINAL

DIVISION," AND "III. INTELLIGENCE SHARING PROCEDURES CONCERNING A

USAO."

The focus of this decision is sections II and III which set out supplementary procedures

affecting the acquisition, retention, and dissemination of information obtained through electronic

surveillances and physical searches of U.S. persons to be approved as part of the government's

applications and incorporated in the orders of this Court.

Our duty regarding approval of these minimization procedures is inscribed in the Act, as is

the standard we must follow in our decision making. Where Congress has enacted a statute like

the FISA, and defined its terms, we are bound to follow those definitions. We cannot add to ,

subtract from, or modify the words used by Congress, but must apply the FISA's provisions with

---

[2]The Attorney General's memorandum of March 6, 2002 asserts its interpretation of the recent amendments to the FISA to mean that the Act can now "be used primarily for a law enforcement purpose, so long as a significant foreign intelligence purpose remains." The government supports this argument with a lengthy memorandum of law which we have considered. However, the Court has decided this matter by applying the FISA's standards for minimization procedures defined in §1801(h) and §1821(4) of the Act, and does not reach the question of whether the FISA may be used primarily for law enforcement purposes . We leave this question for another day.

6

fidelity to their plain meaning and in conformity with the overall statutory scheme. The FISA is a statute of unique character, intended to authorize electronic surveillances and physical searches of foreign powers and their agents, including U.S. persons. "Further, as a statute addressed entirely to 'specialists,' it must, as Mr. Justice Frankfurter observed, 'be read by judges with the minds of \*\*\* specialists'."[3]

The Attorney General's new minimization procedures are designed to regulate the acquisition, retention, and dissemination of information involving the FISA (i.e., disseminating information, consulting, and providing advice) between FBI counterintelligence and counter-terrorism officials on the one hand, and FBI criminal investigators, trial attorneys in the Justice Department's Criminal Division, and U.S. Attorney's Offices on the other hand. These new minimization procedures supersede similar procedures issued by the Attorney General in July 1995 (hereafter the 1995 procedures) which were augmented in January 2000, and then in August 2001 by the current Deputy Attorney General. The Court has relied on the 1995 procedures, which have been followed by the FBI and the Justice Department in all electronic surveillances and physical searches of U.S. persons since their promulgation in July 1995. In November 2001, the court formally adopted the 1995 procedures, as augmented, as minimization procedures defined in §1801(h) and §1821(4), and has incorporated them in all applicable orders and warrants granted since then.

---

[3]Cheng Fan Kwok v. Immigration and Naturalization Service, 392 U.S. 206, 88 S.Ct. 1970 (1968).

7

The 2002 procedures have been submitted to the Court pursuant to §1804(a)(5) and

§1823(a)(5) to supplement the Standard Minimization Procedures for U.S. Person Agents of

Foreign Powers.  Both sets of procedures are to be applied in past and future electronic

surveillances and physical searches subject to the approval of this Court.  Pursuant to §1805(a)

and §1824(a) the Court has carefully considered the 2002 intelligence sharing procedures.  The

Court finds that these procedures 1) have been adopted by the Attorney General, 2) are designed

to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available

information concerning unconsenting United States persons, and 3) are, therefore, minimization

procedures as defined in §1801(h) and §1821(4).

The standard we apply in these findings is mandated in §1805(a)(4) and §1824(a)(4),

which state that "the proposed minimization procedures meet the definition of minimization

procedures under §101(h), [§1801(h) and §1821(4)] of the Act."   The operative language of

each section to be applied by the Court provides that minimization procedures must be reasonably

designed in light of their purpose and technique, and mean –

> specific procedures, which shall be adopted by the Attorney General, that are
> reasonably designed in light of the purpose and technique of the particular
> surveillance, [search] to minimize the acquisition and retention, and prohibit the
> dissemination, of nonpublicly available information concerning unconsenting
> United States persons consistent with the need of the United States to obtain,
> produce, and disseminate foreign intelligence information.
> §1801(h)(1) and §1821(4)(A).

Thus in approving minimization procedures the Court is to ensure that the intrusiveness of

foreign intelligence surveillances and searches on the privacy of U.S. persons is "consistent" with

8

FILED
KAREN E. SUTTON, CLERK
MAY 1 7 2002
U.S. Foreign Intelligence
Surveillance Court

the need of the United States to collect foreign intelligence information from foreign powers and their agents.

Our deliberations begin with an examination of the first part of §1801(h) and §1821(4) involving the acquisition, retention and dissemination of U.S. person information. Most of the rules and procedures for minimization are set forth in the Standard Minimization Procedures which will continue to be applied along with the 2002 procedures, and permit exceptionally thorough acquisition and collection through a broad array of contemporaneous electronic surveillance techniques. Thus, in many U.S. person electronic surveillances the FBI will be authorized to conduct, simultaneously, telephone, microphone, cell phone, e-mail and computer surveillance of the U.S. person target's home, workplace and vehicles. Similar breadth is accorded the FBI in physical searches of the target's residence, office, vehicles, computer, safe deposit box and U.S. mails where supported by probable cause. The breadth of acquisition is premised on the fact that clandestine intelligence activities and activities in preparation for international terrorism are undertaken with considerable direction and support from sophisticated intelligence services of nation states and well-financed groups engaged in international terrorism.

The intrusiveness of the FBI's electronic surveillances and sophisticated searches and seizures is sanctioned by the following practices and provisions in the FISA:

- a foreign intelligence standard of probable cause instead of the more traditional criminal standard of probable cause;

- having to show only that the place or facility to be surveilled or searched is being

9

used or about to be used without the need of showing that it is being used in
furtherance of the espionage or terrorist activities;

- surveillances and searches are conducted surreptitiously without notice to the
  target unless they are prosecuted;

- surveillances and now searches are authorized for 90 days, and may continue for
  as long as one year or more in certain cases;

- large amounts of information are collected by automatic recording to be
  minimized after the fact;

- most information intercepted or seized has a dual character as both foreign
  intelligence information and evidence of crime (e.g., the identity of a spy's
  handler, his/her communication signals and deaddrop locations; the fact that a
  terrorist is taking flying lessons, or purchasing explosive chemicals) differentiated
  primarily by the persons using the information;[4]

- when facing criminal prosecution, a target cannot obtain discovery of the FISA
  applications and affidavits supporting the Court's orders in order to challenge them
  because the FISA mandates in camera, ex parte review by the district court "if the

---

[4] Sections §1801(h)(3) and §1821(4)(C) require that the minimization procedures must
\allow retention and dissemination of evidence of a crime which has been, is being, or is about to
be committed. Such crimes are not related to the target's intelligence or terrorist activities, and
the information would have to be discarded otherwise because it is not necessary to produce
foreign intelligence information. Such retention and dissemination is not relevant to the issues
considered in this opinion. Foreign Intelligence Surveillance Act of 1978, H.R. 7308, 95th
Congress, 2nd Session, Report 95-1283, Pt.1, p.62.

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

Attorney General files an affidavit under oath that disclosure or an adversary

hearing would harm the national security."  §1806(f)) and §1825(g)

It is self evident  that the technical and surreptitious means available for acquisition of

information by electronic surveillances and physical searches, coupled with the scope and

duration of such intrusions and other practices under the FISA, give the government a powerful

engine for the collection of foreign intelligence information targeting U.S. persons.

Retention under the standard minimization procedures is also heavily weighted toward the

government's need for foreign intelligence information.  Virtually all information seized, whether

by electronic surveillance or physical search, is minimized hours, days, or weeks after collection.

The principal steps in the minimization process are the same for electronic surveillances and

physical searches:

- information is reduced to an intelligible form:  if recorded it is transcribed, if in a
  foreign language it is translated, if in electronic or computer storage it is accessed
  and printed, if in code it is decrypted and if on film or similar media it is developed
  and printed;

- once the information is understandable, a reviewing official, usually an FBI case
  agent, makes an informed judgment as to whether the information seized is or
  might be foreign intelligence information related to clandestine intelligence
  activities or international terrorism;

- if the information is determined to be, or might be, foreign intelligence, it is logged

11

into the FBI's records and filed in a variety of storage systems from which it can

be retrieved for analysis, for counterintelligence investigations or operations, or for

use at criminal trial;

- if found not to be foreign intelligence information, it must be minimized, which

    can be done in variety of ways depending upon the format of the information: if

    recorded the information would not be indexed, and thus become non-retrievable,

    if in hard copy from facsimile intercept or computer print-out it should be

    discarded, if on re-recordable media it could be erased, or if too bulky or too

    sensitive, it might be destroyed.

These same principles of minimization are applied to all information collected, whether by

electronic surveillance or physical search. The most critical step in retention is the analysis in

which an informed judgment is made as to whether or not the communications or other data

seized is foreign intelligence information. To guide FBI personnel in this determination the

Standard Minimization Procedures for U.S. Person Agent of a Foreign Power in Section 3.(a)(4)

Acquisition/Interception/Monitoring and Logging provide that "communications of or concerning

United States persons that could not be foreign intelligence information or are not evidence of a

crime . . . may not be logged or summarized." (emphasis added). Minimization is required only

if the information "could not be" foreign intelligence. Thus, it is obvious that the standard for

retention of FISA– acquired information is weighted heavily in favor of the government.

This brings us to the third and perhaps most complex part of minimization practice, the

12

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

dissemination and use of FISA – acquired information. Recognizing the broad sweep of

acquisition allowed under FISA's definition of electronic surveillance (and, subsequently,

physical searches), coupled with the low threshold for retention in the "could not be foreign

intelligence" standard, Congress has provided guidance for the Court in the FISA's legislative

history:

> On the other hand, given this degree of latitude the committee believes it is imperative that
> with respect to information concerning U.S. persons which is retained as necessary for
> counterintelligence or counter terrorism purposes, rigorous and strict controls be placed on
> the retrieval of such identifiable information and its dissemination or use for purposes
> other than counterintelligence or counter terrorism.  (emphasis added)[5]

> The judge has the discretionary power to modify the order sought, such as with
> regard to the period of authorization . . . or the minimization procedures to be
> followed. (emphasis added)[6]The Committee contemplates that the court would
> give these procedures most careful consideration. If it is not of the opinion that
> they will be effective, the procedures should be modified. (emphasis added)[7]

Between 1979 when the FISA became operational and 1995, the government relied on the

standard minimization procedures described herein to regulate all electronic surveillances. In

1995, following amendment of the FISA to permit physical searches, comparable minimization

procedures were adopted for foreign intelligence searches. On July 19, 1995, the Attorney

General  issued Procedures for Contacts Between the FBI and Criminal Division Concerning FI

and Foreign Counterintelligence Investigations, which in part A  regulated "Contacts During an FI

---

[5] Id. at 59.

[6] Id at 78.

[7] Id. at 80.

13

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

or FCI Investigation in Which FISA Surveillance or Searches are Being Conducted" between FBI

personnel and trial attorneys of the Department's Criminal Division. The Court was duly

informed of these procedures and has considered them an integral part of the minimization

process although they were not formally submitted to the Court under §1804 (a)(5) or

§1823(a)(5). In January, 2000 the Attorney General augmented the 1995 procedures to permit

more information sharing from FISA cases with the Criminal Division, and the current Deputy

Attorney General expanded the procedures in August 2001. Taken together, the 1995 procedures,

as augmented, permit substantial consultation and coordination as follows:

 a. reasonable indications of significant federal crimes in FISA cases are to be
    reported to the Criminal Division of the Department of Justice;

 b. The Criminal Division may then consult with the FBI and give guidance
    to the FBI aimed at preserving the option of criminal prosecution, but may not direct
    or control the FISA investigation toward law enforcement objectives;

 c. the Criminal Division may consult further with the appropriate U.S. Attorney's
    Office about such FISA cases;

 d. on a monthly basis senior officials of the FBI provide briefings to senior
    officials of the Justice Department, including OIPR and the Criminal Division,
    about intelligence cases, including those in which FISA is or may be used;

 e. all FBI 90-day interim reports and annual reports of counterintelligence
    investigations, including FISA cases, are being provided to the Criminal
    Division, and must now contain a section explicitly identifying any possible
    federal criminal violations;

 f. all requests for initiation or renewal of FISA authority must now contain
    a section devoted explicitly to identifying any possible federal criminal
    violations;

 g. the FBI is to provide monthly briefings directly to the Criminal Division

14

concerning all counterintelligence investigations in which there is a
reasonable indication of a significant federal crime;

h. prior to each briefing the Criminal Division is to identify (from FBI
reports) those intelligence investigations about which it requires additional
information and the FBI is to provide the information requested; and

i. since September 11, 2001, the requirement that OIPR be present at all meetings
and discussions between the FBI and Criminal Division involving certain FISA cases
has been suspended; instead, OIPR reviews a daily briefing book to inform itself
and this Court about those discussions.

The Court came to rely on these supplementary procedures, and approved their broad

information sharing and coordination with the Criminal Division in thousands of applications. In

addition, because of the FISA's requirement (since amended) that the FBI Director certify that

"the purpose" of each surveillance and search was to collect foreign intelligence information, the

Court was routinely apprised of consultations and discussions between the FBI, the Criminal

Division, and U.S. Attorney's offices in cases where there were overlapping intelligence and

criminal investigations or interests. This process increased dramatically in numerous FISA

applications concerning the September 11th attack on the World Trade Center and the Pentagon.

In order to preserve both the appearance and the fact that FISA surveillances and searches

were not being used sub rosa for criminal investigations, the Court routinely approved the use of

information screening "walls" proposed by the government in its applications. Under the normal

"wall" procedures, where there were separate intelligence and criminal investigations, or a single

counter-espionage investigation with overlapping intelligence and criminal interests, FBI criminal

investigators and Department prosecutors were not allowed to review all of the raw FISA

15

FILED
KAREN E. SUTTON, CLERK
MAY 17 2002
U.S. Foreign Intelligence
Surveillance Court

intercepts or seized materials lest they become defacto partners in the FISA surveillances and searches. Instead, a screening mechanism, or person, usually the chief legal counsel in an FBI field office, or an assistant U.S. attorney not involved in the overlapping criminal investigation, would review all of the raw intercepts and seized materials and pass on only that information which might be relevant evidence. In unusual cases such as where attorney-client intercepts occurred, Justice Department lawyers in OIPR acted as the "wall." In significant cases, involving major complex investigations such as the bombings of the U.S. Embassies in Africa, and the millennium investigations, where criminal investigations of FISA targets were being conducted concurrently, and prosecution was likely, this Court became the "wall" so that FISA information could not be disseminated to criminal prosecutors without the Court's approval. In some cases where this Court was the "wall," the procedures seemed to have functioned as provided in the Court's orders; however, in an alarming number of instances, there have been troubling results.

Beginning in March 2000, the government notified the Court that there had been disseminations of FISA information to criminal squads in the FBI's New York field office, and to the U.S. Attorney's Office for the Southern District of New York, without the required authorization of the Court as the "wall" in four or five FISA cases. Subsequently, the government filed a notice with the Court about it's unauthorized disseminations.

In September 2000, the government came forward to confess error in some 75 FISA applications related to major terrorist attacks directed against the United States. The errors related to misstatements and omissions of material facts, including:

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

     a. an erroneous statement in the FBI Director's FISA certification that the target of the FISA was not under criminal investigation;

     b. erroneous statements in the FISA affidavits of FBI agents concerning the separation of the overlapping intelligence and criminal investigations, and the unauthorized sharing of FISA information with FBI criminal investigators and assistant U.S. attorneys;

     c. omissions of material facts from FBI FISA affidavits relating to a prior relationship between the FBI and a FISA target, and the interview of a FISA target by an assistant U.S. attorney.

     In November of 2000, the Court held a special meeting to consider the troubling number of inaccurate FBI affidavits in so many FISA applications. After receiving a more detailed explanation from the Department of Justice about what went wrong, <u>but</u> <u>not</u> <u>why</u> , the Court decided not to accept inaccurate affidavits from FBI agents whether or not intentionally false. One FBI agent was barred from appearing before the Court as a FISA affiant. The Court decided to await the results of the investigation by the Justice Department's Office of Professional Responsibility before taking further action.

     In March of 2001, the government reported similar misstatements in another series of FISA applications in which there was supposedly a "wall" between separate intelligence and criminal squads in FBI field offices to screen FISA intercepts, when in fact all of the FBI agents were on the same squad and all of the screening was done by the one supervisor overseeing both investigations.

     To come to grips with this problem, in April of 2001, the FBI promulgated detailed procedures governing the submission of requests to conduct FISA surveillances and searches, and to review draft affidavits in FISA applications, to ensure their accuracy. These procedures are

currently in use and require careful review of draft affidavits by the FBI agents in the field offices who are conducting the FISA case investigations, as well as the supervising agents at FBI headquarters who appear before the Court and swear to the affidavits.

In virtually every instance, the government's misstatements and omissions in FISA applications and violations of the Court's orders involved information sharing and unauthorized disseminations to criminal investigators and prosecutors. These incidents have been under investigation by the FBI's and the Justice Department's Offices of Professional Responsibility for more than one year to determine how the violations occurred in the field offices, and how the misinformation found its way into the FISA applications and remained uncorrected for more than one year despite procedures to verify the accuracy of FISA pleadings. As of this date, no report has been published, and how these misrepresentations occurred remains unexplained to the Court.

As a consequence of the violations of its orders, the Court has taken some supervisory actions to assess compliance with the "wall" procedures. First, until September 15, 2001 it required all Justice Department personnel who received certain FISA information to certify that they understood that under "wall" procedures FISA information was not to be shared with criminal prosecutors without the Court's approval. Since then, the Court has authorized criminal division trial attorneys to review all FBI international terrorism case files, including FISA case files and required reports from FBI personnel and Criminal Division attorneys describing their discussions of the FISA cases. The government's motion that the Court rescind all "wall" procedures in all international terrorism surveillances and searches now pending before the Court,

18

or that has been before the Court at any time in the past, was deferred by the Court until now, at the suggestion of the government, pending resolution of this matter.

Given this history in FISA information sharing, the Court now turns to the revised 2002 minimization procedures. We recite this history to make clear that the Court has long approved, under controlled circumstances, the sharing of FISA information with criminal prosecutors, as well as consultations between intelligence and criminal investigations where FISA surveillances and searches are being conducted. However, the proposed 2002 minimization procedures eliminate the bright line in the 1995 procedures prohibiting direction and control by prosecutors on which the Court has relied to moderate the broad acquisition retention, and dissemination of FISA information in overlapping intelligence and criminal investigations. Paragraph A.6. of the1995 procedures provided in part:

> Additionally, the FBI and the Criminal Division should ensure that advice intended to preserve the option of a criminal prosecution does not inadvertently result in either the fact or the appearance of the Criminal Division's directing or controlling the FI or FCI investigation toward law enforcement objectives. (emphasis added)

As we conclude the first part of our statutory task, we have determined that the extensive acquisition of information concerning U.S. persons through secretive surveillances and searches authorized under FISA, coupled with broad powers of retention and information sharing with criminal prosecutors, weigh heavily on one side of the scale which we must balance to ensure that the proposed minimization procedures are "consistent" with the need of the United States to obtain, produce, and disseminate foreign intelligence information. (§1805(a)(4) and §1824(a)(4))

19

### III

The 2002 minimization rules set out in sections II and III, "Intelligence Sharing Procedures Concerning the Criminal Division" and "Intelligence Sharing Procedures Concerning a USAO," continue the existing practice approved by this Court of in-depth dissemination of FISA information to Criminal Division trial attorneys and U.S. Attorney's Offices (hereafter criminal prosecutors). These new procedures apply in two kinds of counterintelligence cases in which FISA is the only effective tool available to both counterintelligence and criminal investigators:

1) those cases in which separate intelligence and criminal investigations of the same U.S. person FISA target are conducted by different FBI agents (overlapping investigations), usually involving international terrorism, and in which separation can easily be maintained, and

2) those cases in which one investigation having a U.S. person FISA target is conducted by a team of FBI agents which has both intelligence and criminal interests (overlapping interests) usually involving espionage and similar crimes in which separation is impractical.

In both kinds of counterintelligence investigations where FISA is being used, the proposed 2002 minimization procedures authorize extensive consultations between the FBI and criminal prosecutors "to coordinate efforts to investigate or protect against" actual or potential attack, sabotage, international terrorism and clandestine intelligence activities by foreign powers and their agents as now expressly provided in §1806(k)(1) and §1825(k)(1). These consultations propose to include:

20

II. A. "Disseminating Information," which gives criminal prosecutors access to "all information developed" in FBI counterintelligence investigations, including FISA acquired information, as well as annual and other reports, and presumably ad hoc reporting of significant events (e.g., incriminating FISA intercepts or seizures) to criminal prosecutors.

II. B. "Providing Advice," where criminal prosecutors are authorized to consult extensively and provide advice and recommendations to intelligence officials about "all issues necessary to the ability of the United States to investigate or protect against foreign attack, sabotage, terrorism, and clandestine intelligence activities." Recommendations may include advice about criminal investigation and prosecution as well as the strategy and goals for investigations, the law enforcement and intelligence methods to be used in investigations, and the interaction between intelligence and law enforcement components of investigations.

Last, but most relevant to this Court's finding, criminal prosecutors are empowered to advise FBI intelligence officials concerning "the initiation, operation, continuation, or expansion of FISA searches or surveillance." (emphasis added) This provision is designed to use this Court's orders to enhance criminal investigation and prosecution, consistent with the government's interpretation of the recent amendments that FISA may now be "used primarily for a law enforcement purpose."

In section III," Intelligence Sharing Procedures Concerning a USAO," U.S. attorneys are empowered to "engage in consultations to the same extent as the Criminal Division under parts II. A and II. B of these procedures," in cases involving international terrorism.

21

A fair reading of these provisions leaves only one conclusion -- under sections II and III of
the 2002 minimization procedures, criminal prosecutors are to have a significant role <u>directing</u>
FISA surveillances and searches from start to finish in counterintelligence cases having
overlapping intelligence and criminal investigations or interests, guiding them to criminal
prosecution. The government makes no secret of this policy, asserting its interpretation of the
Act's new amendments which "allows FISA to be used <u>primarily</u> for a law enforcement
purpose."

Given our experience in FISA surveillances and searches, we find that these provisions in
sections II.B and III, particularly those which authorize criminal prosecutors to advise FBI
intelligence officials on the initiation, operation, continuation or expansion of FISA's intrusive
seizures, are designed to enhance the acquisition, retention and dissemination of <u>evidence for law</u>
<u>enforcement purposes, instead</u> of being consistent with the need of the United States to "obtain,
produce, and disseminate <u>foreign intelligence information</u>" (emphasis added) as mandated in
§1801(h) and §1821(4). The 2002 procedures appear to be designed to amend the law and
substitute the FISA for Title III electronic surveillances and Rule 41 searches. This may be
because the government is unable to meet the substantive requirements of these law enforcement
tools, or because their administrative burdens are too onerous. In either case, the FISA's
definition of minimization procedures has not changed, and these procedures cannot be used by
the government to amend the Act in ways Congress has not. We also find the provisions in
section II.B and III. wanting because the prohibition in the 1995 procedures of criminal

KAREN E. SUTTON, CLERK
MAY 1 7 2002
U.S. Foreign Intelligence
Surveillance Court

prosecutors "directing or controlling" FISA cases has been revoked by the proposed 2002 procedures. The government's memorandum of law expends considerable effort justifying deletion of that bright line, but the Court is not persuaded.

The Court has long accepted and approved minimization procedures authorizing in-depth information sharing and coordination with criminal prosecutors as described in detail above. In the Court's view, the plain meaning of consultations and coordination now specifically authorized in the Act is based on the need to adjust or bring into alignment two different but complementary interests – intelligence gathering and law enforcement. . In FISA cases this presupposes separate intelligence and criminal investigations, or a single investigation with intertwined interests, which need to be brought into harmony to avoid dysfunction and frustration of either interest. If criminal prosecutors direct both the intelligence and criminal investigations, or a single investigation having combined interests, coordination becomes subordination of both investigations or interests to law enforcement objectives. The proposed 2002 minimization procedures require the Court to balance the government's use of FISA surveillances and searches against the government's need to obtain and use evidence for criminal prosecution, instead of determining the "need of the United States to obtain, produce, and disseminate foreign intelligence information" as mandated by §1801(h) and §1821(4).

Advising FBI intelligence officials on the initiation, operation, continuation or expansion of FISA surveillances and searches of U.S. persons means that criminal prosecutors will tell the FBI when to use FISA (perhaps when they lack probable cause for a Title III electronic

surveillance), what techniques to use, what information to look for, what information to keep as

evidence and when use of FISA can cease because there is enough evidence to arrest and

prosecute. The 2002 minimization procedures give the Department's criminal prosecutors every

legal advantage conceived by Congress to be used by U.S. intelligence agencies to collect foreign

intelligence information, including:

- a foreign intelligence standard instead of a criminal standard of probable cause;

- use of the most advanced and highly intrusive techniques for intelligence gathering; and

- surveillances and searches for extensive periods of time;

based on a standard that the U.S. person is only using or about to use the places to be surveilled

and searched, without any notice to the target unless arrested and prosecuted, and, if prosecuted,

no adversarial discovery of the FISA applications and warrants. All of this may be done by use of

procedures intended to minimize collection of U.S. person information, consistent with the need

of the United States to obtain and produce foreign intelligence information. If direction of

counterintelligence cases involving the use of highly intrusive FISA surveillances and searches by

criminal prosecutors is necessary to obtain and produce foreign intelligence information, it is yet

to be explained to the Court.

THEREFORE, because

- the procedures implemented by the Attorney General govern the minimization of electronic surveillances and searches of U.S. persons;

- such intelligence and criminal investigations both target the same U.S. person;

24

- the information collected through FISA surveillances and searches is both foreign intelligence information and evidence of crime, depending upon who is using it;

- there are pervasive and invasive techniques for electronic surveillances and physical searches authorized under the FISA;

- surveillances and searches may be authorized for extensive periods of time;

- notice of surveillances and searches is not given to the targets unless they are prosecuted;

- the provisions in FISA constrain discovery and adversary hearings and require ex parte, in camera review of FISA surveillances and searches at criminal trial;

- the FISA, as opposed to Title III and Rule 41 searches, is the only tool readily available in these overlapping intelligence and criminal investigation;

- there are extensive provisions in the minimization procedures for dissemination of FISA intercepts and seizures to criminal prosecutors and for consultation and coordination with intelligence officials using the FISA;

- criminal prosecutors would, under the proposed procedures, no longer be prohibited from "directing or controlling" counterintelligence investigations involving use of the FISA toward law enforcement objectives; and

- criminal prosecutors would, under the proposed procedures, be empowered to direct the use of FISA surveillances and searches toward law enforcement objectives by advising FBI intelligence officials on the initiation, operation, continuation and expansion of FISA authority from this Court,

The Court FINDS that parts of section II.B of the minimization procedures submitted with the Government's motion are NOT reasonably designed, in light of their purpose and technique, "consistent with the need of the United States to obtain, produce, or disseminate foreign intelligence information" as defined in §1801(h) and §1821(4) of the Act.

25

THEREFORE, pursuant to this Court's authority under §1805(a) and §1824(a) to issue ex parte orders for electronic surveillances and physical searches "as requested or as modified," the Court herewith grants the Governments motion BUT MODIFIES the pertinent provisions of sections II. B. of the proposed minimization procedures as follows:

The second and third paragraphs of section II.B shall be deleted, and the following paragraphs substituted in place thereof:

"The FBI, the Criminal Division, and OIPR may consult with each other to coordinate their efforts to investigate or protect against foreign attack or other grave hostile acts, sabotage, international terrorism or clandestine intelligence activities by foreign powers or their agents. Such consultations and coordination may address, among other things, exchanging information already acquired, identifying categories of information needed and being sought, preventing either investigation or interest from obstructing or hindering the other, compromise of either investigation, and long term objectives and overall strategy of both investigations in order to ensure that the overlapping intelligence and criminal interests of the United States are both achieved. Such consultations and coordination may be conducted directly between the components, however, OIPR shall be invited to all such consultations, and if they are unable to attend, OIPR shall be apprised of the substance of the consultations forthwith in writing so that the Court may be notified at the earliest opportunity."

"Notwithstanding the foregoing, law enforcement officials shall not make recommendations to intelligence officials concerning the initiation, operation, continuation or

26

expansion of FISA searches or surveillances. Additionally, the FBI and the Criminal Division

shall ensure that law enforcement officials do not direct or control the use of the FISA procedures

to enhance criminal prosecution, and that advice intended to preserve the option of a criminal

prosecution does not inadvertently result in the Criminal Division's directing or controlling the

investigation using FISA searches and surveillances toward law enforcement objectives."

These modifications are intended to bring the minimization procedures into accord with

the language used in the FISA, and reinstate the bright line used in the 1995 procedures, on

which the Court has relied. The purpose of minimization procedures as defined in the Act, is not

to amend the statute, but to protect the privacy of Americans in these highly intrusive

surveillances and searches, "consistent with the need of the United States to obtain, produce, and

disseminate foreign intelligence information."

A separate order shall issue this date.

All seven judges of the Court concur in the Corrected and Amended Memorandum

Opinion.

DATE: **5-17-02**
**6:40p.m.**

ROYCE C. LAMBERTH
Presiding Judge

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

UNITED STATES
FOREIGN INTELLIGENCE SURVEILLANCE COURT

---

IN RE ALL MATTERS SUBMITTED TO THE :

FOREIGN INTELLIGENCE SURVEILLANCE :    Docket Numbers: Multiple

COURT                               :    **02—429**

---

## ORDER
## (AS AMENDED)

Motion having been made by the United States of America, by James A. Baker, Counsel

for Intelligence Policy, United States Department of Justice, for the Court to approve proposed

minimization procedures entitled <u>Intelligence Sharing Procedures for Foreign Intelligence and</u>

<u>Foreign Counterintelligence Investigations Conducted by the FBI</u>, to be used in electronic

surveillances and physical searches authorized by this Court, as well as a supporting

memorandum of law, and a supplemental memorandum,  which filing was approved by the

Attorney General of the United States, and full consideration having been given to the matters set

forth therein, the Court finds:

1.  The President has authorized the Attorney General of the United States to approve

applications for electronic surveillance and physical search for foreign intelligence purposes, 50

U.S.C. §1805(a)(l) and §1824(a)(1);

2. The motion has been made by a Federal officer and approved by the Attorney General,

50 U.S.C. §1805(a)(2) and §1824(a) (2);

3. The proposed minimization procedures entitled Intelligence Sharing Procedures for

Foreign Intelligence and Foreign Counterintelligence Investigations Conducted by the FBI as

modified herein, meet the definition of minimization procedures under §1801(h) and §1821(4) of

the Act, 50 U.S.C. §1805(a)(4) and §1824 (a) (4).

WHEREFORE, IT IS ORDERED,

A. The aforementioned minimization procedures are herewith modified, pursuant to this

Court's authority under 50 U.S.C. §1805(a) and (c) and 50 U.S.C.§1824(a) and (c), to delete the

second, third, and fourth paragraphs from Section I of the proposed minimization procedures. A

revised statement of "General Principles" that is not inconsistent with the Court's opinion may be

included in the Attorney General's memorandum.

B. The aforementioned minimization procedures are further modified, pursuant to this

Court's authority under 50 U.S.C. §1805(a) and (c) and 50 U.S. C. § 1824(a) and (c),

to delete the second and third paragraphs from Section II. B and substitute the following

paragraphs in place thereof:

"The FBI, the Criminal Division, and OIPR may consult with each other to coordinate

their efforts to investigate or protect against foreign attack or other grave hostile acts, sabotage,

international terrorism, or clandestine intelligence activities by foreign powers or their agents.

Such consultations and coordination may address, among other things, exchanging information

2

already acquired; identifying categories of information needed and being sought; preventing either investigation or interest from obstructing or hindering the other; compromise of either investigation; and long term objectives and overall strategy of both investigations in order to ensure that the overlapping intelligence and criminal interests of the United States are both achieved. Such consultations and coordination may be conducted directly between the components; however, OIPR shall be invited to all such consultations, and if they are unable to attend, OIPR shall be apprized of the substance of the meetings forthwith in writing so that the Court may be notified at the earliest opportunity."

"Notwithstanding the foregoing, law enforcement officials shall not make recommendations to intelligence officials concerning the initiation, operation, continuation or expansion of FISA searches or surveillances. Additionally, the FBI and the Criminal Division shall ensure that law enforcement officials do not direct or control the use of the FISA procedures to enhance criminal prosecution, and that advice intended to preserve the option of a criminal prosecution does not inadvertently result in the Criminal Division's directing or controlling the investigation using FISA searches and surveillances toward law enforcement objectives."

C. Use of the aforementioned minimization procedures as modified, in all future electronic surveillances and physical searches shall be subject to the approval of the Court in each electronic surveillance and physical search where their use is proposed by the Government pursuant to 50 U.S.C. §1804(a)(5)) and §1823 (a)(5).

3

WHEREFORE, IT IS FURTHER ORDERED, pursuant to the authority conferred on this Court by the Foreign Intelligence Surveillance Act, that the motion of the United States to use the aforementioned minimization procedures as modified, in all electronic surveillances and physical searches already approved by the Court, as described in the Government's motion, is GRANTED AS MODIFIED herein.

A separate Memorandum Opinion has been filed this date. The motion of the United States has been considered by all of the judges of this Court, all of whom concur in the Memorandum Opinion and in the Order. The Court has also adopted a new administrative rule to monitor compliance with this Order as follows:

Rule 11. Criminal Investigations in FISA Cases

All FISA applications shall include informative descriptions of any ongoing criminal investigations of FISA targets, as well as the substance of any consultations between the FBI and criminal prosecutors at the Department of Justice or a United States Attorney's Office.

All seven judges of the Court concur in this Amended Order.

ROYCE C. LAMBERTH
Presiding Judge,
United States Foreign Intelligence
Surveillance Court

Signed  _5-17-02_  _6:40 P.M._ E.S.T.
         Date           Time

4

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

## UNITED STATES
## FOREIGN INTELLIGENCE SURVEILLANCE COURT

IN RE ALL MATTERS SUBMITTED TO THE:

FOREIGN INTELLIGENCE SURVEILLANCE:        **Docket Numbers: Multiple**

COURT

### ORDER

Motion having been made by the United States of America, by James A. Baker, Counsel for Intelligence Policy, United States Department of Justice, for the Court to clarify its order of April 22, 2002 in the above captioned matter, and full consideration having been given to the matters set forth therein, the motion to clarify is granted and the Court's order and memorandum opinion of April 22, 2002 in this matter are amended as follows:

1. The language of the Court's order and memorandum opinion of April 22, 2002 are amended to include the following substitute sentence in the second paragraph of the modified minimization procedures to read: "Additionally, the FBI and the Criminal Division shall ensure that law enforcement officials do not direct or control the use of the FISA procedures to enhance criminal prosecution, and that advice intended to preserve the option of a criminal prosecution does not inadvertently result in the Criminal Division's directing or controlling the investigation using FISA searches and surveillances toward law enforcement objectives."

2. The government also asks that the Court clarify whether its use of the term "law

enforcement officials" in the substitute minimization language adopted by the Court "applies to

FBI agents as well as to prosecutors." The Court's own opinion states as follows:

> The Attorney General's new minimization procedures are designed to regulate the
> acquisition, retention and dissemination of information involving the FISA (i.e.,
> disseminating information, consulting, and providing advice) between FBI
> counterintelligence and counter-terrorism officials on the one hand, and FBI
> criminal investigators, trial attorneys in the Justice Department's Criminal
> Division, and U.S. Attorney's Offices on the other hand. (emphasis added)
> (Opinion, 6-7).

The Court uses, and intended to use, the term "law enforcement officials"in conjunction with the

source and context from which it originated , i.e. the recent amendment to the FISA in which

Congress expressly authorized consultations and coordination between federal officers who

conduct electronic surveillances and physical searches to acquire foreign intelligence information

and "Federal law enforcement officers." (50 U.S.C. §1806 (k) and §1825 (k). The new

minimization procedures apply to the minimization process in FISA electronic surveillances and

physical searches, and to those involved in the process – including both FBI agents and criminal

prosecutors.

Contrary to the assumption made in the government's motion, all of the judges of

this Court concurred in both the opinion and order of April 22, 2002.

Date: 5-17-02   6.46 P.M.

ROYCE C. LAMBERTH
Presiding Judge
United States Foreign Intelligence
Surveillance Court

2

CONCURRING IN THE ORDER: 5/17/02

*William H. Stafford, Jr.*

Honorable William H. Stafford, Jr.
Judge, United States Foreign
Intelligence Surveillance Court

Honorable Stanley S. Brotman
Judge, United States Foreign
Intelligence Surveillance Court

Honorable Harold A. Baker
Judge, United States Foreign
Intelligence Surveillance Court

Honorable Michael J. Davis
Judge, United States Foreign
Intelligence Surveillance Court

Honorable Claude M. Hilton
Judge, United States Foreign
Intelligence Surveillance Court

Honorable Nathaniel M. Gorton
Judge, United States Foreign
Intelligence Surveillance Court

FILED
KAREN E. SUTTON, CLERK

MAY 1 7 2002

U.S. Foreign Intelligence
Surveillance Court

3